**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | ) | |
| ROBERT A. GREEN and HOLLY A. | ) | |
| TAYLOR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:11-CV-00406-10TBS |
| | ) | |
| DR. ASAD U. QAMAR and the | ) | |
| INSTITUTE OF CARDIOVASCULAR | ) | |
| EXCELLENCE, PLLC, | ) | |
| | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

**CONSOLIDATED COMPLAINT IN INTERVENTION**
**AND DEMAND FOR JURY TRIAL OF THE UNITED STATES OF AMERICA**

**I.     INTRODUCTION**

1.     The United States brings this action under the False Claims Act, 31 U.S.C. §§ 3729–33, as amended (the "FCA"), and the common law theories of payment by mistake and unjust enrichment, against Dr. Asad U. Qamar and the Institute of Cardiovascular Excellence, PLLC ("Defendants"), alleging that Defendants knowingly made false statements and knowingly submitted or caused the submission of false claims to Medicare for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures.

2.     Between at least January 1, 2009 and December 31, 2013 (the "relevant period"), Defendants engaged in a pattern and practice of performing and billing Medicare for an excessive number of invasive procedures to treat peripheral artery

disease, including angiography, angioplasty, atherectomy, and stent implantation. Instead of ordering these higher risk procedures after exhausting non-invasive alternative therapies, Defendants regularly subjected patients to peripheral artery interventions when they were not medically necessary and/or without properly evaluating and documenting medical necessity.

3.      Defendants knew, deliberately ignored, or recklessly disregarded the fact that many of the cardiovascular procedures for which they submitted claims to Medicare were not indicated by patients' medical histories and records, or the severity of patients' symptoms, as required by Medicare payment rules. Nevertheless, with each claim, Defendants falsely certified that the procedures were medically necessary.

4.      To facilitate this fraudulent pattern and practice, and in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), Defendants routinely and indiscriminately waived the 20 percent Medicare beneficiary copayment for cardiovascular procedures, but billed Medicare for 100 percent of the procedures' cost— knowingly and willfully misrepresenting the actual cost of the procedures and providing financial kickbacks to induce beneficiaries to continue undergoing excessive testing and treatment without questioning the medical necessity of the procedures.

5.      Defendants' fraudulent conduct made Dr. Qamar the highest paid Medicare cardiologist in the country for at least two years. *See* Whoriskey, Keating, & Sun, *Data Uncovers Nation's Top Medicare Billers*, Wash. Post, Apr. 9, 2014. Between 2012 and 2013, Dr. Qamar received over $35 million from Medicare—over four times more than any other cardiologist. The next highest paid Medicare cardiologist received

$7.7 million from the program in the same period.

6.      By presenting false claims to Medicare for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures—and by routinely and indiscriminately waiving Medicare copayments—Defendants obtained tens of millions of dollars to which they were not entitled.  Accordingly, Defendants are liable to the United States under the FCA and the common law.

## II.      JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345, and 1367 because this is a civil action by the United States that arises under the FCA, 31 U.S.C. §§ 3729–33, and federal common law, and all claims in this action form part of the same case or controversy.

8.      This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), as Defendants reside and transact business within this Court's jurisdiction, and Defendants' actions in violation of the FCA and the common law occurred within this district.

9.      Venue is proper pursuant to 28 U.S.C. §§ 1391(b)–(c) and 31 U.S.C. § 3732(a) because Defendants reside and transact business within this district.

## III.     THE PARTIES

10.     Plaintiff in this action is the United States of America, suing on behalf of the United States Department of Health and Human Services ("HHS"), and its operating division, the Centers for Medicare and Medicaid Services ("CMS").

11.     Relator, Dr. Robert A. Green, is a citizen and resident of Florida.  Dr.

Green filed an action, styled *United States ex rel. Doe v. Institute of Cardiovascular Excellence, PLLC, et al.*, Case No. 5:11-CV-00406-OC-10TBS (M.D. Fla.), in July 2011 under the *qui tam* provisions of the FCA.

12.     Relator Holly A. Taylor is a citizen and resident of Florida.  Relator Taylor filed a related action, styled *United States, et al. ex rel. Taylor v. Dr. Asad Qamar, et al.*, Case No. 8:14-CV-01454-T-35EAJ (M.D. Fla.), in June 2014 under the *qui tam* provisions of the FCA.

13.     On December 22, 2014, the United States intervened in both the *Doe* and *Taylor* actions, and on April 9, 2015, both actions were consolidated before this Court under Case No. 5:11-CV-00406-10TBS.

14.     Defendant Institute of Cardiovascular Excellence, PLLC ("ICE") is a Florida corporation that maintains its principal place of business in Ocala, Florida.

15.     Defendant Dr. Asad U. Qamar  is a cardiologist licensed to practice medicine in Florida whose principal office is located at 4730 SW 49th Road, Ocala, Florida 34474.  Dr. Qamar is the founder and sole Managing Member of ICE.  Dr. Qamar's Florida medical license became active in or around August 1997.

16.     During the relevant period, Defendants operated in at least three North Central Florida cities: Ocala, The Villages, and Williston.

17.     Throughout the relevant period, Defendants were in the business of providing cardiovascular services to Medicare beneficiaries.

## IV.    STATUTORY AND REGULATORY FRAMEWORK

### A.    The False Claims Act

18.    The FCA provides that any person or entity that knowingly presents, or causes to be presented, a false claim for payment or approval, or a false statement that is material to a claim for payment or approval, is liable to the United States for damages and penalties. *See* 31 U.S.C. §§ 3729(a)(1) (1986), 3729(a)(1)(A), (a)(1)(B).[1]

19.    "Knowingly" means that the person or entity: (1) had actual knowledge of the information; (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1). The person or entity need not have acted with the specific intent to defraud the United States to be liable under the FCA. *Id.*

### B.    The Medicare Program

20.    Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395kkk-1, establishes the Health Insurance for the Aged and Disabled Program, commonly referred to as Medicare. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 1395 *et seq.*

21.    Medicare is comprised of Parts A, B, C, and D. Part B is medical insurance that authorizes payment of federal funds for health services, including

---

[1]    The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), of May 20, 2009. Given the claims at issue here,    § 3729(a)(1) of the prior statute and §§ 3729(a)(1)(A) and 3729(a)(1)(B) of the current statute are applicable. Section 3729(a)(1) applies to conduct that occurred before FERA was enacted, and § 3729(a)(1)(A) applies to conduct that occurred after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of § 4(f) of FERA, which makes the new changes to that provision applicable to all claims for payment pending on or after June 7, 2008.

physician, laboratory, outpatient, diagnostic, and radiology services.  *See* 42 U.S.C.
§ 1395k; 42 C.F.R. § 410.10.

22.     The Secretary of HHS has overall responsibility for the administration of
Medicare.  Within HHS, the responsibility for the administration of Medicare has been
delegated to CMS.

23.     To assist in the administration of Medicare Part B, CMS initially
contracted with "carriers" or "fiscal intermediaries."  Carriers, typically private insurance
companies, were largely responsible for processing and paying Part B claims.  42 C.F.R.
§§ 421.1–421.3.

24.     Beginning in November 2006, Medicare Administrative Contractors
("MACs") began replacing carriers and fiscal intermediaries.  *See* 42 U.S.C. § 1395kk-1;
42 C.F.R. § 421.400 *et seq*.; 71 F.R. 67960-01, at 68181 (Nov. 24, 2006).  MACs
generally act on behalf of CMS to process and pay Part A and Part B claims and perform
administrative functions on a regional level.

25.     In Florida, First Coast Service Options, Inc. ("First Coast") served as the
carrier and fiscal intermediary until September 2008, when First Coast was awarded a
contract to serve as Florida's MAC.

26.     CMS also contracts with Zone Program Integrity Contractors ("ZPICs"),
which are responsible for maintaining the integrity of the Medicare program in specific
regions, including through audits and pre- and post-payment reviews.  Florida is in Zone
7, and its ZPIC is SafeGuard Services, LLC.  *See* 42 C.F.R. § 421.300 *et seq*.

27.     Medicare pays only for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A); *see also id*. § 1320c-5(a)(l) (Medicare providers must assure that their services are rendered "economically and only when, and to the extent, medically necessary"); § 1320c-5(a)(2) (Medicare providers must assure that their services are "of a quality which meets professionally recognized standards of health care").

28.     Part B providers present claims to Medicare on the CMS Form 1500 Health Insurance Claim Form, where providers certify, *inter alia*, that their services were medically necessary.

29.     Part B providers make additional certifications to the federal government in provider enrollment agreements on CMS Form 855b (Medicare Enrollment Application for clinics/group practices and certain other suppliers) and/or CMS Form 855i (Medicare Enrollment Application for physicians and certain non-physician practitioners), including:

> I agree to abide by the Medicare laws, regulations and program instructions . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.
>
> * * *
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

30.     Relying on the veracity of these certifications, CMS makes Medicare payments retrospectively (*i.e.*, after the services are rendered) to Part B providers. For this reason, Medicare payments are often referred to as reimbursements.

31.     Dr. Qamar has been registered as a Medicare provider in Florida since in or around December 2000 and has executed at least one provider enrollment agreement.

32.     ICE has been registered as a Medicare group practice in Florida since in or around May 2009.

**C.     Peripheral Artery Disease**

33.     Peripheral artery disease ("PAD") is the narrowing or blockage of peripheral arteries and consequent reduction of blood flow to the limbs.

34.     PAD is usually caused by atherosclerosis—the buildup of cholesterol and fatty deposits called "plaques" on the inner walls of the arteries. Plaques restrict blood flow to the limbs and other parts of the body by clogging arteries or causing abnormal artery function. Cardiovascular specialists and other medical professionals refer to this narrowing or blockage as a "lesion" or "stenosis."

