# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and THE STATE OF FLORIDA *ex rel*. HOLLY A. TAYLOR, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 5:11-CV-00406-10TBS |
| v. | ) ) | |
| DR. ASAD QAMAR and INSTITUTE OF CARDIOVASCULAR EXCELLENCE, | ) ) ) | |
| Defendants. | ) ) ) | |

## STATE OF FLORIDA'S COMPLAINT IN INTERVENTION AND DEMAND FOR JURY TRIAL

Plaintiff, the STATE OF FLORIDA, Office of the Attorney General, Department of Legal Affairs ("FLORIDA") through its Attorney General, Pamela Jo Bondi, brings this cause of action under the Florida False Claims Act, §§68.081-68.092, Fla. Stat., against Defendants Asad Qamar, MD and Institute for Cardiovascular Excellence, while transacting business in Florida (hereinafter collectively "Defendants").

## I.  INTRODUCTION

1.     This is a law enforcement civil action brought pursuant to the Florida False Claims Act, §§68.081-68.092, Fla. Stat. ("FFCA"), to recover treble damages plus all applicable civil penalties and other relief against Defendants.  FLORIDA alleges that Defendants violated the Florida False Claims Act, §§68.081-68.092, Fla. Stat., because: (a) Defendants knowingly presented or caused to be presented false or fraudulent fee-for-service claims to the Florida

Medicaid Program and false or fraudulent managed care claims for payment or approval by managed care organizations who contracted with the Florida Medicaid Program to provide medical services to Florida Medicaid recipients, and (b) Defendants knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent fee-for-service claims paid or approved by the Florida Medicaid Program or managed care claims paid or approved by managed care organizations who contracted with the Florida Medicaid Program to provide medical services to Florida Medicaid recipients. From January 1, 2007 to the present (the "relevant time period"), Defendants have engaged in a pattern and practice of performing medically unnecessary services on Florida Medicaid recipients, including fee-for-service recipients, managed care recipients and Medicare/Medicaid dual eligible recipients. Defendants performed and billed Medicaid for invasive procedures to treat peripheral artery disease, including angiography, angioplasty, atherectomy, and stent implantation. Instead of ordering these higher risk procedures after exhausting non-invasive alternative therapies, Defendants regularly subjected patients to peripheral artery interventions when they were not medically necessary and/or without properly evaluating and documenting medical necessity.

2.      Defendants knew, deliberately ignored, or recklessly disregarded the fact that many of the cardiovascular procedures for which they submitted claims to Medicaid were not indicated by patients' medical histories and records, or the severity of patients' symptoms, as required by Medicaid payment rules. Nevertheless, with each claim, Defendants falsely certified that the procedures were medically necessary.

3.      By presenting false claims to Medicaid for medically unnecessary and/or inadequately documented cardiovascular procedures, Defendants obtained millions of dollars to which they were not entitled.

## II.     JURISDICTION AND VENUE

4.      Pursuant to 28 U.S.C. § 1331, this District Court has original jurisdiction over the subject matter of this civil action since it arises under the laws of the United States, in particular the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* ("FCA").  In addition, the FCA specifically confers jurisdiction upon the United States District Court. 31 U.S.C. § 3732(b).

5.      Pursuant to 28 U.S.C. § 1367, this District Court has supplemental jurisdiction over the subject matter of the claims brought pursuant to the false claims acts of the State of Florida on the grounds that the claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a), and because Defendants transact business in this District.

7.      Venue is proper in this District under 31 U.S.C. §3732 and 28 U.S.C. §1391(b) and (c) because Defendants transact business in this District.

## III.     PARTIES

8.      FLORIDA is acting pursuant to the Attorney General's own authority under the Florida Medicaid Provider Fraud Statute and the FFCA, §§409.920 and 68.083, Fla. Stat., respectively.

9.      Relator provided information to the State which is the basis of this suit pursuant to §68.083(3), Fla. Stat., and continues to be a named Plaintiff pursuant to §68.084(1).

10.     Plaintiff-Relator Holly Taylor ("Relator") is the former director of client services at Partners in Practice, located in Sarasota Florida. Relator was assigned as the account manager for Defendants.

11.    Defendant Institute of Cardiovascular Excellence, PLLC ("ICE") is a Florida corporation that maintains its principal place of business in Ocala, Florida.

12.    Defendant Dr. Asad U. Qamar ("QAMAR") is a cardiologist licensed to practice medicine in Florida whose principal office is located at 4730 SW 49th Road, Ocala, Florida 34474. Dr. Qamar is the founder and sole Managing Member of ICE. Dr. Qamar' s Florida medical license became active in or around August 1997.

13.    During the relevant period, Defendants operated in at least three North Central Florida cities: Ocala, The Villages, and Williston.

14.    Throughout the relevant period, Defendants were in the business of providing cardiovascular services to Medicaid patients.

15.    Defendants are Florida Medicaid providers.

## IV.    THE FLORIDA MEDICAID PROGRAM

16.    The Florida Medicaid Program is authorized by Title XIX of the Social Security Act and Title 42 of the Code of Federal Regulations.  Medicaid is a joint federal-state program that provides health care benefits for certain groups including the poor and disabled.  The funding for Medicaid is shared between the federal and state governments.  The Florida Medicaid program is required to implement a State Plan containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures.  42 U.S.C. §1396a.  The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding.  42 U.S.C. §1396a.  The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average.  42 U.S.C. §1396d (b).  The Florida Medicaid Program is authorized by §409.902 Fla. Stat., and Chapter

59G, Florida Administrative Code ("F.A.C."). Section 409.919, Fla. Stat., mandates the Agency for Health Care Administration ("AHCA") to "adopt any rules necessary to comply with or administer §§409.901-409.920 and all rules necessary to comply with the federal requirements."

