# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### OCALA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ROBERT A. GREEN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DR. ASAD U. QAMAR, *et al.*, <br><br> Defendants. | Civil Action No. 5:11-406-WTH-TBS |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR PRELIMINARY INJUNCTION OR, ALTERNATIVELY, AN INJUNCTION PURSUANT TO INHERENT AUTHORITY, <u>TO PRESERVE THE STATUS QUO AND ENJOIN ONGOING RETALIATION</u>**

Defendant Asad U. Qamar, M.D. and his practice, Defendant Institute of Cardiovascular Excellence, PLLC ("the Practice"), seek an order enjoining the United States ("the Government") from implementing its March 6, 2015 decision to suspend Medicare payments to Defendants ("the Suspension Decision," attached hereto as Exhibit A to the Declaration of Tracy J. Mabry, Esq. ("Mabry Decl.")). The Suspension Decision was issued by the U.S. Department of Health and Human Services ("HHS"), through its component Centers for Medicare and Medicaid Services ("CMS").

This False Claims Act ("FCA") case was originally filed in July 2011. Thereafter, HHS began investigating the allegations with the U.S. Department of Justice ("DOJ"). The Government did not intervene until December 2014. Several months later, HHS issued the

Suspension Decision only *seven days* after Defendants rejected the Government's conditions for resolving this matter.[1]

After four years of investigation, the chronology of recent governmental action is *prima facie* evidence that the suspension of Defendants' Medicare payments is retaliation in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution. Instead of waiting to address the merits of its FCA claims, the Government collaterally attacked Defendants through a unilateral, unchecked, and supposedly unappealable Suspension Decision. Tellingly and inexplicably, the Suspension Decision expressly *relied on DOJ's press release about this case as evidence of fraud*, even though HHS has been aware of the allegations since 2011. The suspension is thus a transparent tactic to bankrupt Defendants so they cannot contest the spurious allegations against them. By issuing the Suspension Decision, the Government has taken deliberate steps to avoid judicial review of the Complaint's allegations – the same allegations the Government is using to *justify* the suspension. It cannot be that the Government can sue someone for fraud and then use its allegations in court to strip that person of the ability to defend himself.

Given the exigencies, the Court can issue the requested relief either as a preliminary injunction under Rule 65 or pursuant to its inherent equitable authority. The balance of the equities weighs heavily in Defendants' favor, and they can readily show a substantial

---

[1] There is substantial correspondence between the Government and Defendants. Given the nature of communications made pursuant to Federal Rule of Evidence 408, that correspondence is not attached to this motion. However, if required by the Court, the Defendants will provide the pertinent correspondence. *See, e.g.*, *Carney v. American Univ.*, 151 F.3d 1090, 1095-96 (D.C. Cir. 1998) (Rule 408 inapplicable to settlement correspondence offered only to establish retaliation as "independent violation . . . unrelated to the underlying claim" at issue in correspondence); Fed. R. Evid. 408, 2006 Committee Notes.

likelihood of success on the merits of their claim of unconstitutional retaliation (and also on their defense against the FCA allegations). Whenever the Government files a civil pleading that accuses someone of violating the law, that person has a fundamental right to contest the charges in court. The Suspension Decision followed just one week after Defendants' discussions with the Government reached an impasse, when Defendants refused to waive that fundamental right. The Suspension Decision is now causing irreparable economic harm to the Practice, which receives about 60% of its revenue from Medicare. Since the suspension, the Practice has continued to operate at a substantial loss, with almost 200 employees still treating 24,000 patients. Absent relief from the Court, the suspension will lead to Defendants' bankruptcy and end their ability to contest the Government's allegations. Issuing the preliminary injunction would restore the *status quo* so Defendants may exercise their right to defend themselves.

The Government should not be permitted to retaliate against Defendants for exercising their opportunity to be heard. Such retaliation by the Executive Branch is also a direct attack upon the Judiciary's power to independently decide the issues for which its jurisdiction has been invoked. An order lifting the suspension is necessary to preserve the *status quo* and reject the Government's attempts to destroy the Court's power to adjudicate the allegations before it. Accordingly, the Court should grant the requested relief.

## **BACKGROUND**

### I. **DEFENDANTS' MEDICAL PRACTICE**

Dr. Qamar is an interventional cardiologist, and the owner and managing member of the Practice. (Decl. of Kamachie Chinapen ("Chinapen Decl.") ¶ 2.) The Practice is a

Florida S-Corporation that operates as a multi-specialty independent physician group with over 193 employees and offices in Ocala, Williston, The Villages, Tavares, and Summerfield. (*Id.*) The Practice is a freestanding healthcare center with 15 providers (including 10 physicians), serving over 24,000 patients throughout North Central Florida, one of the most heavily concentrated Medicare populations in the United States. (*Id.*) It is typically open from 7:30 A.M. to midnight, five days a week, treating approximately 350 patients each day, with Dr. Qamar himself routinely working over 12 hours a day.[2] (*Id.*)

The Practice provides care under several business names, all of which use the same Medicare billing information. (Chinapen Decl. ¶ 6.) One is the Institute of Cardiovascular Excellence ("ICE"), used when the Practice provides about half of its patients (around 12,000) with a wide range of cardiovascular diagnostic and therapeutic treatments, including both medical and interventional treatments. (*Id.*) Another name is Institute of Medical Excellence, used when providing preventive services to the Practice's other patients. (*Id.*)

Approximately 60% of the Practice's revenues come from Medicare. (Chinapen Decl. ¶ 3.) Almost 70% of the Practice's patients are Medicare beneficiaries (60% through Medicare directly and 10% through Medicare Replacement Plans), and another 5% are on Medicaid or have no health insurance at all. (*Id.*) The Practice does not discriminate against patients on the basis of their insurance coverage; accordingly, it treats all Medicaid and