35.     PAD includes a spectrum of syndromes ranging from intermittent "claudication" to "critical limb ischemia." Claudication is exertional leg pain caused by obstructed arteries. "Critical limb ischemia" usually involves non-exertional or resting leg pain, non-healing wounds, ulcers, or gangrene. Most patients with PAD have only intermittent claudication, which is typically unlikely to progress to critical limb ischemia.

36.     PAD that is significant enough to warrant treatment must be specifically and appropriately evaluated, diagnosed, and managed. Peripheral arteries may be

significantly or completely blocked and still not require intervention because more than one artery supplies blood to the peripheral tissue. Accordingly, a provider must evaluate the severity of the PAD and its impact on a patient's symptoms and functionality through non-invasive testing before resorting to invasive procedures.

37.     Commonly used non-invasive testing for PAD includes physical examination for, among other things, a diminished pulse; a whooshing sound (or "bruit") heard over arteries using a stethoscope; and poor wound healing in areas where blood flow may be restricted. Another technique compares systolic blood pressure in the ankle to systolic blood pressure in the arm, and evaluates the resulting ratio, referred to as the "ankle-brachial index" ("ABI").

38.     Other, more sophisticated non-invasive testing for PAD involves techniques like segmental blood pressure recordings; pulse volume recordings ("PVRs"); Doppler flow measurements with ultrasound (or "lower extremity arterial Duplex"); magnetic resonance angiography ("MRA"); and computerized tomography angiography ("CTA"). MRA and CTA involve the injection of contrast material (or "dye") into the blood vessels to enable the cardiovascular specialist to view vascular anatomy without using an invasive catheter-based approach.

39.     Non-invasive treatment for PAD often includes medications such as aspirin, statins (cholesterol-lowering drugs), and cilostazol (the generic name of a drug used to treat claudication); dietary modifications; exercise programs; and risk factor modification, especially smoking cessation.

40.     If non-invasive tests corroborate the severity of the PAD—and if disabling

claudication or critical limb ischemia has developed—a physician may perform invasive testing to determine if "revascularization" is necessary. Revascularization refers to the use of invasive techniques, either catheter-based or surgical, to restore adequate blood flow to the affected limb and relieve symptoms.

41.     Catheter-based angiography, or an "angiogram," is an invasive imaging procedure that involves the insertion of a long, narrow tube called a "catheter" into a blood vessel in the arm or leg. The catheter is guided through the blood vessel to the artery of interest with the aid of an x-ray imaging technique called fluoroscopy. Dye is injected through the catheter into the vessel to make its internal dimensions visible.

42.     Balloon angioplasty can be performed inside the artery in conjunction with catheter-based angiography. After anti-coagulating a patient with blood thinner, a balloon catheter is passed over a guide-wire into a significantly narrowed portion of the artery and inflated to reduce the severity of the blockage. The balloon catheter and guide-wire are then removed.

43.     Atherectomy is another invasive catheter-based treatment that involves the use of a sharp blade, burr, or laser housed within a catheter to excise or obliterate plaques from within an artery.

44.     Stents are small metallic mesh tubes that are placed inside a blocked or narrowed artery to keep the vessel open after it has been dilated or torn, typically after balloon angioplasty. Stents are used depending on certain features of the clogged vessel, including the extent and location of the blockage.

45.     Angiography, angioplasty, atherectomy, and stent implantation are

invasive procedures that usually require conscious sedation and subject patients to some risk of harm.

46. Any invasive procedure can lead to "restenosis" or re-narrowing due to scar build-up at the site of intervention. The catheter can tear or rupture blood vessels causing internal bleeding and dislodge plaques from the arterial wall that can travel downstream or "embolize" into the circulation and lead to stroke, heart attack, or poor blood flow to a limb.

47. The dye injected into the arteries during a catheterization procedure can cause allergic reactions or kidney failure, and the radiation used for imaging can lead to injuries ranging from dermatitis to cancer.

48. Stents can trap or "jail" other arteries depending on their placement, sometimes cutting off important alternative avenues of collateral circulation. Stents can also limit surgical options for revascularization. Excessive stenting can limit the number of viable, un-stented arteries into which a bypass can be connected.

**D.     The Medicare Benefit for PAD**

49. Medicare providers are not entitled to bill or receive payment for any peripheral artery angiography, angioplasty, atherectomy, or stent implantation that is not "reasonable" and medically "necessary." 42 U.S.C. § 1395y(a)(1)(A); *see also* 42 U.S.C. § 1320c-5(a)(l).

50. Clinical indications of the medical necessity of peripheral artery interventions are published in multiple public sources, including national guidelines issued by industry groups like the American College of Cardiology Foundation and the

American Heart Association, and Local Coverage Determinations issued by MACs.

51. Florida's MAC, First Coast, issued a Local Coverage Determination regarding the stenting of lower extremity arteries, advising that such stenting is medically reasonable and necessary only when there is "clinically significant" vascular disease. *See* First Coast Services, Local Coverage Determination (L32102), *Vascular Stenting of Lower Extremity Arteries* (effective Oct. 6, 2011) (hereinafter "First Coast LCD No. L32102").

52. Clinically significant peripheral vascular disease, according to the American College of Cardiology Foundation and the American Heart Association, may exist when a peripheral artery is at least 50 to 75 percent blocked. *See* Jeffrey L. Anderson, *et al*., "Management of Patients with Peripheral Artery Disease (Compilation of 2005 and 2011 ACCF/AHA Guideline Recommendations)," *Journal of the American College of Cardiology*, Vol. 61, No. 14 (Apr. 2013) (hereinafter "PAD Guidelines").

53. As a general principle, "[e]ndovascular intervention is not indicated as prophylactic therapy in an asymptomatic patient with lower extremity PAD." *Id.* Thus, prior to performing an interventional procedure in the peripheral arteries, Medicare providers must assess the medical necessity of the intervention through a detailed evaluation, and thoroughly document the clinical indications necessitating the intervention. *See* First Coast LCD No. L32102.

54. Indeed, Medicare guidelines require that "[m]edical record documentation maintained by the performing physician must clearly indicate the medical necessity for [the] service and [be] made available to Medicare upon request," including

documentation of "[p]revious noninvasive diagnostic evaluation(s)" and the history of relevant symptoms of significant PAD. *Id.* Such symptoms include exertional leg pain, suggesting claudication, and rest pain, ulcers, or gangrene, suggesting critical limb ischemia. *See id.*

55.    In general, only after a Medicare provider has exhausted non-invasive tests and treatments—and after symptoms prove to be recurrent—should invasive procedures be performed on patients with severe PAD. "Because of the variability of individual . . . symptoms and variable impact of these symptoms on quality of life, patients should be selected for revascularization on the basis of the severity of their symptoms; a significant disability as assessed by the patient; failure of medical therapies; lack of significant comorbid conditions; vascular anatomy suitable for the planned revascularization; and a favorable risk/benefit ratio." Alan T. Hirsch, *et al.*, "ACC/AHA 2005 Practice Guidelines for the Management of Patients with Peripheral Arterial Disease," *Circulation* (2006).

**E.    Medicare Claim Submission and Payment Process**

56.    As Medicare providers, Defendants were obligated to understand and certify their compliance with all applicable Medicare laws, regulations, and program instructions as a condition of participation in Part B and as a condition of payment of Medicare reimbursements. *See* ¶ 29, *supra*.

57.    Medicare providers like Defendants are reimbursed for covered services based on their submission of an electronic or hard-copy claim form called the CMS Form 1500 Health Insurance Claim Form.

58. When submitting claims to Medicare, providers certify on CMS Form 1500, *inter alia*, that (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) the information on the claim form is "true, accurate and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws." After a February 2012 revision to CMS Form 1500, providers further expressly certify that their claims comply "with all applicable Medicare . . . laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law)."

59. CMS Form 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

60. Because it is not feasible for Medicare personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicare requirements and trusts providers to submit truthful and accurate certifications and claims.

61. Generally, once a provider submits CMS Form 1500 to the Medicare, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

62. Exceptions to this general procedure include pre- and post-payment reviews, which can be initiated by MACs and ZPICs to address suspect billing practices. In pre-payment review, some or all of a provider's claims undergo medical review before payment is authorized. Medical review involves the collection and evaluation by a medical professional of the medical records associated with each claim. In post-payment review, a sample of paid claims is subjected to medical review to establish whether an underpayment or overpayment occurred in the universe of claims.

**F.      The Anti-Kickback Statute**

63. The Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), arose out of Congress' concern that remuneration given to those who can influence healthcare decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these harms, Congress enacted a prohibition against payment of kickbacks in any form. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

64. The AKS prohibits any person or entity from knowingly and willfully soliciting or receiving remuneration to induce or reward any person for referring, recommending, or arranging for federally-funded medical services, including services provided under the Medicare program. *See* 42 U.S.C. § 1320a-7b(b).

65. In 2010, Congress amended the AKS to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759, codified at 42 U.S.C. § 1320a-7b(g).

## G. The Medicare Copayment

66. Under Part B, Medicare generally pays 80 percent of the reasonable charges (as established by the Medicare Physician Fee Schedule) for medically necessary services provided to beneficiaries. *See* 42 U.S.C. §§ 1395l(a)(1), 1395y(a)(1)(A). Medicare beneficiaries are generally expected to pay the remaining 20 percent in the form of a copayment, also called a "copay" or "coinsurance" payment.

67. The copayment is intended to minimize costs to federal healthcare programs and beneficiaries by incentivizing beneficiaries to be better health care consumers—selecting services because they are medically needed, rather than simply because they are free. *See* HHS Office of Inspector General Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375 (Dec. 19, 1994). Consequently, federal law prohibits the routine waiver of copayments, and except in narrow circumstances, the non-routine waiver of copayments. *Id.* (citing 18 U.S.C. §§ 287, 1001; 31 U.S.C. § 3729; 42 C.F.R. §§ 1320a-7, 1320a-7a, 1320a-7b).