17.     The Florida Medicaid program provides health care benefits on both a fee-for-service and managed care basis. The managed care component of Florida Medicaid, known as the Florida Managed Medical Assistance Program section 1115(a) demonstration ("Reform Demonstration"), was first approved by CMS on October 19, 2005. Florida Medicaid implemented the Reform Demonstration in two of its sixty-seven counties as a pilot project on July 1, 2006, subsequently expanding it to three additional counties on July 1, 2007. House Bill 7107 of the 2011 Florida Legislative session created Part IV of Chapter 409, Florida Statutes (§§ 409.961 – 409.985, Fla. Stat.), directing the Agency for Health Care Administration (AHCA) to create the Statewide Medicaid Managed Care (SMMC) program. The State Plan was amended and CMS approval was obtained. AHCA issued an Invitation to Negotiate (ITN) for SMMC, entered into contracts with the successful bidders, and SMMC became effective on July 1, 2014. Federal and state government funds are used to fund SMMC and the contracts between AHCA and the Managed Care Organizations (MCOs), also known as managed care plans. The SMMC program has two key components: the Managed Medical Assistance (MMA) Program and the Long-term Care (LTC) Program. The Managed Medical Assistance program is comprised of several types of managed care plans: Health Maintenance Organizations, Provider Service Networks, and Children's Medical Services Network. There are 13 MMA Standard (Non-Specialty) Plans that were awarded contracts with AHCA. There are 7 LTC Plans that were awarded contracts with AHCA. The Managed Care Plans in SMMC must comply with all

Florida Medicaid handbooks, as noticed in the Florida Administrative Register, and incorporated by reference in Florida rules relating to the provision of Florida Medicaid services.

18.    Some Medicare beneficiaries are also eligible to receive Medicaid services. These patients are referred to as "dual-eligible."

19.    The FFCA, pursuant to §68.082(1)(a), Fla. Stat., defines "claim" consistent with the Federal False Claims Act ("FCA"):

"Claim" means any request or demand, whether under a contract or otherwise, for money or property, regardless of whether the state has title to the money or property, that:

1. Is presented to any employee, officer, or agent of the state; or

2. Is made to a contractor, grantee, or other recipient if the state provides or has provided any portion of the money or property requested or demanded, or if the state will reimburse the contractor, grantee, or other recipient for any portion of the money or property that is requested or demanded.

20.    The Office of the Attorney General conducts a program of Medicaid fraud control through its Medicaid Fraud Control Unit ("MFCU").

21.    Medicaid handbooks are issued for the purpose of furnishing the Medicaid providers with the policies and procedures needed to receive reimbursement for covered services provided to eligible Florida Medicaid recipients.  The handbooks are incorporated by reference in Chapter 59G-4., Florida Administrative Code.

22.    The "Florida Medicaid Provider General Handbook", among other things, describes the overall Medicaid Program and general requirements for providers; the "Coverage & Limitations Handbooks" explain the scope of covered services, eligibility and fee schedules

for providers; and the "Reimbursement Handbooks" instruct providers how to complete and file claims for reimbursement from Medicaid for services rendered to Medicaid recipients.

## V.  MEDICAID PROVIDER CERTIFICATIONS

23.     Physicians make certifications in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid.  Florida's "Medicaid Provider Enrollment Application" must be completed by any person or entity desiring to receive payment for services provided to Medicaid recipients.   Under Section VII Certification of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Florida Medicaid Program recipients, a provider must certify that the provider understands "that false claims, statements, documents, or concealment of material facts may be prosecuted under applicable federal and state laws."   Florida Medicaid Provider Enrollment Application, Section VII Certification, at 9.

24.     The Florida Medicaid Provider General Handbook contains the following language, in Chapter 5 at page 5-4:

**Provider Responsibility**

When presenting a claim for payment under the Medicaid program, a provider has an affirmative duty to supervise the provision of, and be responsible for, goods and services claimed to have been provided, to supervise and be responsible for preparation and submission of the claim, and to present a claim that is true and accurate and that is for goods and services that:
Are provided in accord with applicable provisions of all Medicaid rules, regulations, handbooks, and policies and in accordance with federal, state and local law.

25.     Rule 59G-5.020, F.A.C., entitled <u>Provider Requirements</u> requires that enrolled Medicaid providers must comply with the <u>Florida Medicaid Provider General Handbook</u>.

26.     Chapter 2 of the <u>Florida Medicaid Provider General Handbook</u> covers certain provider requirements, including enrollment and qualifications.  Florida Medicaid providers who

are physicians are required to fill out the Florida Medicaid Provider Enrollment Application and

Non-Institutional Medicaid Provider Agreement.

27.     The applicable <u>Medicaid Provider Agreement</u> contains the following provisions:

(3) <u>Compliance</u>. The provider agrees to comply with local, state, and federal laws, as well as rules, regulations, and statements of policy applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA.
. . . .
(5) <u>Provider Responsibilities</u>.  The Medicaid provider shall:
. . . .
(f) Within 90 days of receipt, refund any moneys received from the Medicaid program in error or in excess of the amount to which the provider is entitled from the Medicaid program.
. . . .
(i)  Agrees to submit claims to AHCA electronically and to abide by the terms of the Electronic Claims Submission Agreement.