---

[2] The Complaint relies on innuendo and anonymous patient complaints about inconveniences not unique to the Practice, such as crowded waiting rooms and long waiting times. The Government even faults Dr. Qamar for wanting to make his patients "comfortable," such as by offering them food. (U.S. Compl. ¶ 85.) Apparently, the Government prefers that patients be made *un*comfortable while waiting to see healthcare providers, including the many diabetic patients prone to suffering adverse effects from low blood sugar. Indeed, the Government subpoenaed the Practice's medical charts, so it is well aware of the high incidence of diabetes among these patients.

uninsured patients, even at a loss. (*Id.* ¶ 4.) In 2012 alone, the Practice provided over $3 million worth of services to uninsured patients, and spent over $2 million on equipment for those patients' benefit. (*Id.*)

One-third of the Practice's patients (around 8,300) suffer from cardiovascular conditions that are classified as peripheral arterial disease ("PAD"). (Chinapen Decl. ¶ 7.) Advanced age and diabetes significantly increase a person's risk for PAD. *See* HHS, Nat'l Heart, Lung, & Blood Inst. ("NHLBI"), *Who Is at Risk for Peripheral Arterial Disease?*[3] PAD involves the build-up of plaque in the arteries that carry blood to the arms and legs. *See* NHLBI, *What Is Peripheral Arterial Disease?*[4] Plaque can harden and obstruct those blood vessels, causing pain and numbness. *Id.* Blocked blood flow increases the risk of heart attack, stroke, and the need for amputation of the affected limbs or extremities. *Id.* Patients undergoing amputations face healthcare costs in excess of $500,000 over the course of their lives.[5] Treatments can alleviate PAD and prevent the need for costly amputations, including interventions known as revascularizations, which involve the use of a catheter to remove plaque (atherectomy) and/or widen blood vessels with a small balloon (angioplasty). *Id.*

Dr. Qamar is an expert in successfully treating PAD through revascularizations. (*See* Chinapen Decl. ¶ 7.) The majority of Dr. Qamar's patients have been referred to him for the treatment of PAD. (*Id.*) Defendants' performance of PAD interventions saves Medicare the

---

[3] *Available at* http://www.nhlbi.nih.gov/health/health-topics/topics/pad/atrisk.

[4] *Available at* http://www.nhlbi.nih.gov/health/health-topics/topics/pad.

[5] *See, e.g.*, Ellen J. MacKenzie, Ph.D. *et al.*, *Health-Care Costs Associated with Amputation or Reconstruction of a Limb-Threatening Injury*, 89 J. Bone Joint Surg. Am. 1685 (2007), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/17671005.

costs of many amputations.[6]  (*Id.*)  A simple review of claims data – the very same claims data used by the Government to conduct its "investigation" – reveals that the Practice has an extraordinarily low amputation rate.  In 2012, Defendants' PAD patients had only **seven** lower extremity amputations, out of over 8,300 patients suffering from PAD (*id.*), yielding an amputation rate of 84 per 100,000 PAD patients.  The national reported rate for Medicare beneficiaries' PAD-related amputations in 2008 was 5,790 per 100,000 PAD patients.  *See* W. Schuyler Jones, M.D. *et al.*, *Temporal Trends and Geographic Variation of Lower-Extremity Amputation in Patients With Peripheral Artery Disease: Results From U.S. Medicare 2000-2008*, 60 J. Am. Coll. Cardiol. 2230 (2012), *available at* http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3918457.  Given an amputation patient's estimated lifetime healthcare costs of $500,000, Defendants' skill in helping their PAD patients avoid amputation ultimately saves Medicare and other insurers over approximately $200 million.[7]

---

[6] Studies show that despite increased rates of non-amputation interventions, significant socioeconomic disparities persist in amputation rates, with racial minorities and Government-insured patients having higher odds of amputation and lower odds of undergoing certain interventions before amputation. *See, e.g.*, Michael S. Hong *et al.*, *Emerging national trends in the management and outcomes of lower extremity peripheral arterial disease*, 25 Ann. Vasc. Surg. 44 (2011), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/21172580; Kerianne H. Holman *et al.*, *Racial disparities in the use of revascularization before leg amputation in Medicare patients*, 54 J. Vasc. Surg. 420 (2011), *abstract available at* http://www.ncbi.nlm.nih.gov/pubmed/21571495.

[7] Last year, CMS published data on all payments in 2012 to Medicare Part B providers across the country. *See* CMS, *Medicare Provider Utilization and Payment Data: Physician and Other Supplier* (Apr. 2014), *data available at* http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/Medicare-Provider-Charge-Data/Physician-and-Other-Supplier.html.  Ill-informed public criticism focused on Dr. Qamar's high level of Medicare payments for treating PAD through revascularization.  Crucial facts have been overlooked.  First, the Practice is in an area densely populated with Medicare beneficiaries,

## II. THE MEDICARE COVERAGE FRAMEWORK

Medicare Part B provides adults over age 65 and certain disabled individuals with insurance coverage for outpatient items and services. (Mabry Decl. ¶ 2.) The HHS Secretary administers Medicare Part B through CMS, which delegates many administrative functions – including reviewing and processing claims – to regional "Medicare Administrative Contractors" ("MACs"). (*Id.*) MACs often develop "local coverage determinations" ("LCDs") to explain whether, and under what conditions, Medicare will cover services within that MAC's geographic area. (*Id.*) Florida's MAC is First Coast Service Options, Inc. ("First Coast"). (*Id.*) CMS also contracts with regional Zone Program Integrity Contractors ("ZPICs"), which conduct pre- and post-payment reviews of Medicare claims. (*Id.*) Florida's ZPIC is SafeGuard Services, LLC ("SafeGuard"). (*Id.*)