68. The routine waiver of copayments is prohibited, first, because "[a] provider, practitioner or supplier who routinely waives Medicare copayments . . . is misstating its actual charge." For example:

> [I]f a supplier claims that its charge for a piece of equipment is $100, but routinely waives the copayment, the

> actual charge is $80. Medicare should be paying 80
> percent of $80 (or $64), rather than 80 percent of $100 (or
> $80). As a result of the supplier's misrepresentation, the
> Medicare program is paying $16 more than it should for
> this item.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65374–75. As the Medicare Claims

Processing Manual (Ch. 23 § 80.8.1) explains:

> Deductible and coinsurance amounts are taken into account
> (included) in determining the reasonable charge for a
> service or item. In this regard, a billed amount that is not
> reasonably related to an expectation of payment is not
> considered the "actual" charge for the purpose of
> processing a claim or for the purpose of determining
> customary charges.

69.     Second, the routine waiver of copayments may constitute impermissible

remuneration under provisions of the Social Security Act, including the Anti-Kickback

Statute, 42 U.S.C. § 1320a-7b(b), and the Civil Monetary Penalties Law, 42 U.S.C.

§ 1320a-7a.

70.     As the HHS Office of Inspector General explained:

> In certain cases, a provider, practitioner or supplier who
> routinely waives Medicare copayments . . . could be held
> liable under the Medicare and Medicaid anti-kickback
> statute. 42 U.S.C. 1320a-7b(b). The statute makes it
> illegal to offer, pay, solicit or receive anything of value as
> an inducement to generate business payable by Medicare or
> Medicaid. When providers, practitioners or suppliers
> forgive financial obligations for reasons other than genuine
> financial hardship of the particular patient, they may be
> unlawfully inducing that patient to purchase items or
> services from them.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* Medicare Program

Integrity Manual, Ch. 4 § 4.22.1.1 ("Routine waivers of coinsurance or deductibles are

unlawful because they could result in . . . violation of the anti-kickback statute.").

71.     Similarly, § 1128A(a)(5) of the Social Security Act prohibits the offer or transfer of "remuneration" to a Medicare beneficiary that the offeror or transferor knows or should know is likely to influence the beneficiary's healthcare decisions.  42 U.S.C. § 1320a-7a(a)(5); *see also* OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (Aug. 30, 2002).  Prohibited "remuneration" includes "the waiver of coinsurance and deductible amounts (or any part thereof)."  42 U.S.C. § 1320a-7a(i)(6).

72.     Even if non-routine, the waiver of a copayment is permissible only in narrow circumstances.  The waiver must be (1) unadvertised, and must either (2) "address the special financial needs of a particular patient" or (3) occur after "a good faith effort to collect" has been exhausted.  Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; *see also* 42 U.S.C. § 1320a-7a(i)(6) (prohibited remuneration does not include "the waiver of coinsurance" if (i) "the waiver is not offered as part of any advertisement or solicitation;" (ii) "the person does not routinely waive coinsurance;" and (iii) the person determined "in good faith that the individual is in financial need" or failed to collect "after making reasonable collection efforts"); 42 C.F.R. § 1003.101 (same).

73.     Copayment waivers are not permissible if they are advertised.  Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101.  Advertising includes indirect marketing or promotional efforts, or informal channels of information dissemination, such as "word of mouth" promotion by practitioners or patient support groups.  OIG Special Advisory Bulletin, *Offering Gifts*

*and Other Inducements to Beneficiaries* (Aug. 30, 2002). Suspect promotional efforts

include statements like "Medicare Accepted As Payment in Full," "Insurance Accepted

As Payment in Full," or "No Out-Of-Pocket Expense." Special Fraud Alert, 59 Fed. Reg.

65372-01, at 65375.

74.     A copayment waiver based on financial hardship is prohibited if it is not

supported by a "good faith" assessment of the individual beneficiary's financial need.

Special Fraud Alert, 59 Fed. Reg. 65372-01, at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42

C.F.R. § 1003.101. The "[r]outine use of 'Financial hardship' forms which state that the

beneficiary is unable to pay the coinsurance" is insufficient. Special Fraud Alert, 59 Fed.

Reg. 65372-01, at 65375.

75.     A copayment waiver based on a failure to collect is prohibited if it is not

preceded by a "good faith" collection effort. Special Fraud Alert, 59 Fed. Reg. 65372-01,

at 65375; 42 U.S.C. § 1320a-7a(i)(6); 42 C.F.R. § 1003.101. The collection effort must

be more than "token" and must be similar to efforts made to collect comparable amounts

from non-Medicare patients. Medicare Claims Processing Manual, Ch. 23, § 80.8.1.

**V.      DEFENDANTS SUBMITTED FALSE CLAIMS FOR EXCESSIVE,
         MEDICALLY UNNECESSARY, AND/OR INADEQUATELY
         DOCUMENTED CARDIOVASCULAR PROCEDURES.**

76.     Throughout the relevant period, Defendants engaged in a pattern and

practice of seeing as many patients, scheduling as many appointments, ordering as many

tests, performing as many cardiovascular interventions, implanting as many stents, and

ultimately, collecting as many Medicare payments as possible.

77.     Ignoring guidance from hired consultants and Medicare contractors, among other sources, Defendants developed shortcuts to minimize the time they had to spend preparing medical records and justifying the medical necessity of their excessive procedures to Medicare.

78.     Defendants' conduct resulted in the submission of thousands of false claims to Medicare for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures.

**A.     Excessive and Medically Unnecessary Procedures**

79.     Defendants treated an excessive number of patients, many of whom were Medicare beneficiaries.

80.     Defendants treated patients at numerous locations throughout North Central Florida, including at Defendants' headquarters in Ocala and at satellite offices in The Villages and Williston.

81.     The Ocala office housed an expansive outpatient catheterization laboratory (or "cath lab").  At the cath lab, Defendants often treated in excess of 20 patients a day.

82.     Defendants regularly double- and triple-booked appointments.  With Dr. Qamar's approval, for example, an ICE employee instructed her colleagues in an April 29, 2010 company-wide email to "OVERBOOK THE SCHEDULE" for stress tests.

83.     During normal business hours, Dr. Qamar was scheduled to see at least four patients an hour, with the option to add a fifth.  At times, as many as seven appointments were scheduled in a one-hour window.  When appointments during normal business hours were filled, patients were scheduled for evening visits, sometimes lasting

past midnight.

84.    Dr. Qamar's schedule at the Ocala office left little time for travel to The Villages and Williston. At those locations, it was the norm for patients to see nurse practitioners. Dr. Qamar scheduled appointments at the satellite offices at most twice a week, and usually after normal business hours.

85.    Defendants' patients complained about rarely seeing Dr. Qamar, frequent examinations by nurse practitioners, crowded waiting rooms, long waits, and late-night appointments. Some recalled waiting hours for an appointment only to be sent home when Dr. Qamar did not show. One of Dr. Qamar's standard responses to these complaints was to direct his staff, as he did at a meeting on August 24, 2011, to "[m]ake sure the patients have snacks and [are] comfortable" while waiting. Several patients recalled occasions when Defendants ordered pizza for patients in the waiting room.

86.    Defendants' practice management did not keep pace with their patient volume. Defendants' cath lab director admitted in a March 31, 2011 email that the frenetic schedule and late hours led to record-keeping "mistakes" and "breakdowns" in patient care, which occurred "more often than we know."

87.    Patients were mistakenly scheduled for tests that they had just received, and Defendants scheduled invasive procedures before explaining previous test results to patients.

88.    One patient left Defendants' practice after Dr. Qamar performed a diagnostic angiography and told the patient that "she needed a stent ASAP," but was unable to schedule the stent implantation until the following month.

89.     Defendants compounded the unmanageability of their operation by ordering and performing an excessive number of cardiovascular tests and treatments.

90.     Defendants engaged in systematic fishing expeditions to find arteries to treat.  Defendants scheduled follow up tests of largely asymptomatic patients at regular "surveillance intervals" established by Dr. Qamar—generally every 3 months, 6 months, and 12 months.  The follow up tests included invasive, but lucrative, angiography, and other expensive procedures like ultrasounds and stress tests.

91.     Defendants tried to schedule multiple tests on the same day because, as noted in a September 17, 2013 company-wide email, Defendants were getting "a lot of patient[s] complaining about having too many appts."  According to another company-wide email dated October 27, 2011, insurance companies were denying Defendants' claims "because there are too many tests being done in a 12 month period that are not medically necessary."

92.     Defendants' employees had similar concerns about the frequency of appointments and procedures.  One of Defendants' nurse practitioners understood that Defendants expected her to increase her "numbers" by scheduling more patients for more tests.

93.     Employees were also concerned that when performing diagnostic angiograms, Dr. Qamar would perform other interventions that were not scheduled or properly evaluated.  As one of Defendants' consultants noted in a May 18, 2010 memorandum:  "Patients scheduled for specific procedures in the cath lab often end up having additional unplanned diagnostic imaging performed," and "[d]ocumentation is not

always available to support the medical necessity for additional diagnostic imaging."

94.     When tests revealed stenosis in patients' arteries, Defendants overestimated the severity of the blockage to justify lucrative interventions, including angioplasty, atherectomy, and stent implantation.

95.     Defendants often failed to order and exhaust non-invasive therapies before performing invasive peripheral artery interventions.  Similarly, Defendants often failed to rule out alternative, non-vascular causes of patients' symptoms before performing invasive peripheral artery interventions.

96.     Defendants' gross overutilization of Medicare services for this vulnerable population significantly deviated from what other cardiovascular specialists—and Medicare—consider reasonable and appropriate.

**B.     Inadequate Documentation to Support Procedures**

97.     Defendants' habitually failed to document the clinical need for the peripheral artery interventions that they performed so frequently.

98.     Defendants developed and relied upon a variety of record-keeping shortcuts in attempts to justify medical necessity and ensure Medicare payment with minimal effort.