28.     In addition, every time they submit an electronic claim for reimbursement by the

Florida Medicaid program pursuant to an electronic claims submission agreement, physicians

also make certifications that they are complying with state and federal laws applicable to the

Medicaid program and that there has not been a material omission.  According to the <u>Electronic</u>

<u>Claims Submission Agreement</u>, all providers must abide by all Federal and State statutes, rules,

regulations, and manuals governing the Florida Medicaid program and certify that each claim is

in compliance with the conditions stated on the back of the paper claim form and with all federal

and state laws.  The provider certification on the back of the paper claim form for Medicaid

Payments provides:

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency of Dept. of Health and Human Services may request.
I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Approved OMB-0938-0008 FORM CMS-1500 (12-90).

29.     Section 409.907, Fla. Stat., entitled <u>Medicaid Provider Agreements,</u> includes the following provisions:

(1)   Each provider agreement shall require the provider to comply fully with all state and federal laws pertaining to the Medicaid program, as well as all federal, state, and local laws pertaining to licensure, if required, and the practice of any of the healing arts, and shall require the provider to provide services or goods of not less than the scope and quality it provides to the general public.

(2)   Each provider agreement shall be a voluntary contract between the agency and the provider, in which the provider agrees to comply with all laws and rules pertaining to the Medicaid program when furnishing a service or goods to a Medicaid recipient and the agency agrees to pay a sum, determined by fee schedule, payment methodology, or other manner, for the service or goods provided to the Medicaid recipient. Each provider agreement shall be effective for a stipulated period of time, shall be terminable by either party after reasonable notice, and shall be renewable by mutual agreement.

30.     Rule 59G-5.010, F.A.C. entitled <u>Provider Enrollment</u>, sets forth additional provider responsibilities for successful enrollment as a provider, including completion of enrollment applications, which require the providers to agree to abide by all Federal and State statutes, rules, regulations, and manuals governing the Florida Medicaid program.

31.     Section 409.905, Fla. Stat., entitled <u>Mandatory Medicaid Services</u> mandates that "Any service under this section shall be provided only when medically necessary and in accordance with state and federal law." As stated in 59G-1.010(166) of the Florida Administrative Code, "Medically necessary" or "medical necessity" means that the medical or allied care, goods, or services furnished or ordered must:

Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;

Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;

This Florida Administrative Code provision further clarifies:

The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service.

32.    The <u>Medicaid Provider Reimbursement Handbook, CMS-1500</u> requires that physicians bill claims on the CMS-1500 claim form and provides detailed instructions on how to fill out the numerous fields on the CMS-1500 Form.  Computer instructions on Claim Item 31 of the form in chapter 1-34 are as follows:

| | |
|---|---|
| **31  Signature of Physician or Supplier Including Degrees or Credentials** | Sign and date the claim form.  If the provider uses a facsimile signature or a signature stamp, the entry must be initialed.  The provider is responsible for ensuring that the signature on the claim is that of an authorized individual. |
| | The authorized signature certifies that the information entered on the claim is in conformance with the conditions on the back of the claim form and with all federal and state laws and regulations.  State laws and regulations include the regulations applicable to the Medicaid program, including the Medicaid Provider Handbooks issued by AHCA.  Providers are responsible for all claims billed using their Medicaid provider identification numbers.  (See Electronic Claims Submissions in this chapter for information on electronic claim certification.) |
| | "Signature on file" may be used only if the provider's billing agent or authorized designee has a written attestation signed by the provider that allows the billing agent or authorized designee to file claims on the provider's behalf.  The attestation must be maintained on file at the billing agent's or authorized designee's office.  The attestation must be readily available upon AHCA's request. |

Enter the date that the form was signed in six-digit format (MM/DD/YY). For example, for January 15, 2007, enter 01/15/07.

Additionally the instructions in Chapter 1, page 1-48, confirm the certifications made by the provider at the time of the claim submission:

**Claim Certification**

Because an electronic claim cannot be submitted with a signature, the provider's endorsed signature on the back of the remittance check issued by the Medicaid fiscal agent takes the place of a signature on a paper claim form. It acknowledges the submission of the claim and the receipt of the payment for the claim. It certifies that the claim is in compliance with the conditions stated on the back of the paper claim form and with all federal and state laws.

Any provider who utilized the electronic funds transfer system is certifying with each use of the electronic funds transfer system that the claim(s) for which the provider is being paid is in compliance with the provisions found on the back of the paper claim form and with all federal and state laws.

33. Managed care plans receive negotiated per-member, per-month capitation rate payments. Payments are risk-adjusted rates based on historical utilization and spending data, projected forward, and adjusted to reflect the eligibility category, geographic area, and clinical risk profile of the recipients. In negotiating rates with the plans, AHCA considers any adjustments necessary to encourage plans to use the most cost-effective modalities for treatment of chronic disease. §409.968(1), Fla. Stat. As a condition for receiving payment under the Medicaid managed care program, a Managed Care Organization (MCO) must comply with applicable certification federal regulation requirements. 42 C.F.R. §438.602. When State payments to an MCO are based on data submitted by the MCO, the State must require certification of the data as provided in 42 C.F.R. §438.606. The data that must be certified