## III. THE GOVERNMENT'S PREPAYMENT REVIEW OF DEFENDANTS' MEDICARE CLAIMS

In April 2010, Dr. Qamar's interventional cardiovascular procedures were placed under an educational prepayment review by First Coast. (Mabry Decl. ¶ 3.) This review was designed to educate the Practice about various Medicare coverage requirements. (*Id.*) First

---

and is widely renowned for its expertise in revascularization techniques, which generates many referrals of those needing care for advanced PAD. Second, the criticisms also ignore the vast difference in payments between hospital in-patient procedures and those performed in the out-patient setting of physicians' offices. For physicians who, like Dr. Qamar, perform PAD revascularizations in their own freestanding office, Medicare pays them significantly *more* than physicians performing the exact same procedure in a hospital, *see id.* (national data available for CPT codes 37225, 37227, 37229, and 37231), because those reimbursements are designed to cover the cost and additional financial burdens of paying for the freestanding office's overhead, and avoiding the overall higher cost of procedures performed in the hospital. *See* CMS, Frequently Asked Question 9916, *Does the average Medicare payment amount field in the Physician and Other Supplier PUF need to be adjusted?*, *at* https://questions.cms.gov/faq.php?id=5005&faqId=9916.

Coast lifted its prepayment review in April 2011.  (*Id.*)

In October 2012, during the period of the Government's "investigation," SafeGuard imposed a prepayment review on all of the Practice's Medicare claims that were performed or ordered by Dr. Qamar.  (Mabry Decl. ¶ 4.)  Defendants successfully challenged this blanket prepayment review, and around February 2013, SafeGuard agreed to narrow its review to focus only on Medicare claims for certain specific procedures and services, identified by their current procedural terminology ("CPT") codes.  (*Id.*)  This prepayment review has not been lifted and remains in place.  (*Id.*)

In early 2013, the Practice engaged Jackson Davis, an independent national consulting group for Medicare participating providers and suppliers.  (Mabry Decl. ¶ 5.)  Jackson Davis reviewed the Practice's medical documentation for 200 of Dr. Qamar's diagnostic and interventional cases that were submitted for SafeGuard's prepayment review.  (*Id.*)  In May 2013, Jackson Davis found that the documentation for those 200 cases was fully compliant.  (*Id.*)

From late 2012 through April 2014, Defendants' counsel repeatedly, but unsuccessfully, sought an opportunity from the Government to discuss any concerns about Defendants' services, billing, or documentation, so that the prepayment review could be lifted.  (Mabry Decl. ¶ 6.)  Counsel's communications with CMS also repeatedly advised it of SafeGuard's numerous administrative mistakes and misapplication of First Coast's Medicare coverage policies.  (*Id.*)  Upon appeal, SafeGuard was frequently reversed on its denials of Defendants' Medicare claims, yet did not inform CMS of the results of those appeals, in violation of the law.  (*Id.*)  SafeGuard's repeated failure to report Defendants'

favorable appeal results created a false and materially different picture of Defendants when SafeGuard reported the results of its prepayment review to CMS.  (*Id.*)

## IV.    THE INSTANT LITIGATION AND SUSPENSION DECISION

In April 2010, Relator Holly Taylor, an account manager at Partners in Practice ("PIP"), began working on the Practice's account.  (Chinapen Decl. ¶ 9.)  Relator Taylor was never an employee of the Practice.  (*Id.*)  In July 2010, the Practice hired Relator Robert Green, D.O.  (Chinapen Decl. ¶ 8.)  Dr. Green was terminated within five months.  (*Id.*)  In February 2011, the Practice ended its relationship with PIP.  (*Id.* ¶ 9.)  In July 2011 and June 2014, respectively, Relators Green and Taylor filed sealed *qui tam* complaints against Defendants.  Neither Relator had direct involvement with the treatment of PAD.

From April 2013 through July 2014, the HHS Office of the Inspector General ("OIG") issued four subpoenas to both Defendants.  (Decl. of Danielle S. Kemp, Esq. ("Kemp Decl.") ¶ 2.)  These subpoenas requested documents regarding Defendants' cardiology services, approximately 170 patient records, and Defendants' financial information.  (*Id.*)  Defendants thereafter produced over 116,000 pages of documents.  (*Id.*)

By letter to Defendants dated September 22, 2014, the Government confirmed that it was investigating Defendants' cardiology services.  (Kemp Decl. ¶ 3.)  In an effort to resolve the issues without the expense of litigation, the parties began discussions to explore the possibility of a pre-litigation resolution.  (*Id.*)  Ultimately, the Government intervened in both *qui tam* actions on December 22.  (U.S. Compl. ¶ 13.)  The Court also ordered the Government to file and serve its Complaint in Intervention ("Complaint") within 120 days.

On January 5, 2015, DOJ issued a press release announcing the Government's intervention in the *qui tam* actions.[8] (Kemp Decl. ¶ 4.) Notwithstanding the interventions, the parties continued their discussions about possible resolution. (*See id.* ¶ 5.) After Defendants declined to accept the Government's conditions for settlement, those negotiations broke down on or about February 27, 2015. (*Id.*)

**One week later,** on March 6, 2015, without notice, the Government suspended all Medicare payments to the Practice, effective immediately. (*See* Ex. A.) On March 11, Defendants first learned about the Suspension Decision when they received a zero-dollar check from Medicare. (Chinapen ¶ 10.) But it was not until March 16 that Defendants received notice and a copy of CMS's letter explaining the suspension. (*Id.*)

The suspension letter asserted "credible allegations of fraud" concerning Defendants' submission of Medicare claims for physician services that supposedly were not "medically reasonable and necessary." (*See* Ex. A at 2-3.) The letter supported its allegations by citing:

- DOJ's January 2015 **press release** announcing the Government's intervention in the Green and Taylor *qui tam* actions, and the allegations of those complaints;

- SafeGuard's ongoing prepayment review and Defendants' supposed claims denial rate of 58%; and

- unspecified "complaints" about false billing and unnecessary procedures.