99.     Defendants' shortcuts included procedure templates, diagnosis code and billing "cheat sheets," boilerplate "notes" to be included in clinical narratives "to get [claims] paid," and reports dictated or scribed by nurse practitioners who were not always present for the duration of the procedures.

100. One of Defendants' cheat sheets—the "auth cheat sheet"—listed diagnosis codes known to support Medicare reimbursement for the tests and treatments that Defendants performed most often. Defendants relied on such lists of "payable diagnoses" when ordering procedures to "minimiz[e] rejections from medicare."

101. On January 23, 2011, Defendants' practice administrator warned Dr. Qamar that "[t]here is still an issue with diagnosis codes not being given for tests" and, consequently, "techs have been reviewing the chart, and then putting a diagnosis code if not supplied."

102. Defendants' record-keeping shortcuts resulted in errors and omissions of critical information from patients' medical records and associated Medicare claims.

103. Defendants' regularly failed, for example, properly to document relevant medical histories and symptoms supporting invasive treatments, including debilitating claudication and critical limb ischemia.

104. Similarly, Defendants often failed properly to document efforts to exhaust non-invasive treatments before conducting peripheral artery interventions.

105. When Defendants' claims for Medicare reimbursement were denied based on pre-payment medical reviews, *see* ¶¶ 179–89, *infra*, Defendants' consulted Local Coverage Determinations in search of "payable" diagnosis codes. Defendants belatedly added these codes to their medical records—sometimes without proper analysis or approval by members of the clinical staff—before resubmitting the claims.

106. Defendants' cath lab coding specialist acknowledged Defendants' "tendency" to "code for reimbursement" in a February 1, 2011 email and highlighted

procedures for which Defendants billed despite the fact that "there are no real strong indications" for the procedures.

107.    In a March 31, 2011 email to a cath lab employee about her successor, Defendants' cath lab director wrote: "I don't know how she feels about 'creating' diagnoses, as you once struggled to do, so speak to her . . . about that as we attempt to get these things paid . . . all the while trying to maintain quality patient care and good standards of practice!"

**C.    False Claims for Excessive, Medically Unnecessary, and/or Inadequately Documented Procedures**

108.    In the same email, Defendants' cath lab director shared her understanding that Dr. Qamar "will do and say what 'he' likes and wants to do . . . sometimes without, what some would consider, any 'real' diagnosis or medical necessity!!!"  Consistent with that observation, Defendants performed and knowingly submitted or caused the submission of thousands of false claims for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures.

109.    The false claims set forth in this section of the Complaint are specific examples, drawn from a statistically-valid random sample of Defendants' Medicare patients, of the false claims that Defendants submitted to Medicare throughout the relevant period.[2]

---

[2]    To protect patients' privacy, the Medicare beneficiaries discussed herein are identified only by their first and last initials.  The beneficiaries' full names and Medicare numbers are being provided separately to Defendants.

**Patient CF**

110.    Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient CF, a Medicare beneficiary.

111.    Among other potential side effects, these interventions risked worsening CF's significant kidney disease.  *See* ¶ 47, *supra*.

112.    Consistent with Defendants' records for CF, CF recalled excessive, repetitive, and invasive testing and treatment while Defendants' patient.

113.    CF recalled between two and six appointments per month and at least one invasive procedure per month.

114.    CF recalled receiving eight stents from Defendants and joked about being the "stent king of the world."

115.    CF did not recall having a clear understanding of the medical necessity of the invasive testing and treatment to which Defendants subjected CF.

116.    CF did not recall significant improvement in symptoms following Defendants' implantation of stents.

117.    CF left Defendants' practice for two reasons.  First, CF received a second opinion about an invasive procedure that Dr. Qamar recommended.  The physician providing the second opinion advised CF that the procedure was unnecessary.  Second, Defendants ordered a test that CF had undergone just weeks earlier.  *See* ¶ 87, *supra*.

118.    Since switching to a new cardiologist, CF has had fewer appointments, tests, and treatments, but CF's ability to walk has improved.

119.    Defendants were not entitled to receive Medicare payments for at least the

following false claims, which Defendants submitted for excessive, medically unnecessary, and/or inadequately documented cardiovascular interventions performed on CF during the relevant period:

| Medicare Claim Number | Date of Service(s) | Date of Payment by Medicare | Amount of Payment by Medicare |
|---|---|---|---|
| 591010265103100 | 9/1/2010 | 10/4/2010 | $7,072.67 |
| 591010293272500 | 9/27/2010 | 11/1/2010 | $8,389.94 |
| 591010350365830 | 12/1/2010 | 2/2/2011 | $7,751.61 |
| 591011199062480 | 4/18/2011 | 8/1/2011 | $42.54 |
| 591011259033520 | 9/13/2011 | 9/30/2011 | $6,722.84 |
| 591912010885700 | 1/4/2012 | 1/26/2012 | $5,893.11 |

**Patient YL**

120. Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient YL, a Medicare beneficiary.

121. Consistent with Defendants' records for YL, YL recalled excessive, repetitive, and invasive testing and treatment while Defendants' patient.

122. YL recalled frequent appointments with Defendants, with at least one interventional procedure every two to three months.

123. YL recalled receiving ten stents from Defendants and noted feeling like a "pin cushion."

124. YL recalled crowded waiting rooms and long waits for appointments with Defendants, especially Dr. Qamar. On one occasion, YL recalled being prepped and waiting over four hours for a procedure that Dr. Qamar ended up being too busy to perform.

125. YL did not recall having a clear understanding of the medical necessity of the invasive testing and treatments to which Defendants subjected YL.

126.    YL did not recall significant improvement in symptoms following Defendants' implantation of stents.

127.    YL left Defendants' practice because Defendants wanted to implant more stents, and YL did not want anymore.

128.    YL reported stable to improving symptoms since leaving Defendants' practice.

129.    Defendants were not entitled to receive Medicare payments for at least the following false claims, which Defendants submitted for excessive, medically unnecessary, and/or inadequately documented cardiovascular interventions performed on YL during the relevant period:

| Medicare Claim Number | Date of Service(s) | Date of Payment by Medicare | Amount of Payment by Medicare |
|---|---|---|---|
| 591010341024400 | 11/22/2010 | 12/20/2010 | $3,830.36 |
| 598311095025170 | 1/5/2011 | 6/29/2011 | $15,107.15 |
| 598311152029300 | 2/14/2011 | 8/24/2011 | $6,325.86 |
| 591011125083430 | 5/2/2011 | 5/19/2011 | $3,881.95 |
| 590912206609930 | 7/18/2012 | 8/22/2012 | $16,216.84 |
| 590912305226890 | 10/27/2012 | 2/6/2013 | $16,211.15 |
| 591013009373870 | 1/7/2013 | 2/6/2013 | $12,335.57 |

**Patient PH**

130.    Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient PH, a Medicare beneficiary.

131.    Consistent with Defendants' records for PH, PH recalled excessive, repetitive, and invasive testing and treatment while Defendants' patient.

132.    PH recalled crowded waiting rooms and long waits for appointments with Defendants.

133.    While Defendants' patient, PH's hip pain did not noticeably improve. After a time, PH questioned the frequency of Defendants' tests and treatments, and eventually left Defendants' practice.

134.    PH learned from another physician that the primary cause of PH's hip pain was not cardiovascular, as Defendants assumed, but musculoskeletal.  *See* ¶ 95, *supra*. Back surgery in December 2014 ultimately relieved PH's hip pain.

135.    Defendants were not entitled to receive Medicare payments for at least the following false claims, which Defendants submitted for excessive, medically unnecessary, and/or inadequately documented cardiovascular interventions performed on PH during the relevant period:

| Medicare Claim Number | Date of Service(s) | Date of Payment by Medicare | Amount of Payment by Medicare |
|---|---|---|---|
| 590912037291660 | 1/27/2012 | 3/26/2012 | $17,341.60 |
| 590912116032580 | 4/11/2012 | 5/9/2012 | $11,865.71 |
| 590912164227250 | 6/6/2012 | 7/26/2012 | $16,841.80 |
| 590912243206630 | 8/27/2012 | 9/13/2012 | $11,865.71 |
| 598313310020340 | 3/25/2013 | 2/3/2014 | $18,236.05 |

**Patient LG**

136.    Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient LG, a Medicare beneficiary.

137.    One such false claim was for an inadequately supported stent implantation that jailed LG's profunda femoris artery.  *See* ¶ 48, *supra*.  Another was for an inadequately supported intervention to address in-stent restenosis of a stent that Defendants had implanted a few years earlier.  *See* ¶ 46, *supra*.

138.	Defendants were not entitled to receive Medicare payments for at least the

following false claims, which Defendants submitted for excessive, medically

unnecessary, and/or inadequately documented cardiovascular interventions performed on

LG during the relevant period:

| Medicare Claim Number | Date of Service(s) | Date of Payment by Medicare | Amount of Payment by Medicare |
|---|---|---|---|
| 591010288063660 | 9/20/2010 | 10/27/2010 | $3,625.63 |
| 591011032364760 | 1/12/2011 | 2/28/2011 | $17,181.75 |
| 590912103664870 | 4/6/2012 | 4/27/2012 | $9,106.57 |
| 590912145352510 | 5/21/2012 | 7/9/2012 | $16,221.26 |
| 598313151020030 | 10/29/2012 | 8/21/2103 | $16,219.84 |
| 598313294136180 | 4/5/2013 | 1/17/2014 | $3,840.09 |

## VI.	DEFENDANTS' KNOWINGLY AND WILLFULLY PAID KICKBACKS IN THE FORM OF WAIVED MEDICARE COPAYMENTS AND MISREPRESTND THE TRUE COST OF THEIR SERVICES.

139.	Defendants routinely and indiscriminately waived Medicare copayments,

assuring that patients had no financial incentive to question the necessity of the excessive

cardiovascular procedures to which Defendants subjected them.