include, but are not limited to, enrollment information, encounter data, and other information required by the State and contained in contracts, proposals, and related documents. 42 C.F.R. § 438.604(a). The certification required by 42 C.F.R. §438.606 for data submitted by the MCO includes a certification as to the accuracy, completeness, and truthfulness of the data by the MCO's Chief Executive Officer, Chief Financial Officer, or an individual with delegated authority to sign for, and who reports directly to, the MCO's Chief Executive Officer or Chief Financial Officer. AHCA is required to pay the applicable capitation rate to the MCO for each eligible enrollee for each month with the total amount of payment dependent upon the number of enrollees in each eligibility category and each rate group. MMA Standard Contract, Attachment II, Core Contract Provisions, Section IX(B)(1)(a). The capitation rates reflect historical utilization and spending for covered services projected forward and will be adjusted to reflect the level of risk for enrollees in each MCO. MMA Standard Contract, Attachment II, Core Contract Provisions, Section §IX(B)(1)(b). The MMA Standard Contracts are in compliance with the federal regulations. The managed care plan reporting requirements within the MMA Standard Contracts require the MCO's CEO, CFO, or an individual who reports to the CEO or CFO and who has delegated authority to certify the MCO's reports, shall attest, based on his/her best knowledge, information and belief, that all data submitted in conjunction with the reports and all documents requested by AHCA are accurate, truthful and complete in accordance with 42 C.F.R. 438.606(a) and (b). MMA Standard Contract, Attachment II, Core Contract Provisions, Section XIV.A.5.

34. The contracts between MCOs and Defendants require Defendants to submit timely, complete and accurate encounter data to the MCOs in accordance with the encounter data requirements set forth in Section VIII.E. of the MMA Standard Contract, Attachment II, Core

Contract Provisions, Section VI.C.6.c.(25). The contracts also require Defendants to maintain an adequate record system for recording services, charges, dates and all other commonly accepted information elements for services rendered to the MCO as provided in MMA Standard Contract, Attachment II, Core Contract Provisions, Section VI.C.6.c.(21). Pursuant to §409.967(2)(l), Fla. Stat., any claims payment to a provider by a managed care plan, or by a fiscal agent or intermediary of the plan, must be accompanied by an itemized accounting of the individual claims included in the payment including, but not limited to, the enrollee's name, the date of service, the procedure code, service units, the amount of reimbursement and the identification of the managed care plan on whose behalf the payment is made. The contracts between MCOs and Defendants require Defendants to certify compliance with state and federal laws. Defendants are also obligated to comply with the Florida Medicaid Handbooks, including certifying compliance with state and federal laws, as a Florida Medicaid fee-for-service provider and a provider within the SMMC program.

35. Defendants presented false or fraudulent claims for payment to MCOs within the Florida SMMC program. By this conduct, Defendants caused the MCOs to present false or fraudulent encounter data to AHCA. The submission of accurate, complete, and truthful encounter data, certified as being in compliance with state and federal laws, as required by contractual provisions and state and federal laws and regulations, was a condition of payment by the Florida Medicaid program.

36. During the relevant period, QAMAR has been registered as a non-institutional Medicaid provider in Florida.

37. During the relevant period, ICE has been registered as a non-institutional Medicaid provider in Florida.

## VI.    MEDICAL NECESSITY

38.    The Medicaid Practitioner Services Coverage and Limitations Handbook provides that "Medicaid reimburses services that are determined to be medically necessary and do not duplicate another provider's service."

39.    "Medical Necessity" is defined by Rule 59G-1.010(166), Florida Administrative Code as follows:

(166) "Medically necessary" or "medical necessity" means that the medical or allied care, goods, or services furnished or ordered must:

(a) Meet the following conditions:

1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;

2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;

3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;

4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; statewide; and

5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

(b) "Medically necessary" or "medical necessity" for inpatient hospital services requires that those services furnished in a hospital on an inpatient basis could not,

consistent with the provisions of appropriate medical care, be effectively furnished more economically on an outpatient basis or in an inpatient facility of a different type.

(c) The fact that a provider has prescribed, recommended, or approved medical or allied care, goods, or services does not, in itself, make such care, goods or services medically necessary or a medical necessity or a covered service.

## VII.    PERIPHERAL ARTERY DISEASE

40.     Peripheral artery disease ("PAD") is the narrowing or blockage of peripheral arteries and consequent reduction of blood flow to the limbs.

41.     PAD is usually caused by atherosclerosis, the buildup of cholesterol and fatty deposits called "plaques" on the inner walls of the arteries. Plaques restrict blood flow to the limbs and other parts of the body by clogging arteries or causing abnormal artery function. Cardiovascular specialists and other medical professionals refer to this narrowing or blockage as a "lesion" or "stenosis."

42.     PAD includes a spectrum of syndromes ranging from intermittent "claudication" to "critical limb ischemia." Claudication is exertional leg pain caused by obstructed arteries. "Critical limb ischemia" usually involves non-exertional or resting leg pain, non-healing wounds, ulcers, or gangrene. Most patients with PAD have only intermittent claudication, which is typically unlikely to progress to critical limb ischemia.

43.     PAD that is significant enough to warrant treatment must be specifically and appropriately evaluated, diagnosed, and managed. Peripheral arteries may be significantly or completely blocked and still not require intervention because more than one artery supplies blood to the peripheral tissue. Accordingly, a provider must evaluate the severity of the PAD and its impact on a patient's symptoms and functionality through non-invasive testing before

resorting to invasive procedures.

44.    Commonly used non-invasive testing for PAD includes physical examination for, among other things, a diminished pulse; a whooshing sound (or "bruit") heard over arteries using a stethoscope; and poor wound healing in areas where blood flow may be restricted. Another technique compares systolic blood pressure in the ankle to systolic blood pressure in the arm, and evaluates the resulting ratio, referred to as the "ankle-brachia! index" ("ABI").