(Ex. A at 3.) The letter further explained Defendants were not given an opportunity to be heard before the suspension because CMS supposedly determined "that the Medicare Trust Funds would be harmed by giving prior notice." (*Id.* at 2.)

---

[8] This Court later consolidated the Green and Taylor *qui tam* actions.

The letter also invited Defendants to submit a rebuttal, pursuant to 42 C.F.R. § 405.372(b)(2), addressing why the suspension should be lifted.  (Ex. A at 5.)  The letter acknowledged that CMS "must consider" the rebuttal "and determine whether the facts justify termination of the suspension."  (*Id.* at 5-6.)  However, the letter asserted, the Suspension Decision "is not appealable," and the suspension of Defendants' payments "will continue while the Rebuttal Statement is being reviewed."  (*Id.* at 6.)  Finally, the letter noted that during the suspension period, claims would be processed but held in escrow.  (*Id.*)

On March 31, 2015, Defendants hand-delivered their rebuttal ("the Rebuttal") to SafeGuard and also sent copies to CMS by overnight delivery.  (*See* Mabry Decl. ¶ 9.)  The Rebuttal detailed, *inter alia*, SafeGuard's systemic failure to accurately calculate the denial rate of Defendants' Medicare claims, because SafeGuard had repeatedly failed to account for initial denials reversed on appeal and "redetermined" as payable.  (*Id.*)  The Government's response was then due on April 15.  (*Id.* ¶ 10.)  However, although Defendants communicated with the Government on April 15, 16, and 20, and 27 to request a response to their Rebuttal, they have never received any reply or indication that the Rebuttal has been considered.  (*See id.* ¶¶ 11-15.)

On April 20, 2015, the Government filed its Complaint in this case, the day before its deadline for doing so.  The next day, April 21, Defendants waived service of the Complaint and anticipate filing a comprehensive Motion to Dismiss this case within 60 days of that date.

## VI.  THE SUSPENSION'S EFFECT ON DEFENDANTS AND THEIR PATIENTS

Notwithstanding the Suspension Decision, Defendants still attempt to serve their patients without interruption and pay its almost 200 employees, its medical suppliers, and

other overhead.  (Chinapen Decl. ¶ 11.)  Since the suspension, Medicare payments totaling almost $3 million have been held, more than half of which is for services other than the treatment of PAD (including services by the Practice's 14 other providers).  (*See id.* ¶ 12.) The Practice's monthly expenses are approximately $2.6 million, and the suspension has caused it to operate at a total loss of almost $1.5 million through April 30.  (*Id.* ¶¶ 13-14.)

As of this filing, the Practice can no longer make its payroll, which is next due to be paid on May 13.  (Chinapen ¶ 15.)  As a result, the Practice must cease operations and terminate its almost 200 employees.  (*Id.*)  This will also force the Practice to surrender the goodwill associated with its regular operation, and force its 24,000 patients – many of whom are elderly, in poor health, and require prompt medical attention – to seek out alternative arrangements for their medical care.  (*Id.*)  The Practice's closure will also deprive Defendants of resources to defend against the Government's false allegations, and will cause the Practice to seek protection from creditors in bankruptcy.  (*See id.* ¶¶ 16.)

## ARGUMENT

## I.    THE COURT SHOULD RESTORE THE STATUS QUO.

The Government's retaliatory Suspension Decision is pretextual, bad faith misconduct that will fundamentally disrupt this litigation.  *See infra* § II.  Given the exigencies, this Court should enjoin the suspension as unconstitutional retaliation against Defendants pursuant either to Rule 65 or its inherent equitable authority.

Under Rule 65, "there are circumstances of such an exigent nature that an injunction can precede even the filing of the suit itself," as long as the briefing and factual support clarify the nature and legal support for the requested relief.  *Ruscitto v. Merrill Lynch, Pierce,*

*Fenner & Smith, Inc.*, 777 F. Supp. 1349, 1352 (N.D. Tex.), *aff'd*, 948 F.2d 1286 (5th Cir. 1991).[9] The same is true where a defendant seeks preliminary injunctive relief on an affirmative claim *against* the plaintiff, even absent any counterclaim, so long as the motion and factual submissions "make pellucid the precise relief [Defendants] seek[] and the bases [they] contend[] warrant such relief. *Id.* (granting preliminary injunction to defendant). Accordingly, this Court should issue the preliminary injunction because Defendants can show they are substantially likely to succeed on their claim of retaliation for exercising their right to litigate this case. *See Allen v. Suntrust Banks, Inc.*, 549 F. Supp. 2d 1379, 1382-83 (N.D. Ga. 2008) (issuing injunctive relief and finding substantial likelihood of success on merits of plaintiffs' new claim that defendant unlawfully retaliated against them for filing underlying complaint for unpaid wages).

This Court may also exercise its inherent authority "to issue an order to preserve the *status quo* in order to protect its ability to render judgment . . . ." *United States v. Hall*, 472 F.2d 261, 265 (5th Cir. 1972).[10] This inherent power is distinct from the Court's authority under Rule 65, *see id.* at 266-67, "'is both broader and narrower than other means of imposing sanctions[,]' and extends to 'a full range of litigation abuses.'" *U.S. ex rel. Bibby v. Wells Fargo Home Mortg. Inc.*, No. 1:06-CV-547, 2015 WL 82037, at *12 (N.D. Ga. Jan. 5,

---

[9] *See Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir. 1966) (affirming pre-complaint preliminary injunction based on affidavit alone)); *accord United States v. Lynd*, 301 F.2d 818, 823 (5th Cir. 1962) ("The grant of a temporary injunction need not await any procedural steps perfecting the pleadings . . . .").