140.	Defendants failed to satisfy the conditions established by Medicare laws,

regulations, and program instructions to support those copayment waivers.

141.	Defendants, especially Dr. Qamar, regularly told patients that they would

not have to pay for Defendants' services, and that insurance payments, including

Medicare payments, would be treated as payment in full.

142.	One of Defendants' cath lab employees summarized her understanding of

Dr. Qamar's approach to collecting copayments in a September 13, 2011 email:

> Let me also clarify that Dr Qamar tells me, most often after
> the patient has already left :) that he wants the patient as
> ins[urance] only or a no pay.  Other times the patient will

try to cancel an appt because they say they can't afford to come again when he wants them to. Dr Qamar most always says to have the pt come in anyway and just make it a no-pay. Those are a few situations where he may request this but I don't question why he wants them a no-pay. I just make the notes. In many cases the pt may not qualify as a "financial hardship" but Dr Q is the boss :) and he figures it[']s his way of giving back. I make notes when this happens but if when [sic] the patient comes in the office next time and the note pops up, you are more than welcome to have someone over there ask the patient to fill out the hardship form (even if financially they may not meet criteria) if it would keep things 'across the board' for you.

143. When patients called to inquire about bills they received from Defendants or their billing agent, Defendants routinely advised the patients to ignore the bills. Defendants assured the patients that their balances would eventually be written off.

144. Knowledge of these policies spread among Defendants' patients through word of mouth and other forms of publicity.

145. Indeed, after the United States announced its intervention in this action on December 22, 2014, Dr. Qamar posted a video on YouTube promoting to "patients and friends" that "ICE is the only cardiovascular practice in the entire area taking absolutely free care of our indigent, our uninsured, and our poorly insured patients."[3] Consistent with that statement, Defendants routinely and indiscriminately promised free care without first making the required good faith effort to determine the special financial needs of the individual patients affected. Often, the files of such patients contained no documentation of financial hardship; at best, the files contained a short "Financial Hardship Request

---

[3]    *See* https://www.youtube.com/watch?v=NSWC6TsuPg8&feature=youtu.be
(last visited Apr. 14, 2015).

Form," which is inadequate.  *See* ¶ 74, *supra*.

146.   Similarly, Defendants' efforts to collect copayments, if undertaken at all, were token.  For much of the relevant period, Defendants' billing was handled in consultation with a third party consultant called Partners in Practice (now Origin Healthcare Solutions) ("PIP").  Defendants understood that if PIP was unsuccessful in collecting a copayment, PIP would list the corresponding patient account on a Physician Review Report, which PIP would send to Defendants for guidance on whether to refer the account to collections or write off the patient balance.

147.   Defendants knew that if they gave no instructions, PIP eventually would write off the patient balance.  Defendants relied on this mechanism to approve implicitly the waiver of numerous copayments.

148.   Defendants never instructed PIP to refer a patient account to a collection agency.  By contrast, most of PIP's other billing clients referred delinquent accounts to collection agencies.

149.   During the relevant period, Defendants knowingly submitted or caused the submission of claims to Medicare that were false because (a) they were tainted by the knowing and willful offer and/or provision of kickbacks in the form of unjustified copayment waivers, and (b) they misrepresented the actual cost of Defendants' services. Specific examples of these false claims are set forth below.

**Patient LG**

150.   Defendants knowingly submitted or caused the submission of false claims by routinely and indiscriminately waiving copayments, without proper justification, for

services performed for LG between at least September 30, 2009, and the end of the relevant period.

151.    Although PIP indicated in an August 6, 2010 email that there was a "Financial Hardship form on file per ICE," Defendants' records for LG contain no financial hardship form or documentation justifying LG's financial need.

152.    Each of the following claims was false because it misrepresented the actual cost of Defendants' services and was tainted by the knowing and willful provision of a kickback in the form of an unjustified copayment waiver:

| Medicare Claim Number | Date of Service(s) | Date Claim Received by Medicare | Date Claim Paid by Medicare | Amount Paid by Medicare |
|---|---|---|---|---|
| 591009279340400 | 9/30/2009 | 10/6/2009 | 10/19/2009 | $68.95 |
| 591009287215850 | 10/13/2009 | 10/14/2009 | 10/26/2009 | $72.99 |
| 591009287216970 | 10/13/2009 | 10/14/2009 | 10/26/2009 | $16.70 |
| 591010054238460 | 10/21/2009 | 2/23/2010 | 3/8/2010 | $96.31 |
| 591010054238500 | 10/30/2009 | 2/23/2010 | 3/8/2010 | $1,296.30 |
| 591010057469290 | 12/2/2009 | 2/26/2010 | 3/10/2010 | $1,296.30 |
| 591010054238620 | 12/7/2009 | 2/23/2010 | 3/8/2010 | $96.31 |
| 599611025369220 | 1/4/2010 | 1/25/2011 | 4/20/2011 | $1.29 |
| 599611060130250 | 1/21/2010 | 3/1/2011 | 7/13/2011 | $89.07 |
| 599611107098250 | 2/10/2010 | 4/17/2011 | 6/30/2011 | $78.70 |
| 591010062355980 | 2/11/2010 | 3/3/2010 | 3/15/2010 | $3.00 |
| 599611175167250 | 2/11/2010 | 6/24/2011 | 8/26/2011 | $19.09 |
| 599611175167610 | 2/11/2010 | 6/24/2011 | 8/26/2011 | $749.39 |
| 599611147361990 | 2/16/2010 | 5/27/2011 | 8/9/2011 | $186.22 |
| 599611294184380 | 4/5/2010 | 10/21/2011 | 12/13/2011 | $54.65 |
| 591010169060830 | 6/14/2010 | 6/18/2010 | 7/7/2010 | $1,399.09 |
| 598310263025150 | 6/17/2010 | 9/20/2010 | 11/19/2010 | $95.14 |
| 591010175115580 | 6/22/2010 | 6/24/2010 | 7/9/2010 | $80.42 |
| 591010189015260 | 7/7/2010 | 7/8/2010 | 7/20/2010 | $144.75 |
| 590910218859290 | 8/5/2010 | 8/6/2010 | 8/18/2010 | $16.34 |
| 591010223068460 | 8/5/2010 | 8/11/2010 | 8/23/2010 | $80.42 |
| 590910229806410 | 8/13/2010 | 8/17/2010 | 8/30/2010 | $252.75 |

| | | | | |
|---|---|---|---|---|
| 598310344041070 | 8/25/2010 | 12/10/2010 | 2/2/2011 | $2,685.61 |
| 591010280446040 | 10/5/2010 | 10/7/2010 | 10/19/2010 | $80.42 |
| 591010293272150 | 10/19/2010 | 10/20/2010 | 11/1/2010 | $385.73 |
| 598311006034200 | 10/20/2010 | 1/6/2011 | 2/23/2011 | $501.80 |
| 591010307142600 | 10/21/2010 | 11/3/2010 | 11/9/2010 | $81.89 |
| 591010308209410 | 11/2/2010 | 11/4/2010 | 11/9/2010 | $83.42 |
| 590910330144610 | 11/23/2010 | 11/26/2010 | 12/8/2010 | $235.97 |
| 590910333715070 | 11/24/2010 | 11/29/2010 | 12/13/2010 | $55.85 |
| 591011068626670 | 11/29/2010 | 3/9/2011 | 3/23/2011 | $201.74 |
| 598311053027040 | 11/29/2010 | 2/22/2011 | 4/29/2011 | $6,471.44 |
| 599711164868630 | 11/29/2010 | 6/13/2011 | 7/13/2011 | $6,269.70 |
| 591011039648410 | 1/13/2011 | 2/8/2011 | 2/22/2011 | $42.54 |
| 591011024546670 | 1/20/2011 | 1/24/2011 | 2/7/2011 | $92.32 |
| 591011026353170 | 1/20/2011 | 1/26/2011 | 2/7/2011 | $82.62 |
| 591011056429650 | 2/18/2011 | 2/25/2011 | 3/8/2011 | $183.46 |
| 591011062409490 | 3/1/2011 | 3/3/2011 | 3/8/2011 | $54.64 |
| 591011084376860 | 3/21/2011 | 3/25/2011 | 4/18/2011 | $1,474.58 |
| 591011083368680 | 3/23/2011 | 3/24/2011 | 4/19/2011 | $94.30 |
| 591011119479960 | 4/26/2011 | 4/29/2011 | 5/13/2011 | $82.62 |
| 591011129212790 | 5/5/2011 | 5/9/2011 | 5/23/2011 | $786.39 |
| 590911133836010 | 5/9/2011 | 5/13/2011 | 5/27/2011 | $1,474.58 |
| 590911138785750 | 5/13/2011 | 5/18/2011 | 6/16/2011 | $94.30 |
| 590911138786040 | 5/16/2011 | 5/18/2011 | 6/1/2011 | $1,474.58 |
| 590911147856200 | 5/23/2011 | 5/27/2011 | 7/27/2011 | $94.30 |
| 590911168749910 | 6/16/2011 | 6/17/2011 | 7/1/2011 | $143.65 |
| 590911173347890 | 6/16/2011 | 6/22/2011 | 7/6/2011 | $82.62 |
| 590911178822010 | 6/22/2011 | 6/27/2011 | 7/11/2011 | $54.64 |
| 591011186015520 | 6/28/2011 | 7/5/2011 | 8/16/2011 | $17,904.06 |
| 590911215639230 | 7/28/2011 | 8/3/2011 | 8/17/2011 | $82.62 |
| 590911215639240 | 7/28/2011 | 8/3/2011 | 8/17/2011 | $88.64 |
| 590911222535480 | 8/5/2011 | 8/10/2011 | 9/16/2011 | $15,614.30 |
| 590911265663610 | 9/13/2011 | 9/22/2011 | 10/6/2011 | $98.48 |
| 590911277751560 | 9/30/2011 | 10/4/2011 | 10/18/2011 | $194.52 |
| 590911277751570 | 9/30/2011 | 10/4/2011 | 10/18/2011 | $92.32 |
| 590911297748300 | 10/19/2011 | 10/24/2011 | 11/7/2011 | $646.89 |
| 590911299804540 | 10/19/2011 | 10/26/2011 | 11/9/2011 | $54.64 |
| 590911320807200 | 11/8/2011 | 11/16/2011 | 12/29/2011 | $92.32 |
| 591811340443580 | 12/1/2011 | 12/6/2011 | 12/20/2011 | $82.62 |
| 591911348174360 | 12/12/2011 | 12/14/2011 | 12/28/2011 | $144.54 |