45.    Other, more sophisticated non-invasive testing for PAD involves techniques like segmental blood pressure recordings; pulse volume recordings ("PVRs"); Doppler flow measurements with ultrasound (or "lower extremity arterial Duplex"); magnetic resonance angiography ("MRA"); and computerized tomography angiography ("CTA"). MRA and CTA involve the injection of contrast material (or "dye") into the blood vessels to enable the cardiovascular specialist to view vascular anatomy without using an invasive catheter-based approach.

46.    Non-invasive treatment for PAD often includes medications such as aspirin, statins (cholesterol-lowering drugs), and cilostazol (the generic name of a drug used to treat claudication); dietary modifications; exercise programs; and risk factor modification, especially smoking cessation.

47.    If non-invasive tests corroborate the severity of the PAD - and if disabling claudication or critical limb ischemia has developed - a physician may perform invasive testing to determine if "revascularization" is necessary. Revascularization refers to the use of invasive techniques, either catheter-based or surgical, to restore adequate blood flow to the affected limb and relieve symptoms.

48.    Catheter-based angiography, or an "angiogram," is an invasive imaging procedure

that involves the insertion of a long, narrow tube called a "catheter" into a blood vessel in the arm or leg. The catheter is guided through the blood vessel to the artery of interest with the aid of an x-ray imaging technique called fluoroscopy. Dye is injected through the catheter into the vessel to make its internal dimensions visible.

49.     Balloon angioplasty can be performed inside the artery in conjunction with catheter-based angiography. After anti-coagulating a patient with blood thinner, a balloon catheter is passed over a guide-wire into a significantly narrowed portion of the artery and inflated to reduce the severity of the blockage. The balloon catheter and guide-wire are then removed.

50.     Atherectomy is another invasive catheter-based treatment that involves the use of a sharp blade, burr, or laser housed within a catheter to excise or obliterate plaques from within an artery.

51.     Stents are small metallic mesh tubes that are placed inside a blocked or narrowed artery to keep the vessel open after it has been dilated or torn, typically after balloon angioplasty. Stents are used depending on certain features of the clogged vessel, including the extent and location of the blockage.

52.     Angiography, angioplasty, atherectomy, and stent implantation are invasive procedures that usually require conscious sedation and subject patients to some risk of harm.

53.     Any invasive procedure can lead to "restenosis" or re-narrowing due to scar build-up at the site of intervention. The catheter can tear or rupture blood vessels causing internal bleeding and dislodge plaques from the arterial wall that can travel downstream or "embolize" into the circulation and lead to stroke, heart attack, or poor blood flow to a limb.

54.     The dye injected into the arteries during a catheterization procedure can cause

allergic reactions or kidney failure, and the radiation used for imaging can lead to injuries ranging from dermatitis to cancer.

55.     Stents can trap or "jail" other arteries depending on their placement, sometimes cutting off important alternative avenues of collateral circulation. Stents can also limit surgical options for revascularization. Excessive stenting can limit the number of viable, un-stented arteries into which a bypass can be connected.

## VIII.   MEDICAL NECESSITY AND TREATMENT FOR PERIPHERAL ARTERY DISEASE

56.     Medicaid providers are not entitled to bill or receive payment for any periperal artery angiography, angioplasty, atherectomy, or stent implantation performed on Medicaid recipients that is not "medically necessary." §409.905, Fla. Stat. and 59G-1.010(166), Florida Administrative Code. Clinical indications of the medical necessity of peripheral artery interventions are published in multiple public sources, including national guidelines issued by industry groups like the American College of Cardiology Foundation and the American Heart Association.

57.     Clinically significant peripheral vascular disease, according to the American College of Cardiology Foundation and the American Heart Association, may exist when a peripheral artery is at least 50 to 75 percent blocked. *See* Jeffrey L. Anderson, *et al.,* "Management of Patients with Peripheral Artery Disease (Compilation of 2005 and 2011 ACCF/AHA Guideline Recommendations)," *Journal of the American College of Cardiology,* Vol. 61, No. 14 (Apr. 2013) (hereinafter "PAD Guidelines").

58.     As a general principle, "[e]ndovascular intervention is not indicated as prophylactic therapy in an asymptomatic patient with lower extremity PAD." *Id.*

59.      In general, only after a provider has exhausted non-invasive tests and treatments -

and after symptoms prove to be recurrent - should invasive procedures be performed on patients with severe PAD. "Because of the variability of individual . . . symptoms and variable impact of these symptoms on quality of life, patients should be selected for revascularization on the basis of the severity of their symptoms; a significant disability as assessed by the patient; failure of medical therapies; lack of significant comorbid conditions; vascular anatomy suitable for the planned revascularization; and a favorable risk/benefit ratio." Alan T. Hirsch, *et al.,* "ACC/AHA 2005 Practice Guidelines for the Management of Patients with Peripheral Arterial Disease," *Circulation* (2006).

## IX. MEDICAID CLAIM SUBMISSION AND PAYMENT PROCESS

60. As Medicaid providers, Defendants were obligated to understand and certify their compliance with all applicable Medicaid laws, regulations and program instructions.

61. Medicaid providers like Defendants are reimbursed for covered services from the Medicaid program based on their submission of an electronic or hard-copy claim form called the CMS Form 1500 Health Insurance Claim Form.

62. When submitting claims to Medicaid, providers certify on CMS Form 1500, *inter alia,* that (a) the services rendered are "medically indicated and necessary for the health of the patient;" (b) the information on the claim form is "true, accurate and complete;" and (c) the provider understands that "payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal and State laws."