[10] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (Fifth Circuit cases decided before October 1, 1981 are binding precedent in this Circuit).

2015) (quoting *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010)) (citations omitted).[11]

Thus, a court may enjoin "disruptive conduct prior to the court's decision" that might "destroy[] the court's power to settle a controversy," even where the court has yet to enter final judgment. *Hall*, 472 F.2d at 265 (affirming injunction against non-party whose conduct jeopardized court's existing judgment and "would also undercut its power to enter binding desegregation orders in the future").

When the United States appears before the Court as a party, the Court's inherent authority extends to "the actions or inaction of the government as a whole," and "not a particular division or office of [an agency]." *United States v. Comco Mgmt. Corp.*, No. 8:08-CV-668, 2009 WL 4609595, at *3-*4 (C.D. Cal. Dec. 1, 2009) (exercising inherent authority to compel government to return company's stolen documents). Although DOJ is the litigating arm appearing in this case, HHS administers Medicare, the federal program underlying the Government's allegations. HHS was directly involved in investigating those allegations, and in the failed negotiations with Defendants. And HHS regulations required CMS to consult with DOJ, "as appropriate," when deciding whether to issue the Suspension Decision and withhold advance notice to Defendants. *See* 42 C.F.R. § 405.372(a)(4)(i). By implementing the Suspension Decision in a manner calculated to disrupt this litigation, HHS placed its actions squarely within the reach of the Court's inherent authority.

"The key to unlocking a court's inherent power is a finding of bad faith." *Peer*, 606 F.3d at 1316. As shown below, *see infra* § II.A.1, the Suspension Decision's circumstances

---

[11] *E.g.*, *United States v. Real Prop. Located at 475 Martin Lane, Beverly Hills, Cal.*, No. 04-CV-2788, 2011 WL 2939408, at *4 (C.D. Cal. July 18, 2011) (enjoining trustee sale of property under both Rule 65 and inherent authority, to permit orderly adjudication of competing legal claims to the property), *aff'd*, 488 F. App'x 272 (9th Cir. 2012).

reveal it was issued in bad faith retaliation, as the Government "used the opportunity to [receive Medicare payments] as a lever to coerce favorable settlement of the [FCA litigation]. While such a tactic may be the norm between private parties, it has no place in government." *See Bank of Jackson County v. Cherry*, 980 F. 2d 1362, 1369 (11th Cir. 1993) (criticizing federal government's procedurally improper bank debarment, but declining to reach merits of constitutional retaliation claim).

## II. DEFENDANTS ARE SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS, AND THE BALANCE OF THE EQUITIES WARRANTS THE REQUESTED RELIEF.

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990). A preliminary injunction should be granted where the movant establishes "that (1) there is a substantial likelihood that he ultimately will prevail on the merits of the claim; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue." *Cate v. Oldham*, 707 F.2d 1176, 1185 (11th Cir. 1983) (granting preliminary injunction against public official for unconstitutionally retaliating against movant for filing earlier lawsuit against that official). Defendants satisfy each of these requirements.[12]

---

[12] Because this Motion presents substantial constitutional questions, and because the Government retains almost $3 million of Defendants' Medicare payments, this Court should also exercise its discretion to waive Rule 65(c)'s bond requirement. *See, e.g., All States Humane Game Fowl Org., Inc. v. City of Jacksonville, Fla.*, No. 3:08-CV-312, 2008 WL 2949442, at *13 (M.D. Fla. July 29, 2008) (waiving bond in case alleging constitutional

## A. Defendants' Claims Are Substantially Likely to Succeed on Their Merits.

"The necessary level or degree of possibility of success on the merits will vary according to the court's assessment of the other factors. '[W]here the balance of the equities weighs heavily in favor of granting the [injunction],' the movant need only show a 'substantial case on the merits.'" *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla.) (requiring plaintiff only to show "substantial case" because other three prerequisites were met, but ultimately finding no substantial case) (quoting *Garcia–Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)) (citations omitted), *aff'd*, 403 F.3d 1223, 1226 (11th Cir. 2005). As discussed, the balance of the harms and other equities weighs heavily in Defendants' favor, so they need only make the lesser showing of a substantial case on the merits. *See Garcia-Mir*, 781 F.2d at 1453 ("substantial case" requires "lesser showing" than "substantial likelihood").[13] Regardless, Defendants are likely to succeed on their claim of retaliation – and even on their defense against the Government's FCA allegations.

### 1. Retaliation

The Government suspended Defendants' ability to receive ***all*** payments from the Medicare program ***only seven days*** after settlement discussions reached an impasse. The Suspension Decision's timing, content, and circumstances establish that the Government retaliated against Defendants asserting their Fifth Amendment rights to be heard in this Court. In particular, the suspension covers all payments to Defendants, even though vast

---

violation); *BellSouth Telcomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) (courts retain discretion to waive bond requirement).

[13] *See, e.g.*, *World Triathlon*, 2005 WL 3445526, at *3 (concluding Defendant established substantial likelihood of success on merits by demonstrating "substantial case" on merits); *Int'l Hair & Beauty*, 2011 WL 5359264, at *8 (finding that movant "demonstrated at least a 'substantial case on the merits'" and issuing preliminary injunctive relief in relevant part).

numbers of their Medicare claims – including those of the other 14 providers at the Practice besides Dr. Qamar – have nothing to do with this case.