| | | | | |
|---|---|---|---|---|
| 591911353128250 | 12/14/2011 | 12/19/2011 | 1/3/2012 | $138.88 |
| 590912040525990 | 2/2/2012 | 2/9/2012 | 2/23/2012 | $52.31 |
| 590912040526000 | 2/3/2012 | 2/9/2012 | 2/23/2012 | $3,482.13 |
| 590912108503070 | 4/12/2012 | 4/17/2012 | 5/1/2012 | $97.20 |
| 591012153705720 | 5/3/2012 | 6/1/2012 | 6/15/2012 | $52.31 |
| 590912137118470 | 5/11/2012 | 5/16/2012 | 5/30/2012 | $166.94 |
| 590912151533350 | 5/23/2012 | 5/30/2012 | 6/13/2012 | $145.78 |
| 590912150187370 | 5/24/2012 | 5/29/2012 | 6/12/2012 | $83.56 |
| 590912156157500 | 5/30/2012 | 6/4/2012 | 6/18/2012 | $154.86 |
| 590912157223720 | 5/31/2012 | 6/5/2012 | 6/19/2012 | $83.56 |
| 590912158575030 | 6/4/2012 | 6/6/2012 | 6/20/2012 | $160.17 |
| 590912158575040 | 6/4/2012 | 6/6/2012 | 6/20/2012 | $44.00 |
| 590912158575050 | 6/4/2012 | 6/6/2012 | 6/20/2012 | $143.79 |
| 590912180239180 | 6/4/2012 | 6/28/2012 | 7/12/2012 | $33.78 |
| 590912172151170 | 6/5/2012 | 6/20/2012 | 7/5/2012 | $801.73 |
| 590912181378580 | 6/25/2012 | 6/29/2012 | 7/13/2012 | $83.56 |
| 590912187210390 | 6/28/2012 | 7/5/2012 | 7/19/2012 | $83.56 |
| 590912194102930 | 7/9/2012 | 7/12/2012 | 7/26/2012 | $166.18 |
| 590912228482640 | 8/9/2012 | 8/15/2012 | 8/29/2012 | $52.31 |
| 590912242446440 | 8/23/2012 | 8/29/2012 | 9/12/2012 | $23.00 |
| 598312284034460 | 8/31/2012 | 10/10/2012 | 1/14/2013 | $11,271.93 |
| 590912289324620 | 9/2/2012 | 10/15/2012 | 12/20/2012 | $42.08 |
| 590912278659270 | 9/20/2012 | 10/4/2012 | 10/18/2012 | $83.56 |
| 590912279166960 | 9/20/2012 | 10/5/2012 | 10/19/2012 | $3.00 |
| 591013301607000 | 11/1/2012 | 10/28/2013 | 12/30/2013 | $42.08 |
| 591113016825510 | 1/11/2013 | 1/16/2013 | 2/6/2013 | $111.63 |
| 590913032287570 | 1/17/2013 | 2/1/2013 | 2/15/2013 | $85.63 |
| 591013024140500 | 1/22/2013 | 1/24/2013 | 2/13/2013 | $138.46 |
| 591013024140510 | 1/22/2013 | 1/24/2013 | 2/15/2013 | $25.32 |
| 590913025117880 | 1/23/2013 | 1/25/2013 | 2/8/2013 | $256.30 |
| 590913059312980 | 2/21/2013 | 2/28/2013 | 3/14/2013 | $85.63 |
| 591013084797110 | 3/21/2013 | 3/25/2013 | 5/23/2013 | $3.00 |
| 591013143196100 | 3/21/2013 | 5/23/2013 | 8/13/2013 | $304.32 |
| 591013107469390 | 4/16/2013 | 4/17/2013 | 5/1/2013 | $83.92 |
| 591113115611150 | 4/24/2013 | 4/25/2013 | 5/9/2013 | $50.21 |
| 591013135378020 | 5/14/2013 | 5/15/2013 | 5/29/2013 | $92.57 |
| 591013196616080 | 7/8/2013 | 7/15/2013 | 7/29/2013 | $92.57 |
| 591013200034880 | 7/16/2013 | 7/19/2013 | 8/2/2013 | $98.33 |
| 591013210629410 | 7/25/2013 | 7/29/2013 | 8/12/2013 | $50.21 |

| | | | | |
|---|---|---|---|---|
| 591013298509160 | 10/17/2013 | 10/25/2013 | 11/8/2013 | $98.33 |
| 591914021407940 | 11/1/2013 | 1/21/2014 | 2/4/2014 | $98.33 |
| 591013326446090 | 11/20/2013 | 11/22/2013 | 12/6/2013 | $145.71 |
| 591013326446100 | 11/20/2013 | 11/22/2013 | 12/6/2013 | $148.85 |
| 590914003835620 | 12/9/2013 | 1/3/2014 | 1/17/2014 | $145.41 |
| 591013347705840 | 12/9/2013 | 12/13/2013 | 12/27/2013 | $72.18 |
| 590914003835610 | 12/10/2013 | 1/3/2014 | 1/17/2014 | $46.36 |
| 591013346369130 | 12/10/2013 | 12/12/2013 | 12/26/2013 | $1,727.26 |
| **TOTAL** | | | | **$86,108.63** |

## Patient MW

153.    Defendants knowingly submitted or caused the submission of false claims by routinely and indiscriminately waiving copayments, without proper justification, for services performed for MW between at least December 21, 2009, and September 9, 2010.

154.    MW did not recall ever being asked for—or ever providing—a financial hardship form or documentation verifying MW's financial need.

155.    Each of the following claims was false because it misrepresented the actual cost of Defendants' services and was tainted by the knowing and willful provision of a kickback in the form of an unjustified copayment waiver:

| Medicare Claim Number | Date of Service(s) | Date Claim Received by Medicare | Date Claim Paid by Medicare | Amount Paid by Medicare |
|---|---|---|---|---|
| 591009364184150 | 12/21/2009 | 12/30/2009 | 1/11/2010 | $2,449.99 |
| 591010007109000 | 12/29/2009 | 1/7/2010 | 1/19/2010 | $48.36 |
| 591010007109470 | 12/29/2009 | 1/7/2010 | 1/19/2010 | $3.00 |
| 598310291059110 | 1/11/2010 | 10/18/2010 | 9/16/2011 | $2,849.40 |
| 599611067259870 | 1/18/2010 | 3/8/2011 | 6/1/2011 | $8,068.02 |
| 599611067259250 | 1/25/2010 | 3/8/2011 | 5/31/2011 | $1.18 |
| 591010158402410 | 6/3/2010 | 6/7/2010 | 6/29/2010 | $80.42 |
| 591010180350060 | 6/28/2010 | 6/29/2010 | 7/12/2010 | $493.23 |
| 591010182271430 | 6/30/2010 | 7/1/2010 | 7/13/2010 | $175.58 |
| 590910190870510 | 7/6/2010 | 7/9/2010 | 7/21/2010 | $80.42 |

| | | | | |
|---|---|---|---|---|
| 591010188224620 | 7/6/2010 | 7/7/2010 | 7/19/2010 | $294.61 |
| 598310284034240 | 7/19/2010 | 10/11/2010 | 12/6/2010 | $3,565.83 |
| 591010207307430 | 7/22/2010 | 7/26/2010 | 8/9/2010 | $80.42 |
| 598310284034230 | 7/26/2010 | 10/11/2010 | 12/6/2010 | $3,095.00 |
| 591010230111590 | 7/28/2010 | 8/18/2010 | 8/30/2010 | $81.89 |
| 591010230111610 | 7/29/2010 | 8/18/2010 | 8/30/2010 | $81.89 |
| 590910225805870 | 8/10/2010 | 8/13/2010 | 8/25/2010 | $80.42 |
| 591010243225180 | 8/30/2010 | 8/31/2010 | 9/13/2010 | $19.50 |
| 591010243225410 | 8/30/2010 | 8/31/2010 | 9/13/2010 | $86.11 |
| 591010243225480 | 8/30/2010 | 8/31/2010 | 9/13/2010 | $759.49 |
| 591010256461370 | 9/9/2010 | 9/13/2010 | 9/27/2010 | $80.42 |
| **TOTAL** | | | | **$22,475.18** |

**Patient RB**

156.    Defendants knowingly submitted or caused the submission of false claims by routinely and indiscriminately waiving copayments, without proper justification, for services performed for RB between at least September 9, 2009 and April 22, 2011.

157.    Defendants' records for RB contain a Financial Hardship Request Form dated April 22, 2011, and a "LOG NOTE" indicating that Defendants received a "financial hardship form from patient dated 9-9-12" that was "[s]igned by Dr. Qamar and scanned in patients['] chart."  Defendants' records for RB contain no financial hardship form dated prior to April 22, 2011.

158.    Even assuming the Financial Hardship Request Form alone was sufficient to justify Defendants' routine waiver of copayments for RB after April 22, 2011—which it was not, *see* ¶ 74, *supra*—Defendants routine waiver of copayments for RB before April 22, 2011 were unjustified and inappropriate.