63. CMS Form 1500 also requires providers to acknowledge that: "Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete

or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

64.     Because it is not feasible for Medicaid personnel to review every patient's medical records for the millions of claims for payments they receive from providers, the program relies on providers to comply with Medicaid requirements and trusts providers to submit truthful and accurate certifications and claims.

65.     Generally, once a provider submits CMS Form 1500 to the Medicaid Program, the claim is paid directly to the provider without any review of supporting documentation, including medical records.

### X.     DEFENDANTS  SUBMITTED FALSE CLAIMS FOR MEDICALLY UNNECESSARY, AND/OR INADEQUATELY DOCUMENTED CARDIOVASCULAR PROCEDURES

66.     Throughout the relevant period, Defendants engaged in a pattern and practice of seeing as many patients, scheduling as many appointments, ordering as many tests, performing as many cardiovascular interventions, implanting as many stents, and ultimately, collecting as many Medicaid payments as possible.

67.     Defendants developed shortcuts to minimize the time they had to spend preparing medical records and justifying the medical necessity of their excessive procedures.

68.     Defendants' conduct resulted in the submission of false claims to Medicaid for excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures.

### A.     Medically Unnecessary Procedures

69.     Defendants treated a large patient population, many of whom were Medicaid patients.

70.     Defendants treated patients at numerous locations throughout North Central

Florida, including at Defendants' headquarters in Ocala and at satellite offices in The Villages and Williston.

71.     The Ocala office housed an expansive outpatient catheterization laboratory (or "cath lab"). At the cath lab, Defendants often treated in excess of 20 patients a day.

72.     Defendants compounded the unmanageability of their operation by ordering and performing an inordinate number of cardiovascular tests and treatments.

73.     Defendants engaged in systematic fishing expeditions to find arteries to treat. Defendants scheduled follow up tests of largely asymptomatic patients at regular intervals, generally every 3 months, 6 months, and 12 months. The follow up tests included invasive, but lucrative, angiography, and other expensive procedures like ultrasounds and stress tests.

74.     When tests revealed stenosis in patients' arteries, Defendants overestimated the severity of the blockage to justify lucrative interventions, including angioplasty, atherectomy, and stent implantation.

75.     Defendants often failed to order and exhaust non-invasive therapies before performing invasive peripheral artery interventions. Similarly, Defendants often failed to rule out alternative, non-vascular causes of patients' symptoms before performing invasive peripheral artery interventions.

76.     Defendants' overutilization of Medicaid services significantly deviated from what other cardiovascular specialists - and Florida Medicaid - consider medically necessary.

**B.     Inadequate Documentation to Support Procedures**

77.     Defendants' habitually failed to document the clinical need for the peripheral artery interventions that they performed so frequently.

78.     Defendants developed and relied upon a variety of record-keeping shortcuts in

attempts to justify medical necessity.

79.     Defendants' shortcuts included procedure templates, diagnosis code and billing "cheat sheets," boilerplate "notes" to be included in clinical narratives "to get [claims] paid," and reports dictated or scribed by nurse practitioners who were not always present for the duration of the procedures.

80.     Defendants' record-keeping shortcuts resulted in errors and omissions of critical information from patients' medical records and associated Medicaid claims.

81.     Defendants regularly failed to document relevant medical histories and symptoms supporting invasive treatments.

82.     Similarly, Defendants often failed properly to document efforts to exhaust non-invasive treatments before conducting peripheral artery interventions.

## XI.     FALSE CLAIMS FOR MEDICALLY UNNECESSARYAND/OR INADEQUATELY DOCUMENTED PROCEDURES

83.     The false claims set forth in this section of the Complaint are specific examples, drawn from a statistically-valid random sample of Defendants' Medicaid patients, of the false claims that Defendants submitted to Medicaid throughout the relevant period.

### A.     Patient LG

84.     Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient LG, a Medicaid patient.

85.     LG received repetitive and invasive testing and treatment while Defendants' patient.

86.     LG had frequent appointments with Defendants, with at least one interventional procedure every few months.

87.     From 2008 to 2009, LG received twenty-three (23) interventions from

Defendants.

88. Of those twenty-three (23) interventions, six (6) were stents.

89. Defendants were not entitled to receive Medicaid payments for at least the following false claims, which Defendants submitted because the services were medically unnecessary and/or inadequately documented cardiovascular interventions performed on LG during the relevant period:

| Patient LG | | | |
|---|---|---|---|
| Medicaid Claim Number | Date of Service | Date of Reimbursement | Amount of Medicaid Reimbursement |
| 2009064199122 | 6/20/2008 | 3/11/2009 | $1,433.53 |
| 2008281099872 | 9/22/2008 | 10/15/2008 | $1,699.03 |
| 2008346088432 | 12/4/2008 | 12/17/2008 | $582.74 |
| 2009036034087 | 1/26/2009 | 2/11/2009 | $1,296.87 |

**B.      Patient RC**

90. Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient RC, a Medicaid patient

91. RC received repetitive, and invasive testing and treatment while Defendants' patient.

92. RC had frequent appointments with Defendants, with at least one interventional procedure every few months.

93. In 2009, RC received eighteen (18) interventions from Defendants.

94. Of those eighteen (18) interventions, six (6) were stents.

95. Defendants were not entitled to receive Medicaid payments for at least the following false claims, which Defendants submitted because the services were medically unnecessary and/or inadequately documented cardiovascular interventions performed on RC during the relevant period:

| Patient RC | | | |
|---|---|---|---|
| **Medicaid Claim Number** | **Date of Service** | **Date of Medicaid Reimbursement** | **Amount of Medicaid Reimbursement** |
| 5909265011300 | 5/27/2009 | 9/30/2009 | $3,152.55 |
| 2009278023178 | 8/5/2009 | 10/14/2009 | $2,557.01 |
| 5909357009706 | 9/23/2009 | 12/30/2009 | $3,170.25 |
| 2010026026532 | 1/13/2010 | 2/3/2010 | $164.44 |

## C.  Patient AA

96.  Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient AA, a Medicaid patient.