A constitutional retaliation claim "depends not on the denial of a constitutional right, but on the harassment [the claimants] received for exercising their rights." *Bennett v. Hendrix*, 423 F.3d 1247, 1253 (11th Cir. 2005) (citation and quotation marks omitted). "To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of conduct whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Thus, "an act in retaliation for exercise of a constitutionally protected right is actionable . . . even if the act, when taken for different reasons would have been proper." *Adams v. James*, 797 F. Supp. 940, 948 (M.D. Fla. 1992).

A *prima facie* retaliation claim, whether based on the Constitution or federal statute, consists of three elements. Claimants must show that (1) they engaged in protected activity, (2) they were subjected to a retaliatory adverse action, and (3) there was a causal connection between the retaliatory action and the protected activity.[14] All three elements exist here.

### a. A defendant's refusal to waive its procedural due process rights is itself a constitutionally protected activity.

The Due Process Clause provides that no person shall be "deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. A civil defendant's due process rights include the right to defend himself in court against the Government's

---

[14] *See, e.g.*, *Bennett*, 423 F.3d at 1250 (First Amendment); *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F. 3d 1261, 1277 (11th Cir. 2008) (Title VII and 42 U.S.C. § 1981).

allegations,[15] as well as the right to refuse to waive his procedural rights.[16]  Thus, choosing to

vindicate oneself in court and contesting the Government's legal position are constitutionally

protected activities.[17]  Here, Defendants exercised those very rights by refusing to waive their

opportunity for a judicial hearing.  Such protected activity establishes the first element of

their *prima facie* retaliation claim.

### b.  The Suspension Decision is an adverse action.

The withholding of Defendants' earned income, and the consequent prospect of

shuttering the Practice, is a materially adverse action, as it "would likely deter a person of

ordinary firmness from the exercise of [constitutional] rights."  *Bennett*, 423 F.3d at 1250

(discussing First Amendment retaliation) (citation omitted).  The Supreme Court's seminal

---

[15] *E.g.*, *Windsor v. McVeigh*, 93 U.S. 274, 277 (1876) ("Wherever one is assailed in his person or his property, there he may defend, for the liability and the right are inseparable."); *Hovey v. Elliott*, 167 U.S. 409, 417 (1897) ("due process of law signifies a right to be heard in one's defence"); *Chambers v. Baltimore & Ohio R. Co.*, 207 U.S. 142, 148 (1907) ("The right to sue and defend in the courts" "is the right conservative of all other rights").

[16] *E.g.*, *Ashokkumar v. Elbaum*, 932 F. Supp. 2d 996, 1008-09 (D. Neb. Mar. 15, 2013) (plaintiff alleged valid due process retaliation claim where, *inter alia*, she refused to settle disciplinary charges brought against her by public officials); *Vance v. Barrett*, 345 F.3d 1083, 1093 (9th Cir. 2003) (prison officials retaliated against prisoner for refusing to waive his procedural due process rights); *La. Pac. Corp. v. Beazer Materials & Servs.*, 842 F. Supp. 1243, 1256 (E.D. Cal. 1994) (denying federal government's motion for summary judgment on whether it retaliated against party for its "refusal to waive its due process rights").

[17] *E.g.*, *Blackledge v. Perry*, 417 U.S. 21, 28-29 (1974) (due process barred government from re-indicting convicted misdemeanant on felony charge after he exercised right to attack original conviction, given "realistic likelihood of 'vindictiveness'"); *Ashokkumar*, 932 F. Supp. 2d at 1008-09; *La. Pac.*, 842 F. Supp. at 1256; *Mims v. City of Philadelphia*, No. 09-CV-4288, 2010 WL 2077140, at *12-*14 (E.D. Pa. May 19, 2010) (claimant stated retaliation claim for exercising due process rights by appealing her suspension); *Richard v. Perkins*, 373 F. Supp. 2d 1211, 1215-16, 1220 (D. Kan. 2005) (same where claimant exercised due process rights by appealing state university's decision not to renew his scholarship); *Pressley v. Haeger*, No. 83-C-3974, 1989 WL 152973, at *4 (N.D. Ill. Nov. 16, 1989) (same where claimant alleged he exercised "his procedural due process right to take an administrative appeal"), *verdict affirmed*, 977 F.2d 295 (7th Cir. 1992).

retaliation decision in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), should guide the "adverse action" analysis here. There, an employee's 37-day suspension without pay was a materially adverse "hardship" for purposes of supporting a retaliation claim under Title VII of the Civil Rights Act of 1964, because "an indefinite suspension without pay could well act as a deterrent [against taking protected action], even if the suspended employee eventually received backpay." *Id.* at 72-73.

As discussed in greater detail below, *see infra* § II.B, the Suspension Decision has caused the Practice irreparable harm. It currently operates at an unsustainable loss because the majority of its income is from Medicare. It faces bankruptcy because a prolonged suspension of its Medicare payments will deprive it of the resources needed to treat its patients and cover its expenses. The two months since the Suspension Decision is longer than the workplace suspension at issue in *Burlington*. And as in *Burlington*, Defendants have no way to know when – if ever – the suspension will be lifted. For the same reasons that the suspension is causing Defendants irreparable harm, it is plainly an "adverse action."

        **c.**    **Defendants' exercise of their rights is causally connected to the suspension of their Medicare payments.**

"Proximity in time is sufficient to raise an inference of causation." *Bechtel Const. Co. v. Sec'y of Labor*, 50 F.3d 926, 934 (11th Cir. 1995). That inference is warranted here. Defendants' protected activity occurred on February 27, 2015, when Defendants rejected the Government's conditions for settlement. The Government suspended them on March 6, ***only seven days later***. This short period is sufficient, at this stage, to show a causal relationship between the two events. *E.g.*, *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (lapse of one month would be "sufficient circumstantial evidence of a causal connection").