159.    At least each of the claims below was false because it misrepresented the actual cost of Defendants' services and was tainted by the knowing and willful provision

of a kickback in the form of an unjustified copayment waiver. Defendants submitted additional false claims for services provided after April 22, 2011 because the form they collected from RB was insufficient to justify continued routine copayment waivers. *See* ¶ 74, *supra*.

| Medicare Claim Number | Date of Service(s) | Date Claim Received by Medicare | Date Claim Paid by Medicare | Amount Paid by Medicare |
|---|---|---|---|---|
| 590909261914590 | 9/9/2009 | 9/18/2009 | 9/30/2009 | $29.38 |
| 590909261914730 | 9/10/2009 | 9/18/2009 | 9/30/2009 | $19.67 |
| 590909261915140 | 9/10/2009 | 9/18/2009 | 9/30/2009 | $719.77 |
| 590909265918960 | 9/16/2009 | 9/22/2009 | 10/4/2009 | $48.36 |
| 591009287216920 | 10/12/2009 | 10/14/2009 | 10/26/2009 | $165.77 |
| 591009287217100 | 10/13/2009 | 10/14/2009 | 10/26/2009 | $164.62 |
| 591009301662170 | 10/16/2009 | 10/28/2009 | 11/9/2009 | $3,479.89 |
| 591009294321120 | 10/20/2009 | 10/21/2009 | 11/2/2009 | $72.99 |
| 591010112459500 | 4/16/2010 | 4/22/2010 | 5/4/2010 | $3.00 |
| 599611330640230 | 5/4/2010 | 11/26/2011 | 1/5/2012 | $0.46 |
| 591010182270860 | 6/23/2010 | 7/1/2010 | 7/13/2010 | $80.42 |
| 591010256461380 | 9/9/2010 | 9/13/2010 | 9/27/2010 | $257.79 |
| 591010314314910 | 11/9/2010 | 11/10/2010 | 11/22/2010 | $80.42 |
| 591010350365570 | 12/14/2010 | 12/16/2010 | 12/28/2010 | $512.11 |
| 591010355588480 | 12/14/2010 | 12/21/2010 | 1/2/2011 | $159.10 |
| 591010363019410 | 12/20/2010 | 12/29/2010 | 1/10/2011 | $144.75 |
| 591011012478460 | 12/27/2010 | 1/12/2011 | 1/24/2011 | $19.50 |
| 591011012478850 | 12/27/2010 | 1/12/2011 | 1/24/2011 | $595.42 |
| 591011020266510 | 1/13/2011 | 1/20/2011 | 2/1/2011 | $35.65 |
| 591011063091000 | 1/25/2011 | 3/4/2011 | 3/9/2011 | $147.50 |
| 591011073654200 | 2/23/2011 | 3/14/2011 | 5/20/2011 | $2,490.93 |
| 591011073654202 | 2/23/2011 | 3/14/2011 | 5/20/2011 | $2,446.25 |
| 591011083199440 | 3/21/2011 | 3/24/2011 | 4/19/2011 | $290.69 |
| **TOTAL** | | | | **$11,964.44** |

## VII.  DEFENDANTS KNEW THE CERTIFICATIONS AND CLAIMS THEY SUBMITTED TO MEDICARE WERE FALSE.

160.    Throughout the relevant period, Defendants actually knew that that their certifications and claims for reimbursement submitted to Medicare were false, or else deliberately ignored, and/or were recklessly indifferent to, the truth or falsity of those certifications and claims.

### A.    Defendants Understood and Disregarded Medicare Laws, Regulations, and Program Instructions Regarding Medical Necessity and Documentation.

161.    Through the advice of hired consultants, and because of frequent audits and pre- and post-payment reviews by Medicare contractors, Defendants were aware of the rules governing Medicare coverage, claim submission, and reimbursement—and of their systematic lack of compliance with those rules.

### i.    Defendants' Knowledge of Medicare Laws, Regulations, and Program Instructions

162.    Defendants retained outside consultants to advise them on billing and compliance issues.  Throughout much of the relevant period, Defendants worked with two consultants—PIP, from 2008 to 2011, and Ray Howard & Associates (RHA), from 2009 to at least 2010.

163.    With the assistance of these consultants, Defendants regularly received guidance from Florida's MAC, First Coast, and ZPIC, Safeguard Services, including Local Coverage Determinations applicable to claims for peripheral artery interventions.

164.    Similarly, Defendants were kept abreast of guidance from professional organizations.  On May 20, 2010, for example, PIP sent Dr. Qamar and others "a copy of

the ACC/AHA guidelines for cardiac catheterization," observing that "there has been some discussion on what the appropriate use criteria is for outpatient/freestanding labs and I thought you would be interested in the expert consensus on this issue."

165. Regarding use of the cath lab, Defendants understood, as their cath lab director advised in a November 2, 2011 email to "All Users," that "prior and adequate non-invasive testing is required on these patients before being scheduled in our lab."

166. Defendants' consultants also advised on discrete issues of medical necessity and documentation. For example, in a June 15, 2010 email, RHA advised Dr. Qamar:

> Keep in mind that if a patient is hypertensive and being managed by treatment therapies the fact the patient is hypertensive does not automatically provide medical necessity for performing renal angiography. If the patient[] is hypertensive and not being managed by treatment therapies this may provide what is needed for medical necessity to selectively engage the renals. In addition, if the patient has had diagnostic studies that provide clinical indication for peripheral angiography this should be referenced in the note to show the proper steps have been taken prior to the angiography.

167. Around the same time, RHA resolved to send to Dr. Qamar an article headlined "Probe of Cardiologist Accused of Implanting Unneeded Stents Now Expanding to Other Docs" along with "editorial comments."

168. More generally, PIP and RHA repeatedly advised Defendants, as PIP reminded them on May 5, 2010, that they "should not perform any procedure that is not medically necessary." Dr. Qamar "agreed to this," according to PIP, but asked "questions to determine if there is a way to get around this."

169. Defendants' consultants also advised on proper medical record-keeping procedures.

170. From 2008 to 2011, PIP served as Defendants' outside billing agent. PIP learned that Dr. Qamar had undergone a "probe" audit by First Coast and remained under scrutiny. PIP also learned that Defendants had been placed on pre-payment review by First Coast with respect to six billing codes for cath lab procedures.

171. These investigations concerned PIP personnel. Accordingly, PIP met with Dr. Qamar in April 2010 to discuss remedial measures. Dr. Qamar understood the "importance of improving his documentation in order to more accurately document the medical necessity and the full procedural details," according to minutes of the April 2010 meeting, and he agreed to cooperate with PIP's "corrective action plan."

172. The corrective action plan involved PIP temporarily taking over the management of Defendants' practice. Among other changes, PIP required Dr. Qamar to dictate, scribe, and sign his own cath lab procedure reports instead of relying on non-physician scribes who were not always present for the duration of the procedures.

173. Defendants complied with PIP's corrective action plan for only a few months. In June 2010, PIP learned that Dr. Qamar was no longer dictating and scribing all of his cath lab procedures, and was again relying on inadequate procedure templates and non-physician scribes to document his work.

174. PIP continued to work with Defendants to develop record-keeping techniques that would assure proper documentation of cath lab procedures and accommodate Defendants' need for expediency, but Defendants disregarded PIP's

proposals.

175.     On July 20, 2010, PIP's counsel wrote to Defendants' counsel about Defendants' failure "to implement and enforce a corrective action plan," including Defendants' failure to eliminate reliance on "documentation produced by employee scribes."  PIP warned that it could not continue to provide billing services to Defendants without "written assurances that a corrective action plan has been undertaken to mitigate issues that have been brought to the attention of ICE, in addition to preventing any future compliance issues from arising."

176.     Dr. Qamar responded to PIP's letter the day after he received it: "I am finding this letter extremely distasteful . . .  I will not allow this constant condescending tone.  I will not be chastised for something I have not done.  This notion of Pip doing me a favor is unacceptable."

177.     By February 2011, Defendants had stopped using PIP for billing services and had developed their own billing system.  Defendants' system included many of the procedures that PIP had advised against, including giving non-physician nurse practitioners the authority to scribe procedures and sign off on procedure reports.

178.     Three weeks into the new system, Defendants' old problems remained:  as Defendants' chief nurse practitioner advised by email dated April 19, 2011, "we providers and scribes need to meet very soon to decide upon a standard format/way to share a common dictation strategy" because some reports "while technically accurate didn't have the meat necessary to explain to Medicare the rational [sic] for the ordering of the diagnostic testing."

ii.     **Defendants' Knowledge of their Failure to Comply with Medicare Laws, Regulations, and Program Instructions**

179.    Because of audits and reviews conducted by Medicare contractors throughout the relevant period, Defendants knew that they were performing medically unnecessary procedures and failing adequately to document medical necessity.

180.    Between August and September 2009, First Coast conducted a "probe" audit of Dr. Qamar.  The audit involved the review of 50 cardiovascular procedures performed on ten Medicare beneficiaries, and it indicated that 88 percent of the claims for those procedures were unpayable because the procedures were not medically necessary and/or not properly documented.

181.    In 2010 and 2011, Defendants' Medicare claims for six billing codes related to cath lab procedures were subjected to pre-payment review by First Coast.  PIP closely monitored the results of this review and regularly reported the results to Defendants.

182.    In a September 9, 2010 email, for instance, PIP advised Defendants on "the most recent round of denials from Medicare for the procedure claims processed under the pre-payment stipulation."  PIP noted concern that Defendants were "receiving an increasing amount of denials for codes in addition to the renals," including denials of claims for peripheral angiography.

183.    Days later, PIP advised Defendants that since the inception of the pre-payment review, only 66 percent of their claims for peripheral angiography, and 29 percent of their claims for renal angiography, had been approved on initial pre-payment review.

184.     A few months later, PIP provided Defendants an update on "pre-payment claims that have been denied in full," noting that "two claims were denied due to medical necessity, and the third was denied due to incomplete records."