97.  AA received repetitive and invasive testing and treatment while Defendants' patient.

98.  AA had frequent appointments with Defendants, with at least one interventional procedure every few months.

99.  From 2010 to 2011, AA received thirteen (13) interventions from Defendants.

100.  Of those thirteen (13) interventions, four (4) were stents.

101.  Defendants were not entitled to receive Medicaid payments for at least the following false claims, which Defendants submitted because the services were medically unnecessary and/or inadequately documented cardiovascular interventions performed on AA during the relevant period:

| Patient AA | | | |
|---|---|---|---|
| **Medicaid Claim Number** | **Date of Service** | **Date of Medicaid Reimbursement** | **Amount of Medicaid Reimbursement** |
| 2010321202647 | 11/3/2010 | 11/24/2010 | $331.41 |
| 2010350114199 | 11/29/2010 | 12/22/2010 | $1,279.79 |
| 5911048013760 | 1/14/2011 | 2/23/2011 | $1,281.79 |
| 5911120000188 | 2/23/2011 | 5/11/2011 | $1,637.62 |
| 2011321054136 | 11/11/2011 | 11/23/2011 | $1,279.79 |

### D. Patient JC

102.    Defendants knowingly submitted or caused the submission of false claims for cardiovascular interventions performed on patient JC, a Medicaid patient.

103.    JC received repetitive and invasive testing and treatment while Defendants' patient.

104.    JC had frequent appointments with Defendants, with at least one interventional procedure every few months.

105.    From 2011 to 2013, JC received thirteen (13) interventions from Defendants.

106.    Of those thirteen (13) interventions, five (5) were stents.

107.    Defendants were not entitled to receive Medicaid payments for at least the following false claims, which Defendants submitted because the services were medically unnecessary, and/or inadequately documented cardiovascular interventions performed on JC during the relevant period:

| Patient JC Medicaid Claim Number | Date of Service | Date of Medicaid Reimbursement | Amount of Medicaid Reimbursement |
|---|---|---|---|
| 2011243171482 | 8/26/2011 | 9/7/2011 | $1,265.22 |
| 2011258084400 | 9/12/2011 | 9/21/2011 | $1,575.77 |
| 2011348057984 | 12/6/2011 | 12/21/2011 | $2,305.19 |
| 2012179181540 | 6/25/2012 | 7/4/2012 | $1,931.71 |
| 2012255011864 | 9/5/2012 | 9/19/2012 | $1,377.36 |
| 2012340194857 | 12/1/2012 | 12/12/2012 | $1,977.57 |
| 2013217019732 | 7/31/2013 | 8/14/2013 | $1,337.29 |
| 2013261033714 | 9/13/2013 | 9/25/2013 | $1,337.29 |

## XII.    DEFENDANTS' FRAUDULENT SCHEME VIOLATES THE FLORIDA FALSE CLAIMS ACT

108.    Defendants knowingly presented false or fraudulent fee-for-service and managed care claims (i.e., for payment or approval) to the Florida Medicaid program for reimbursement of

medically unnecessary services. Defendants' interventions do not and did not meet the medical necessity standard required by all the federal health care programs, including the Florida Medicaid program.

109.    In carrying out this fraudulent scheme, Defendants repeatedly violated the Florida False Claims Act.  As detailed *supra*, certification of compliance with federal and state laws is a condition of receiving payments from the Florida Medicaid program.  Defendants violated the Florida False Claims Act by falsely certifying its compliance with federal and state laws.

### XIII.   THE ACTIONABLE CONDUCT OF DEFENDANTS

110.    Defendants violated the Florida False Claims Act, Fla. Stat. §68.081 *et seq.,* in connection with submitting both fee-for-service and managed care claims to the Florida Medicaid program for reimbursement of medically unnecessary intervention services provided to Medicaid recipients.

111.    Defendants acted knowingly, as defined by Fla. Stat. §68.082(1)(c), in presenting or causing to be presented to the Florida Medicaid Program false fee-for-service and managed care claims for payment or approval in violation of Fla. Stat. §68.082(2)(a), by:

A.    Submitting claims to the Florida Medicaid program for reimbursement of services which were not medically necessary; and

B.    Falsely certifying it was in compliance with all the applicable federal and state statutes, rules and regulations governing the Medicaid program.

112.     Defendants acted knowingly,  in making, using, or causing to be made false records or statements to get fee-for-service and managed care claims paid or approved by the Florida Medicaid Program in violation of Fla. Stat. § 68.082(2)(b), by:

A.    Failing to document medical necessity for intervention services;

B.      Making and using false and fraudulent statements about the services rendered and obtaining reimbursement that Defendants were not otherwise entitled to;

C.      Falsely certifying that Defendants were in compliance with all the applicable federal and state statutes, rules and regulations governing the Medicaid program.