This compressed timeline confirms that the timing was not merely coincidence but rather "a litigation and/or strategic decision." *See Johnson v. Florida Dep't of Corr.*, No. 3:04-CV-522, 2007 WL 4404209, at *8-*9 (M.D. Fla. Feb. 22, 2007) (evidence that retaliatory action was delayed for litigation purposes created jury question). Tellingly, HHS was required to consult "as appropriate" with DOJ before issuing the Suspension Decision. 42 C.F.R. § 405.372(a)(4)(i). There was no urgency for HHS to issue the suspension when it did: after the Government intervened in this action but before it filed its Complaint. HHS has never issued any determination that Defendants were overpaid, despite the fact that for the past two and a half years, it reviewed (and continues to review) *every* claim that Dr. Qamar submitted for the services at issue in the Government's Complaint. Defendants' counsel last communicated with CMS in ***April 2014*** about SafeGuard's prepayment review of Defendants' Medicare claims. He never received any response from CMS, let alone any further expression of concern about Dr. Qamar's practices – until the Suspension Decision was issued a year later with no advance warning, in clear retaliation for Defendants refusal to accede to the Government's demands.

Other evidence also reinforces how the Suspension Decision's reliance on this FCA case as a "credible allegation[] of fraud" is mere pretext for retaliation. First, the suspension is plainly overbroad. The FCA allegations against the Practice solely concern Dr. Qamar's cardiology services. Yet when issuing the Suspension Decision, HHS cited this case as evidence warranting suspension of *all* Medicare payments to the *entire* Practice – including those owed to its other 14 healthcare providers. The Government is now withholding almost $3 million of the Practice's money, almost half of which for these other providers.

Second, the Government is inexplicably "deviati[ng] from its own standard procedures" by refusing, in violation of HHS regulations, to respond to Defendants' Rebuttal to the suspension. *See Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298-99 (11th Cir. 2006) (finding jury question on retaliation claim, where two weeks elapsed between protected activity and adverse action, and defendant delayed issuance of termination notice). The Government "must" respond to the Rebuttal within 15 days of receiving it. 42 C.F.R. §405.375(a). That deadline came and went on April 15. Over the next two weeks, Defendants repeatedly informed the Government of the Practice's dire economic situation and urgent need for a response. They have never received a reply. The Government's unexplained disregard for its administrative procedures confirms its retaliatory motive.[18]

## 2.     FCA Defense

Defendants also have a substantial case that the Government's FCA allegations are meritless. Most notably, the Government's *only specific allegation* about medically unnecessary or inadequately documented services concern interventional cardiology treatments for four patients out of over 12,000 patients in ICE's cardiology practice. (*See* U.S. Compl. ¶¶ 110-138.) In late 2014, Defendants sought an independent cardiologist's review of multiple patients' interventional treatments, including all interventions performed by Defendants for three of the patients cited in the Government's Complaint: Patient C.F. (*see id.* ¶¶ 110-119), Patient P.H. (*see id.* ¶¶ 130-135), and Patient L.G. (*see id.* ¶¶ 136-138 & 150-152). (*See* Mabry Decl. ¶ 16.) The reviewer concluded that all treatments for lesions

---

[18] *See also Paeth v. Worth Twp.*, 483 F. App'x 956, 964 (6th Cir. 2012) (affirming jury verdict of unconstitutional retaliation where causal connection was established by temporal proximity and by government's failure to provide "prompt further proceedings" that should have ordinarily occurred during administrative appeals process).

that limited blood flow were appropriate, met the current standard of care, and yielded significant physiological improvements (*id.*), thus satisfying Medicare's requirement that the procedures be "reasonable and necessary." *See* 42 U.S.C. § 1395y(a). This is precisely the type of evidence that should be put before the Court as the parties litigate this case on the merits.[19] Yet the Government's retaliatory actions seek to stop Defendants from ever being able to put on this defense.

**B.      Absent an Injunction, Defendants Will Be Irreparably Harmed.**

The Government's retaliatory suspension of Defendants' Medicare payments is causing irreparable harm to Defendants, given their "substantial loss of business and perhaps even bankruptcy," which "sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975). An order compelling the Government to lift the Suspension Decision is needed to "preserve the status quo until the merits of the [Complaint] can be fully and fairly adjudicated." *City of Jacksonville*, 896 F.2d at 1284.

First, suspending Defendants because they exercised their constitutional right to challenge the Government in court is, *per se*, irreparable harm. *See Cate*, 707 F.2d at 1188-89. Second, the suspension has deprived the Practice of 60% of its revenue, causing most of its income to "simply evaporate," *see Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1288 (11th Cir. 2013) (affirming grant of preliminary injunction that barred enforcement of law prohibiting awards of certain state contracts), notwithstanding its continuing work and patient base.

---

[19] A declaration by the reviewer himself is forthcoming.

The Practice has lost over $1.5 million in the two months since the suspension went into effect. Unless the suspension is lifted, it will have to declare bankruptcy, as it can no longer make payroll and must cease operations in its current form, terminate employees, surrender goodwill, and require its 24,000 patients – many of whom are elderly, in poor health, and require prompt medical attention – to make alternative healthcare arrangements. Courts routinely hold that such threats to a movant's revenue, employees, customers, and goodwill pose irreparable harm.[20]

The loss of revenue also harms Defendants' ability to avail itself of the judicial process and meaningfully contest the Government's baseless allegations. Denying the instant Motion would allow the Government to "obtain[] a *de facto* termination" of Defendant's challenged activities "even without a decision on [the Government's] claim[s]." *See World Triathlon Corp. v. SRS Sports Ctr.*, No. 8:04-CV-1594, 2005 WL 3445526, at *4 (M.D. Fla. Dec. 14, 2005) (granting defendant's preliminary injunction motion). Granting the Motion will merely preserve the *status quo* so the Court can adjudicate the claims on their merits.