185.     On October 15, 2012, SafeGuard Services placed Defendants on a 100 percent pre-payment review, subjecting all of Defendants' Medicare claims to medical review before authorizing payment.  During this review, Defendants' stenting dropped significantly despite the fact that Defendants' Medicare beneficiary population remained largely the same.

186.     After approximately 17 months of 100 percent pre-payment review, over 6,700 of Defendants' Medicare claims were denied.  The denial rate for all Defendants' Medicare claims remained around 60 percent throughout the pre-payment review period.

187.     On January 31, 2013, at the urging of Defendants' counsel, Safeguard Services reduced the 100 percent pre-payment review to a more limited code-specific review, which remains in effect.

188.     By March 2013, in response to the ongoing government scrutiny, Defendants had engaged another consultant to "Clean-Up" clinical narratives "to make sure we are including the information needed to justify an audit if we needed to."

189.     Through third party consultants and Medicare audits and payment reviews, Defendants understood the Medicare requirements relevant to their practice and their systematic failure to comply with those requirements.

### B. Defendants Understood and Disregarded Medicare Laws, Regulations, and Program Instructions Regarding Medicare Copayment Collection.

190.    Defendants also understood the rules governing Medicare copayments, and the circumstances under which the waiver of a Medicare copayment was permissible.

191.    As part of Defendants' relationship with PIP, Defendants agreed to adhere to PIP's billing manual of operations, which included a "FINANCIAL HARDSHIP POLICY" based on the rules governing Medicare copayments.  *See ¶¶ 66–75, supra.*  The policy provided that "Medicare and Medicaid co-payments, co-insurance and deductibles shall not be waived without a good faith determination that the patient is in financial need and reasonable efforts to collect can be proven."

192.    By letter dated July 20, 2010, PIP warned Defendants about their "inconsistent billing policies in relation to government insured, commercial insured, and self pay patients."  *See ¶ 75, supra.*

193.    Dr. Qamar ignored PIP's guidance and routinely assured patients that they would not be held responsible for copayments.  Dr. Qamar knowingly and willfully gave such assurances before collecting a financial hardship form from the patient (if a form was collected at all), and before making a good faith effort to verify the patient's financial need.

194.    Defendants' Billing Meeting Minutes of August 24, 2011 summarized the practical effect of Dr. Qamar's approach to copayments for cardiovascular interventions: "no financial hardship forms needed at the Cath lab."

195.    One of Defendants' cath lab employees expounded on her understanding of Dr. Qamar's approach to copayments, noting in a September 13, 2011 email that "[i]n

many cases the pt may not qualify as a 'financial hardship' but Dr Q is the boss :)." Demonstrating the insufficiency of Defendants' financial hardship forms, *see* ¶ 74, *supra*, the employee went on to encourage a colleague to "ask the patient to fill out the hardship form (even if financially they may not meet criteria) if it would keep things 'across the board' for you."

196.     Defendants implicitly waived hundreds more copayments by rarely responding to PIP's repeated requests for guidance on the disposition of delinquent patient accounts.  *See* ¶¶ 146–48, *supra*.

197.     Defendants knew the requirements for waiving Medicare copayments, including on account of financial hardship, and knowingly, deliberately, and/or recklessly disregarded them.

## VIII.   CAUSES OF ACTION

### <u>Count I: False or Fraudulent Claims</u>

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) (1986),
amended by 31 U.S.C. § 3729(a)(1)(A) (2009)**

198.     The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

199.     From at least January 1, 2009 to December 31, 2013, Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment or approval for cardiovascular services that were not medically necessary and/or were not properly documented, in violation of the FCA, 31 U.S.C. § 3729(a)(1) (1986), amended by 31 U.S.C. § 3729 (a)(1)(A) (2009).

200.     The false or fraudulent claims were the CMS Form 1500 Health Insurance Claim Forms that Defendants submitted to the Medicare program throughout the relevant period.

201.     Because of Defendants' false or fraudulent claims, the United States suffered damages.

202.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants to the Medicare program.

<u>**Count II: False Statements**</u>

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009)**

203.     The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

204.     From at least January 1, 2009 to December 31, 2013, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims for payment or approval by the Medicare program for cardiovascular services that were not medically necessary and/or not properly documented, in violation of the FCA, 31 U.S.C. § 3729 (a)(1)(B).

205.     The false records or statements appeared on CMS Form 1500—where Defendants falsely certified to the United States, *inter alia*, that the cardiovascular services for which they sought Medicare payment were medically necessary—and on CMS Forms 855b and 855i–where Defendants falsely certified to the United States, *inter*

*alia*, their compliance with all "Medicare laws, regulations and program instructions."

206. The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

207. Because of Defendants' false or fraudulent records or statements, the United States suffered damages.

208. Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false record or statement presented or caused to be presented by Defendants to the Medicare program.

## Count III: False or Fraudulent Claims (Kickbacks)

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1) (1986), as amended by § 3729(a)(1)(A) (2009)

209. The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

210. From at least January 1, 2009 to December 31, 2013, Defendants presented or caused to be presented false or fraudulent claims to the United States for payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1) (1986), amended by 31 U.S.C. § 3729(a)(1)(A) (2009).

211. The false or fraudulent claims were the CMS Form 1500 Health Insurance Claim Forms that Defendants submitted throughout the relevant period.

212. The claims were false or fraudulent because they were tainted by kickbacks that Defendant knowingly and willfully provided to Medicare beneficiaries in

the form of copayment waivers, at least one purpose of which was to induce the beneficiaries to obtain additional medical services from Defendants paid for by the Medicare program, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), (g).

213.    The claims also were false or fraudulent because they overstated the cost of the Defendants' services by the amount of the inappropriately waived beneficiary copayments and therefore resulted in inflated claims to Medicare for payment of such services.

214.    Because of Defendants' false or fraudulent claims, the United States suffered damages.

215.    Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false claim presented or caused to be presented by Defendants to the Medicare program.

### Count IV: False Statements (Kickbacks)

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) (2009)**

216.    The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

217.    From at least January 1, 2009 to December 31, 2013, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false or fraudulent claims for payment or approved by the United States, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B).

218.     The false records or statements appeared on CMS Form 1500—where Defendants falsely certified to the United States, *inter alia*, that their claims for Medicare payment were true, accurate, and complete—and on CMS Forms 855b and 855i—where Defendants falsely certified to the United States, *inter alia*, their compliance with all "Medicare laws, regulations and program instructions . . . including, but not limited to, the Federal anti-kickback statute."

219.     The Defendants records or statements on CMS Form 1500 also were false or fraudulent because they overstated the cost of the Defendants' services by the amount of the inappropriately waived beneficiary copayments and therefore resulted in inflated claims to Medicare for payment of such services.

220.     The false records or statements were material to Defendants' claims for Medicare payment because Medicare would not have paid the claims absent the records or statements.

221.     Because of Defendants' false or fraudulent records or statements, the United States suffered damages.

222.     Defendants are jointly and severally liable to the United States for treble damages under the FCA, in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each false record or statement presented or caused to be presented by Defendants.

### Count V: Payment under Mistake of Fact

223.     The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

224.     The United States paid the claims described in this Complaint as a result of mistaken understandings of fact.  Specifically, the United States paid those claims under the mistaken understanding that Defendants' cardiovascular services were reasonable, medically necessary, and properly documented.

225.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants certain sums of money to which Defendants were not entitled.  Defendants are thus liable to make restitution to the United States for such amounts, which are to be determined at trial.

## Count VI: Payment under Mistake of Fact (Kickbacks)

226.     The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

227.     The United States paid the claims described in this Complaint as a result of mistaken understandings of fact.  Specifically, the United States paid what it believed was 80 percent of those claims under the mistaken understanding that Defendants were collecting the remaining 20 percent beneficiary copayment.

228.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of Defendants' certifications and representations, paid Defendants certain sums of money to which Defendants were not entitled.  Defendants are thus liable to make restitution to the United States for such amounts, which are to be determined at trial.

## Count VII: Unjust Enrichment

229. The United States repeats and re-alleges paragraphs 1 through 197 as if fully set forth herein.

230. From at least January 1, 2009 to December 31, 2013, the United States paid Defendants for medically unnecessary and/or improperly documented cardiovascular services.

231. By directly or indirectly obtaining federal funds from Medicare to which they were not entitled, Defendants were unjustly enriched at the expense of the United States, and are liable to account and pay to the United States such amounts, or the proceeds therefrom, which are to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in favor of the United States as follows:

I. On Counts I, II, III, and IV under the FCA, against all Defendants jointly and severally, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with such further relief as may be just and proper.

II. On Counts V and VI for payment under mistake of fact, for an amount equal to the money paid by the United States to Defendants to which Defendants were not entitled, plus interest, costs, and expenses.

III. On Count VII for unjust enrichment, for an amount equal to the monies that the Defendants obtained from the United States without right and by which they have

been unjustly enriched,  plus interest, costs, and expenses.

IV.      All other relief as may be required or authorized by law and in the

interests of justice.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the United States

demands a jury trial in this case.

Dated: April 20, 2015                           Respectfully submitted,

**Benjamin C. Mizer**
Principal Deputy Assistant Attorney General
Civil Division

**A. Lee Bentley III**
United States Attorney

By:___*s/ Sean P. Flynn*_____
**Sean P. Flynn (Trial Counsel)**
Deputy Chief, Civil Division
Assistant United States Attorney
USAO 111
400 North Tampa Street, Suite 3200
Tampa, FL  33602
Telephone: (813) 274–6000
Facsimile: (813) 274–6200
Sean.Flynn2@usdoj.gov

**Michael D. Granston**
**Tracy L. Hilmer**
**Eva U. Gunasekera (Trial Counsel)**
**Adam R. Tarosky (Trial Counsel)**
Civil Division
Commercial Litigation Branch
P.O. Box 261
Ben Franklin Station
Washington, DC  20044
Telephone: (202) 307–0404
Facsimile: (202) 307–3852