113.    The Florida Medicaid Program suffered damages from January 2007 through the present as a result of the presentment of the false and fraudulent fee-for-service and managed care described claims.  Defendants knew that the procedure codes submitted on the claim forms for reimbursement were false and that the services provided and billed for were medically unnecessary.

114.    In submitting claims for payment to Medicaid, Defendants represented that they had complied with all federal and state statutes, rules, and regulations governing the Medicaid program.  Those representations were false because Defendants were performing - and seeking reimbursement for - medically unnecessary services.

115.    Florida relied on the false information provided in the claims submitted by Defendants in reimbursing them for services for which they would not otherwise have been reimbursed.

116.    At all times relevant hereto, Defendants "knew" or acted "knowingly," as those terms are defined in Florida Statute section 68.082, subdivision (1)(c), in making, presenting, or submitting false claims.  In that respect, Defendants acted:

(a)      With actual knowledge of the information; or

(b)      In deliberate ignorance of the truth or falsity of the information; or

(c)      With reckless disregard of the truth or falsity of the information.

117.    At all times relevant hereto, Defendants presented false claims, as defined in Florida Statute Section 68.082, by:

(a)    Knowingly presenting false claims to the Florida Medicaid program for payment or approval of claims for Medicaid reimbursement; and/or,

(b)    Knowingly making and using false statements and/or records for the purpose of obtaining approval of false claims for Medicaid reimbursement.

118.    As a result of the foregoing, each claim for payment for each intervention was a false claim in violation of Florida's False Claims Act (Fla. Stat. Ann. § 68.081 *et seq.*) because Defendants submitted claims for services that were not medically necessary.  Attached as Exhibit A are examples of the Medicaid claims for medically unnecessary interventions Defendants submitted for Medicaid Fee-For-Service reimbursement. Attached as Exhibit B are examples of Medicaid claims for medically unnecessary interventions Defendants submitted for Medicaid Managed Care reimbursement. Attached as Exhibit C are examples of Medicaid claims for medically unnecessary interventions Defendants submitted for  Medicare/Medicaid dual-eligible patients.[1]

### XIV.   CAUSES OF ACTION
### Count One – False Claims
### (Florida False Claims Act, Fla. Stat. §68.082(2)(a))

119.    Plaintiffs incorporate herein by reference and reallege the allegations stated in Paragraphs 1 through 118, inclusive, of this Complaint.

---

[1] Patient YL, referenced in the United States' Consolidated Complaint in Intervention (ECF 10, paragraphs 120-129), is a Medicare/Medicaid dual eligible patient. FLORIDA seeks recovery for the medically unnecessary Medicaid services provided in conjunction with medically unnecessary Medicare services Defendants performed on YL and other dual eligible patients.

120. Defendants knowingly presented or caused to be presented false or fraudulent fee-for-service and managed care claims for payment or approval to the Florida Medicaid Program, thereby creating liability for a false claims action pursuant to Fla. Stat. § 68.082(2)(a).

121. As a result of Defendants' conduct, Florida paid the false or fraudulent Medicaid fee-for-service and managed care claims and has suffered actual damages.

122. Pursuant to Fla. Stat. §§ 68.082(2) and 68.086, Plaintiffs are entitled to treble the actual damages sustained, and civil penalties of not less than $5,500 and not more than $10,000 per claim, plus all other relief set forth in said statutes, including attorneys' fees and court costs.

**Count Two – False Records Or Statements**
**(Florida False Claims Act, Fla. Stat. §68.082(2)(b))**

123. Plaintiffs incorporate herein by reference and reallege the allegations stated in Paragraphs 1 through 118, inclusive, of this Complaint.

124. Defendants knowingly made, used, or caused to be made or used a false record or statement to get a false or fraudulent fee-for-service or managed care claim paid or approved by the Florida Medicaid Program, thereby creating liability for a false claims action pursuant to Fla. Stat. § 68.082(2)(b).

125. By virtue of the unlawful conduct of Defendants, Florida paid the false or fraudulent Medicaid fee-for-service and managed care claims, and has suffered actual damages.

126. Pursuant to Fla. Stat. §§ 68.082(2) and 68.086, Plaintiffs are entitled to treble the actual damages sustained, and civil penalties of not less than $5,500 and not more than $10,000 per claim, plus all other relief set forth in said statutes, including attorneys' fees and court costs.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand that judgment be entered in favor of the State of Florida against Dr. Qamar as follows:

29

Plaintiffs demand treble the amount of the State of Florida's actual damages against Defendants for the period beginning January 1, 2007 through the present pursuant to Fla. Stat. § 68.082.(2). In addition, Plaintiffs demand that Defendants be assessed civil penalties of $10,000 for each and every false claim identified in this action and for medically unnecessary services revealed through discovery. Plaintiffs further demand payment of interest on the judgment, attorneys' fees, expenses, investigatory costs, Qui Tam Plaintiffs' expenses, attorneys' fees and costs, and for such other and further relief as the Court deems just and equitable pursuant to Fla. Stat. § 68.086.

## DEMAND FOR JURY TRIAL

The STATE OF FLORIDA respectfully demands trial by jury of all issues so triable.

DATED:  April 29, 2015

Respectfully submitted,

PAMELA JO BONDI
ATTORNEY GENERAL


 /s/Marc Ito
Marc Ito (Trial Counsel)
Assistant Attorney General
Florida Bar No: 61463
Office of the Attorney  General
Medicaid Fraud Control Unit
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: 850-414-3883
Facsimile:  850-410-0179
Email: Marc.Ito@myfloridalegal.com