### C.     The Balance of Harms and the Public Interest Favor Defendants.

Absent the requested relief, Defendants will continue to face irreparable injury that would exceed any harm to Government if the injunction is issued. Similarly, issuing the relief "would not disserve the public interest." *Odebrecht Constr.*, 715 F.3d at 1274.

---

[20] *See, e.g.*, *Odebrecht Constr.*, 715 F.3d at 1288 (enjoining enforcement of law that would eliminate plaintiff's revenues and impair its ability to "retain employees"); *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, No. 8:11-CV-1883, 2011 WL 5359264, at *9 (M.D. Fla. Sept. 26, 2011) (granting preliminary injunction and holding that actual and potential loss of movant's "customers and goodwill" was irreparable injury), *report & recommend. adopted in relevant part*, 2011 WL 5360098 (M.D. Fla. Nov. 3, 2011); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1307-08 (S.D. Fla. 2008) (granting preliminary injunction where plaintiff would lose over 70% of its business source).

As an initial matter, even temporary infringements of constitutional rights constitute irreparable harm, and neither the Government nor the public has any legitimate "interest in enforcing an unconstitutional [action]." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (affirming permanent injunction issued on constitutional grounds). Accordingly, the balance of harms and public interest strongly favor Defendants with respect to enjoining the Government's unconstitutionally retaliatory activity.

Moreover, the irreparable economic harm to Defendants far outweighs any hypothetical economic harm to the Government. Lifting the suspension will let the Practice continue to exist – with the Government protected by its existing prepayment review – and allow Defendants to meaningfully defend themselves. Issuing the requested injunction will also serve the public interest by letting the Practice continue serving its 24,000 patients without interrupting their care or forcing them to find new doctors.

Allowing Defendants to continue being paid for treating Medicare patients also serves the public interest by enabling them to continue contesting the merits of the allegations. The public has great interest in ensuring that once the Executive Branch has invoked the Judiciary's jurisdiction to determine a defendant's liability, the Executive should not be allowed to undercut, through a unilateral and unappealable administrative determination ***that relies on the Government's unproven allegations pending before the Judiciary***, the defendant's ability to contest those very allegations. *Cf. Bordenkircher*, 434 U.S. at 363 (discussing Court's rejections of "the State's unilateral imposition of a penalty" upon defendants who exercised the right to attack their convictions).

During almost four years of "investigation," the Government has suffered no harm, because Defendants' Medicare claims have been scrutinized under prepayment review. Granting injunctive relief will not change this. The irrationality of the Government's retaliation is highlighted when viewed against the backdrop of this prepayment review and the fact that the suspension was issued at an arbitrary time (save for retaliatory motive, *see supra* § II.A.1.c). Further, the Government's stated purpose for suspending ***future*** payments to Defendants was to protect the Medicare Trust Fund. (Ex. A at 1.) That interest will not be impaired while this litigation proceeds. The longstanding prepayment review of Defendants' cardiovascular claims remains in place, and over the past six years, Medicare has only paid for the procedures at issue after subjecting them to heightened scrutiny.

## CONCLUSION

For the foregoing reasons, Defendants respectfully move the Court to issue an order compelling the Government to lift the suspension of Medicare payments to Defendants and barring it from engaging in further retaliatory and otherwise unconstitutional action.

Dated: May 6, 2015                                    Respectfully submitted,

/s/ Gregory W. Kehoe
Gregory W. Kehoe (FBN 486140)           Kirk Ogrosky (*pro hac vice pending*)
Danielle S. Kemp (FBN 474355)             Murad Hussain (*pro hac vice pending*)
GREENBERG TRAURIG, P.A.                 ARNOLD & PORTER LLP
Courthouse Plaza                                     555 Twelfth Street, NW
625 East Twiggs Street, Suite 100            Washington, DC 20004-1206
Tampa, FL 33602                                    (202) 942-5000
(813) 318-5700                                        (202) 942-5999 (facsimile)
(813) 318-5900 (facsimile)                      Kirk.Ogrosky@aporter.com
Kehoeg@gt.com                                      Murad.Hussain@aporter.com
Kempd@gt.com

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to the counsel of record listed below.

/s/ Gregory W. Kehoe

**Adam Russell Tarosky**
US Department of Justice - Civil Division
adam.r.tarosky@usdoj.gov

**Daniel Robert Anderson**
US Department of Justice - Civil Division
Dan.Anderson@usdoj.gov

**Eva U. Gunasekera**
US Department of Justice - Civil Division
eva.gunasekera@usdoj.gov

**Michael D. Granston**
US Department of Justice - Civil Division
michael.granston@usdoj.gov

**Sean Flynn**
US Attorney's Office - FLM
sean.flynn2@usdoj.gov

**Jonathan Kroner**
Jonathan Kroner Law Office
jk@floridafalseclaim.com

**Marc Ito**
Office of the Attorney General
Marc.Ito@myfloridalegal.com

**Rafael Jacinto Nobo, III**
The Nobo Law Group
rafael.nobo@gmail.com

**Sam S. Sheldon**
Quinn Emanuel Urquhart & Sullivan, LLP
samsheldon@quinnemanuel.com

**Ben O'Neil**
Quinn Emanuel Urquhart & Sullivan, LLP
777 6th St NW 11th Flr
Washington, DC 20001

**John S. Didday**
John S. Didday, Esq.
50 California St 22nd Flr
San Francisco, CA 94111