```
 1                   UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3

 4
                     Docket No. 5:11-CV-406
 5

 6

 7    . . . . . . . . . . . . . .
      UNITED STATES OF AMERICA,   :
 8    ET AL.                      :
                                  :          Orlando, Florida
 9          Plaintiffs            :          May 29, 2015
                                  :          9:01 a.m.
10                v.              :
                                  :
11    INSTITUTE OF CARDIOVASCULAR :
      EXCELLENCE, PLLC, ET AL.    :
12                                :
            Defendants            :
13    . . . . . . . . . . . . . .

14

15

16
                   TRANSCRIPT OF MOTION HEARING
17         BEFORE THE HONORABLE ROY B. DALTON, JR.
                   UNITED STATES DISTRICT JUDGE
18

19

20

21

22    Court Reporter:    Amie R. First, RMR, CRR
                          AmieFirst.CourtReporter@gmail.com
23

24    Proceedings recorded by mechanical stenography.

25    Transcript produced by Computer-Aided Transcription.
```

1    APPEARANCES:

2

3    For the Plaintiff United States of America:

4                      Sean P. Flynn

5

6    For the Consol Plaintiff Holly Taylor, Relator

7                      Sam S. Sheldon

8

9    For the Defendant Institute of Cardiovascular
     Excellence, PLLC:
10

11                     Gregory W. Kehoe

12                     Kirk Ogrosky

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE DEPUTY CLERK:  Case Number
 3   5:11-CV-406-OC37-TBS, United States of America, et al.,
 4   versus Institute of Cardiovascular Excellence.
 5            Counsel, please state your appearance for the
 6   record.
 7            MR. SHELDON:  Good morning.  Sam Sheldon on behalf
 8   of the relator, Holly Taylor.
 9            MR. FLYNN:  Good morning.  Sean Flynn on behalf of
10   the United States of America.
11            THE COURT:  Good morning.
12            MR. KEHOE:  Good morning, Your Honor.  Gregory
13   Kehoe and Kirk Ogrosky on behalf of the defendants.
14            THE COURT:  Good morning to you all.
15            We're here on the motion of defendant for a
16   preliminary injunction.
17            A couple of preliminary things.  I have reviewed
18   all of your papers, and so I'm familiar with the underlying
19   facts as well as your respective positions, just so that
20   you can perhaps save a little bit of time as you focus your
21   arguments.
22            Let me bring one other thing to your attention.  I
23   have a clerk who's on his way out in the next couple of
24   months who is in the middle of his exploration of job
25   opportunities.
```

```
1              I know he has had at least one interview with the

2    Greenberg firm.  He also has some expressions of interest,

3    I think, but no active applications pending, with the

4    Department of Justice.

5              But as most of them do, he's looking in all of

6    those areas.

7              He's not worked on this case at all.  But I, just

8    in the interest of complete disclosure, want to let you

9    know I do have a clerk who's on the way out who's in the

10   job-hunting mode.

11             So I don't see that as any problem from my end,

12   but I wanted to bring it to your attention.

13             MR. KEHOE:  Your Honor, in the spirit of full

14   disclosure, I, in fact, did talk to the gentleman several

15   weeks ago as a preliminary interview with him.  So --

16             THE COURT:  Okay.  As I said, at this stage, at

17   this stage of the process, he's not worked on this case at

18   all.  And I just wanted to bring it to your attention.

19             As I said, I don't see it as any problem for the

20   Court.  But I want to make sure that both the Government,

21   the relator, and the defense were aware of it.

22             So with that, Mr. Kehoe, I'm anxious to hear from

23   you with respect to your position on the motion for

24   preliminary injunction.

25             MR. KEHOE:  Yes, Your Honor.  I understand that
```

```
1    Your Honor has given us a half an hour each for this.
2    Respectfully, Your Honor, if I can reserve some rebuttal
3    time --
4              THE COURT:  Yes.
5              MR. KEHOE:  -- in the area of ten, fifteen
6    minutes, which will be taken by Mr. Ogrosky.
7              THE COURT:  Okay.  Do you want to split your time?
8    You want to make a presentation, and you want to come back
9    after the relator and the Government have had an
10   opportunity?
11             MR. KEHOE:  Yes, Your Honor.  As the movant, we
12   would like to have some rebuttal time.
13             THE COURT:  No.  I think that makes perfect sense.
14   So we'll do that.  And I'll ask my courtroom deputy to give
15   you a 15-minute warning.
16             MR. KEHOE:  Yes, Your Honor.
17             May I proceed, Your Honor?
18             THE COURT:  Yes, you may.
19             MR. KEHOE:  Your Honor, we come before the Court
20   for a preliminary injunction for the Court to exercise its
21   powers under Rule 65 and also its inherent equitable powers
22   to preclude the Government from preventing, from a variety
23   of means, the defendants from litigating this action before
24   Your Honor.
25             It focuses on the suspension by the Department of
```

1   Health and Human Services in a letter issued on March 6,

2   which suspended all Medicaid payments, Medicare payments to

3   the defendants.

4         Medicare payment is essential for the entities to

5   begin to operate, to continue to operate, to service their

6   patients, and to provide the medical care that they have

7   been providing.

8         The exercise of this suspension should not be

9   taken in isolation.  And we hope to take Your Honor through

10  the temporal issues that are involved in this case, because

11  it simply doesn't involve just the matters herein.

12        This is a retaliation to preclude the defendants

13  from coming before Your Honor after the refusal of several

14  settlement offers.  And we will talk about those offers and

15  the temporal sequence as to what happened on the heels of

16  that.

17        Contrary to the prosecutor or the United States'

18  position, this is not a sovereign immunity issue, and this

19  is not an exhaustion issue.

20        We are not here to challenge a monetary decision

21  by Medicare.  We are here to challenge an unconstitutional

22  retaliatory action taken by the Department of Justice and

23  the United States Health and Human Services to preclude

24  these defendants from getting access to this court in order

25  to decide the elements in the facts and circumstances in

1    this matter.

2         By cutting off the funds to allow these defendants

3    to proceed, they are doing exactly that.  They are bringing

4    this entity to its knees, to essentially prevent it from

5    litigating this matter before you.

6         To compound the matters, when we look at the

7    suspension itself -- and we'll get into it in some detail,

8    Judge.  One of the bases of the suspension letter of

9    March 6 of 2013 are credible -- allegedly credible

10   allegations of fraud that emanate not from the complaint in

11   this matter but from a press release issued by the

12   Department of Justice on January 5 of 2015.

13        So we are in somewhat of a catch-22.  The

14   Department of Justice makes an announcement on January 5,

15   2015, to intervene in the matter without even filing the

16   complaint.

17        And then HHS uses that as a basis on which to

18   suspend, thereby precluding the defendants from coming

19   before this Court to litigate the matter for which the

20   press release was supposedly to announce.

21        Again, this is not an exhaustion issue.  This is

22   not a sovereign immunity issue.  We take this through some

23   of the fundamental elements.  And we'll go through the

24   timing here.  There are any number of meetings concerning

25   settlement in this matter.  It was in the interests of the

1    defendants to settle this matter.

2         But the timing of the Government action on the

3    heels of the impasse in those settlements -- as I know Your

4    Honor, as a trial lawyer for many years, has been through.

5         We have a crucial settlement breakdown on the

6    27th of February, 2015, followed seven days later by

7    the suspension letter of March 6, 2015.

8         Now, we're going to get into this again in some

9    detail.  The Government argues, well, you know, this was

10   all the process and merely this is a coincidence.

11        Really?

12        We have another meeting with the Department of

13   Justice.  And there were subsequent meetings after the

14   27th of February, 2015.  A crucial meeting on April 24

15   of 2015 that the Government describes as productive.

16        I don't really know what their idea of productive

17   is.  I didn't find that meeting productive at all.  Quite

18   the contrary.  But there was, again, no settlement in that

19   discussion.

20        And four days later, what do they get?  They get a

21   revocation.  So we have a suspension on the 6th of

22   March.

23        The Government files their paper, says, well, you

24   know, the defendants can continue to file their Medicaid

25   claims.

1        They can continue to file it, Judge, until

2   yesterday.  Because the letter of the 28th of April,

3   2015, revoked both Dr. Qamar and ICE's ability to file

4   Medicare claims.

5        This is a retaliation claim brought to Your Honor,

6   and they are acts of retaliation by the Government designed

7   to bring these defendants to their knees.

8        Let's just look at who they are trying to bring to

9   their knees.  The Institute of Cardiovascular Excellence

10  and Dr. Qamar, he's an interventional cardiologist.

11       And by the way, the practice is broken down into

12  two various elements.  One is the Institute of

13  Cardiovascular Excellence.  And they do basically

14  interventional cardiovascular work.  And there is another

15  more traditional element of the Institute of Medical

16  Excellence.

17       What's interesting to note is that all of the

18  allegations in the complaint filed by the Government are

19  directed towards Dr. Qamar and the Institute of

20  Cardiovascular Excellence; but the monies that have been

21  frozen, suspended by the Government, entail all of the

22  practice, both arms of the practice.

23       The Government could easily sift through and go

24  through doctors who are involved in the Institute of

25  Medical Excellence and cleave that out and not freeze that.

```
1   But they haven't done that.

2           And the question is, why?

3           These two practices are owned and operated by

4   Dr. Qamar.  They have five offices in the Ocala area.  As

5   I'm sure Your Honor knows being a long-time resident of

6   Orlando, a lot of that area around Ocala involves itself --

7   has retirement communities in various locales around the

8   Ocala area.  And that makes up a large segment of the ICE's

9   population.

10          They have 15 healthcare providers, 10 physicians,

11  almost 200 employees.  60 percent, 60 percent of their

12  revenue comes from Medicare.  They have 24,000 patients,

13  70 percent of which are on Medicare.

14          And if you read the complaint by the Government,

15  you would think that all this entity does is take money in

16  and doesn't give anything back.

17          In 2012 alone, this practice gave over $3 million

18  in services to uninsured patients using approximately

19  $2 million in equipment.

20          That's who this practice is.  And who is

21  Dr. Qamar?  As I mentioned, he's an interventional

22  cardiologist, dealing with people with serious problems.

23          I'm sure Your Honor has gone through the papers.

24  And I don't want to reiterate everything that's in there.

25  But these people have serious cardiac problems.
```

1          THE COURT:  I have read the papers.  And let me

2    interrupt you and ask you more of a foundational question.

3          You're proceeding on your claim, retaliation claim

4    under the Court's -- you're invoking the Court's inherent

5    authority.

6          MR. KEHOE:  Yes, Your Honor.

7          THE COURT:  You're not proceeding under the

8    All Writs Act.  You're not proceeding under the

9    federal-question jurisdiction.  You're not proceeding under

10   some of the other, I would say, methods that have been

11   employed from time to time around the country to try to

12   address this type of situation.

13         I'm not suggesting that your situation is not

14   unique.  But obviously, as you know, as you all know, there

15   have been a number of cases around the country that have

16   dealt with efforts by medical providers and the recipients

17   of benefits to intercede in the decisions of Medicare with

18   respect to the suspension of payments.

19         So I want to make sure I understand

20   foundationally, Mr. Kehoe, your retaliation claim.  Is it

21   your contention that the retaliation claim is actually --

22   that your petition is actually the claim?

23         Because in order for you to receive a status quo

24   injunction, at least as I read the cases, it would be

25   necessary for you to demonstrate that you've got a

1    substantial likelihood of success on the merits of your

2    retaliation claim.

3            And the retaliation claim, as I understand it, is

4    based perhaps on other things but primarily on the temporal

5    relationship between the suspension of benefits and the

6    breakdown in your negotiations with the Government.

7            Is that a fair summary?

8            MR. KEHOE:  That is a fair summary, Judge.

9            And we are not arguing the Bristol Health case, a

10   situation that is cited by the Government where they talk

11   about this just as being a monetary issue where an

12   individual provider is challenging Medicare's cutting off

13   of payments.  It's not that type of monetary issue.

14           This is simply an injunctive issue based on that

15   retaliation.

16           THE COURT:  I don't mean to skip over the

17   jurisdictional argument, because I'm sure I'll hear more

18   about that in a moment.

19           But as far as my question to you, tell me -- what

20   would help me is if you could highlight for me what you

21   think the facts are other than the temporal relationship

22   between the suspension of benefits and the breakdown of

23   negotiations.

24           In other words, what is there in the record that I

25   have before me that you think suggests that you have a

1    substantial likelihood of prevailing on that issue.

2         MR. KEHOE:  Your Honor, I can direct Your Honor to

3    the affidavit of my learned friend, Mr. Mabry, that is

4    behind me, seated in the front row.  He has been working

5    with Dr. Qamar and ICE for, well, the better part of five

6    years.

7         And when we look at the temporal sequence of what

8    was transpiring here, this is not an isolated incident.

9         If we go back to April of 2010 when ICE started

10   up, they were on what is known as an educational prepayment

11   review, where the Medicare administrative contractor,

12   MAC -- it's named First Coast -- was doing a prepayment

13   review of the bills, the Medicare bills coming in from ICE.

14        That stopped in approximately 2011, in April of

15   2011.  In October of 2012, October of 2012, and goes on

16   till today, ICE was put on a prepayment review by

17   SafeGuard.

18        That's -- SafeGuard is a zone program integrity

19   contract, a ZPIC.  What do they do?  They do audits.  They

20   check whether or not these payments should be made.

21        And from October of 2012 till February of 2013,

22   ICE was on 100 percent prepayment review.  100 percent.

23   Now, through the efforts of Mr. Mabry, that was narrowed a

24   bit.  But even today, even today, Judge, they are on a

25   prepayment review.

1          That will go into some other elements on whether

2     or not anybody is going to be injured if this money frees

3     up going to ICE and Dr. Qamar simply because they are on a

4     prepayment review now.

5          And, interestingly enough, while they were on this

6     100 percent prepayment review, First Coast now uses some

7     issues during that time frame as a basis for the suspension

8     that was issued on March 6, 2006 -- excuse me -- March 6,

9     2015.

10          But we have to look at this in isolation.  There's

11     a long history here of an analysis and a review.  And

12     frankly, Judge, throughout the period of time from, I would

13     say, October of 2012, certainly after February of 2012,

14     Mr. Mabry was consistently trying to interface with CMS and

15     SafeGuard to talk about their incorrect statistics; to talk

16     about, okay, there were denials of claims, but you didn't

17     take into account any of the appeals that reversed those

18     claims.

19          And those were met almost -- with almost deaf ears

20     during that period of time.

21          And if you go back to Mr. Mabry's affidavit, he

22     documents the consistent attempts on his part to get the

23     attention of CMS and SafeGuard to change their factual

24     recitation of what's going on with the claims.  So we go

25     before that.

1        Then we move into this particular case.  And we go

2   into the temporal sequence in this case.  Between April of

3   2013, while the prepayment review is ongoing, four

4   subpoenas are issued by HHS, Office of Inspector General to

5   ICE and Dr. Qamar.

6        Those subpoenas asked for any number of patient

7   records.  I believe it's somewhere in the area of

8   170 patient records.

9        In September of 2014, DOJ confirms that there is

10   an investigation.  And -- excuse me.  In December of 2014,

11   December 22, there is the intervention by the Department of

12   Justice.  And then move to the press release on January 5

13   of 2015.

14        Now, all of this is transpiring.  All of this is

15   being reviewed.  Then the settlement negotiations begin.

16   And there's a large settlement -- series of negotiations

17   that culminate on February 27, 2015, a crucial period of

18   time where the plaintiffs, where the Government wants the,

19   obviously, the defendants to settle for a monetary amount.

20        I can't go into those right now, Judge.  I would

21   but I'm barred, I think, by Rule 408.

22        What happens after that, on the heels of that, is

23   the suspension order, highlighting in the suspension order

24   the credible allegations of fraud from the press release,

25   among other things, among other -- there were other issues.

1  But in large part, central to all of this, the new thing is

2  the January 5, 2015, press release.

3        What happens in that, Judge, is the suspension is

4  not appealable.  They put it forth in a letter it's not

5  appealable.  You can try to rebut it, which Mr. Mabry did;

6  gave an extensive rebuttal talking to CMS about how their

7  information was incorrect, how their information was

8  inaccurate, cataloging his attempts to try to rectify the

9  situation.

10        THE COURT:  What's your understanding of the next

11  step?  Lay out the process for me as you understand it for

12  any kind of administrative review outside of the Article

13  III context.

14        MR. KEHOE:  There is none, Judge.  On the

15  suspension, there is no review.  It's not appealable.

16  We're stuck.

17        Do you know what we're stuck for?  We're stuck

18  until these credible allegations of fraud are resolved.

19  And what that means is we are stuck until this case is

20  resolved.

21        THE COURT:  You've used up 15 minutes.

22        MR. KEHOE:  Yes, Your Honor.

23        If I can go, Your Honor -- and I think it's

24  important to look at this in isolation.  The isolation, you

25  can't look at the March 6, 2015, suspension letter in

1    isolation.  It has to be taken in conjunction with yet

2    another strike.

3           After the April 24 meeting among -- with the

4    United States and with my client and with others, we

5    attempted to finally resolve this matter.

6           It broke down yet again on very serious issues.

7    And four days later, the complete revocation of the ability

8    of ICE and Dr. Qamar to submit Medicare payments.

9           So this comment in page 8 and 9 of the

10   Government's reply that they can somehow continue to file

11   these matters is simply not correct.  Because it's over as

12   of yesterday.

13          They have no remedies here.  They can't appeal it.

14   They can appeal the revocation.  Heaven knows how long

15   that's going to take.  Because they have been revoked for

16   up to three years.

17          THE COURT:  You interpret the Government's

18   contention to be essentially that you can continue to file

19   these claims; and we'll process them, but we're not going

20   to pay them?

21          MR. KEHOE:  Well, now you can't even process them.

22          THE COURT:  Well, I mean, they'll still be

23   subjected to review.  The claims, that is.  In other words,

24   if, if, hypothetically, the case were to proceed and your

25   client were to be vindicated and the credible allegations

```
 1   of fraud were refuted and that you were to prevail, however

 2   long that might take, forgetting for just a moment your

 3   argument about the economic harm, but then those payments

 4   that have been submitted will be processed and paid,

 5   presumably.

 6          MR. KEHOE:  Well, that's up until yesterday,

 7   Judge.  With the revocation, we can't even submit claims

 8   anymore.

 9          THE COURT:  Okay.

10          MR. KEHOE:  So that's cut off.  So the issue, of

11   course, is we're now -- they're holding approximately

12   $4 million.  I think it's 3.9.  I checked with the

13   administrator.  $3.9 million in monies now, growing every

14   day in claims that have gone in, with no idea when the

15   suspension is going to be lifted.

16          Clearly, the suspension is not going to be lifted

17   until this happens.  The suspension is indefinite.  This

18   type of indefinite suspension where you say, well, you have

19   a remedy.  You can get the money down the end of the line.

20          The Supreme Court cast that aside in Burlington

21   Northern versus Santa Fe Railway and said that's no remedy

22   at all.

23          If I can just go through these elements quickly,

24   Judge.  I don't want to use up all of my time because I

25   want to give Mr. Ogrosky a chance to rebut.
```

1        But, clearly, Judge, there are the substantial

2   likelihoods of success on the merits here of retaliation.

3   There are two strikes of retaliation that Your Honor has to

4   look at the timing of those on the heels of impasses in the

5   settlement.

6        The first being in March 6 of 2015; the second

7   being a letter on April 28, 2015, after the breakdown of

8   settlement negotiations on the 24.

9        Are these merely coincidences in timing, Judge?  I

10  submit to Your Honor they are not.

11       Because the Government has advanced the affidavit

12  of an individual in CMS that says that this was in

13  progress.  Really?  Well, they didn't give you an

14  affidavit, Judge, of the individual who actually gave the

15  order for the suspension or gave the order for the

16  revocation.  This is merely an individual that advised

17  itself up the line.

18       I submit to Your Honor this is something

19  significantly more than a coincidence.  And what they have

20  done as a result of this is precluded the defendants from

21  coming to court.

22       Now, the Government has said in Patel, a Ninth

23  Circuit case, that there is no First Amendment right to

24  come to court as a result of a breakdown of settlement

25  negotiations.

1        I want to give to Your Honor -- I gave it to

2   counsel -- the case of Pizzolato versus Perez.  If I could

3   hand it up to Your Honor.  I've highlighted the pertinent

4   portion.

5        And this is a case that was under the old Fifth

6   Circuit before -- Bonner versus City of Prichard.  Judge,

7   as you can see from the date, it is September 4, 1981.

8        Judge Arceneaux essentially ruled that he enjoined

9   a criminal case, a criminal indictment because a plaintiff

10  -- or in this case an individual -- refused to settle the

11  case with the Government.

12       Almost on all fours with this case.  Our case is a

13  Fifth Amendment case.  That's a First Amendment case.  But

14  the concept is still the same that you cannot chill a

15  constitutional right of an individual simply because

16  there's a breakdown in settlement negotiations.

17       This is squarely contrary to the Patel case but

18  squarely within the confines of the case that we have

19  before us.  If we go through this just generally, Judge,

20  the irreparable harm is significant.

21       If you look at these individuals behind us, these

22  are the patient core of ICE.  These are the individuals

23  that are going to be hurt.  This is not just a monetary

24  issue.  It is a people issue.

25       Yes, there's money involved.  But there's also the

```
 1   ability to service and take care of these people who need
 2   these -- need Dr. Qamar and need ICE.
 3            We have 8,300 patients that are patients of
 4   Dr. Qamar, ICE, getting cardiovascular work.  And Dr. Qamar
 5   is not only a hard worker; he's good.
 6            If I put forth the statistics that were in our
 7   brief, 8,300 patients, they had 7 amputations,
 8   7 amputations.  If we extrapolate that out to the
 9   government's figures, the government's national average is
10   5,790 per 100,000.
11            What is ICE?  84 per 100,000.  Yes, Dr. Qamar
12   works hard, but he's also good.
13            And if, if this suspension, this retaliatory
14   suspension designed to bring Dr. Qamar, ICE, to its knees
15   is allowed to proceed, this harm will infect everybody in
16   this room and others.
17            The balance of harm to the Government is minimal.
18   First, the Government can't, can't, Judge, preclude an
19   individual from coming to court to exercise his right to
20   litigate the matter.  And that's what this is designed to
21   do.
22            And there's not going to be any harm to the
23   Government.  ICE and Dr. Qamar continue to be on prepayment
24   review.
25            The severe harm to the defendants in this case
```

1    tremendously outweighs any potential harm to the United

2    States.  Tremendously.  It's not even close.

3           The public interest here is clear.  The public

4    interest here is to allow this particular physician with

5    his entity to continue to practice and service these people

6    while at the same time having the funds to re-litigate this

7    matter before Your Honor.

8           Coming back full circle, Judge, this is not a

9    sovereign immunity issue.  This is not an exhaustion issue.

10   Because that's the path the Government would want to take

11   you down so they don't have to resolve whether or not they

12   retaliated against these defendants for the free exercise,

13   the constitutional exercise of their privilege to come

14   before this Court to resolve this matter.

15          That is the thrust of our argument here.  I would

16   reserve any time I do have for Mr. Ogrosky to respond.

17          THE COURT:  Thank you, Mr. Kehoe.

18          MR. KEHOE:  Your Honor, I will say that with

19   regard to -- I did give a copy to counsel.  It's not in the

20   brief.  I handed it up, but I did give it to Mr. Flynn.

21          THE COURT:  Mr. Flynn?

22          MR. FLYNN:  Thank you, Your Honor.

23          Good morning again, Your Honor.

24          THE COURT:  Good morning.

25          MR. FLYNN:  Sean Flynn on behalf of the United

1    States.

2          Your Honor, defendants' retaliation claim, or

3    defense as they refer to it as, is patently frivolous.  The

4    United States has intervened in two qui tam cases that have

5    since been consolidated.

6          Make no mistake about it.  The United States

7    intends to prove at trial that Dr. Qamar and his company,

8    the Institute of Cardiovascular Excellence, defrauded the

9    federal government out of tens of millions of dollars and,

10   worse than that, subjected vulnerable elderly patients to

11   medically unnecessary, invasive procedures.

12         The United States is not -- I repeat -- not trying

13   to force anybody to settle this case.  To the contrary, it

14   is the defendants who have tried to get the United States

15   to settle this case for a fraction of what the actual

16   damages are in this case.

17         And to that end, what they have done is invoked

18   their, quote, ability to pay or their financial ability to

19   make the United States whole in this case and offered a

20   settlement which they've represented to be the maximum that

21   they are able to pay.

22         Now, in reviewing the documents that they provided

23   us, the United States determined that not only did the

24   documents they provide not support their settlement

25   position, it actually raised more questions than it

```
 1   answered.
 2           For instance --
 3           THE COURT:  So the question arises, Mr. Flynn --
 4   and I apologize for the interruption.  But because our time
 5   is precious, a couple of things that I have on my mind is
 6   that if -- you're not going to get any argument from me
 7   that parties to complex litigation oftentimes have
 8   contentious settlement negotiations which ebb and flow as
 9   the process matures.
10           I guess the question that I have is, tell me where
11   it is in the administrative process that the suspension of
12   benefits was going to occur without regard to what happened
13   in connection with the negotiations over the resolution of
14   the qui tam case.
15           In other words, educate me a little bit as to,
16   what do you think there is in the record to refute
17   Mr. Kehoe's contention that the action taken by the
18   Government was retaliatory in nature and not part of the
19   normal parallel course, if you will, of the administrative
20   process of looking into the propriety of the Medicare
21   payments and exercising what the Government would contend
22   would be appropriate measures to suspend benefits as a
23   result of creditable allegations of fraud.
24           And then, of course, the train on the other track
25   is the qui tam litigation.  Help me understand from the
```

1   Government's view why those courses don't transact.

2          MR. FLYNN:  Sure, Your Honor.

3          The paramount sum of the negotiations in this

4   False Claims Act case are completely unrelated to the

5   administrative measures taken by CMS.

6          And I point Your Honor to the declaration of

7   Chong, which was an employee of CMS who had knowledge of

8   the administrative measures that were taken in this case.

9          And as Chong declared in the declaration, those

10  steps that were taken -- you know, take a step back, Your

11  Honor.

12         It's defendants' -- defendants' theory that the

13  Government, you know, in the snap of a finger can take

14  administrative action, that they didn't, you know, move

15  mountains in seven days or four days as they say.  And the

16  declaration clearly points out that that's not the case.

17         The steps that were necessary in order to do the

18  suspension, to issue the suspension are heard long before

19  that.

20         The declaration clearly states that those steps,

21  the steps taken to suspend Dr. Qamar and ICE, occurred in

22  January, long before the alleged breakdown of settlement

23  negotiations which, as the record indicates, weren't even

24  really a breakdown in settlement negotiations.  They

25  continued after that and as recently as two days ago.

1          THE COURT:  Is the decision to suspend benefits,

2    in your estimation, one that is discretionary within the

3    department, or is it one that's mandated by statute?

4          MR. FLYNN:  It's discretionary.

5          When you say "department," Your Honor, the

6    Department of Justice has no authority --

7          THE COURT:  I misspoke.

8          MR. FLYNN:  The CMS?

9          THE COURT:  Does the Medicare statute mandate

10   administratively the suspension of benefits upon the

11   receipt of credible allegations of fraud, or is it a

12   discretionary matter?

13         In other words, do you have other administrative

14   tools that you can employ, such as the review process which

15   is ongoing?  Do you have other administrative tools that

16   could be used to try to protect the Government against the

17   possible abuse of the Medicare system that's short of a

18   suspension?

19         I'm just trying to understand because the Medicare

20   Act, as you know, is a very complicated piece of

21   legislation.

22         So help me understand within that legislation and

23   the regulations that -- the regulations that govern the

24   administration of the Medicare Act.  Tell me where within

25   the regulations or the Act does the -- does Medicare have

1   discretion with respect to which tools it employs to try to

2   protect the Government against fraud.

3          MR. FLYNN:  Yes, Your Honor.

4          The regulations clearly state that it is

5   discretionary.  In fact, CMS could lift the suspension at

6   any time.

7          And, in fact, when they submitted their rebuttal

8   to the suspension, CMS reconsidered and took the rebuttal

9   evidence under advisement.  And if they thought it was

10  appropriate, they could have lifted it at that time but

11  chose not to.

12         The fact of the matter is there's credible

13  allegations of fraud which authorizes them to take this

14  action.  And it's their authority to decide whether that's

15  appropriate under these circumstances.

16         It's not the Department of Justice.  It's not the

17  defendants'.  It's not even this court, Your Honor.  CMS is

18  the one with the authority to determine which

19  administrative measures need to be taken when there's a

20  credible allegation of fraud.

21         And the credible allegation of fraud, you know,

22  they try to paint as just this qui tam action.  But clearly

23  it's not.  It states right in the suspension letter that

24  there was other credible allegations of fraud.

25         So even if you pull out this False Claims Act

```
 1   case, there still remains other credible allegations of
 2   fraud that justify the suspension.
 3          THE COURT:  I don't want to preempt your argument.
 4   But, again, in the interest of time, as I try to distill
 5   Mr. Kehoe's argument down, it strikes me that the defense
 6   position is not -- obviously, they contest whether or not
 7   these allegations of fraud are credible.  That's the
 8   essence of the dispute in the qui tam case.
 9          But assuming for purposes of our conversation that
10   the allegations of fraud are credible, I guess my question
11   is, in response to Mr. Kehoe's assertion or the defendants'
12   assertion that but for the qui tam action the suspension of
13   benefits would not have occurred, that some other
14   administrative remedy, such as continued review,
15   maintaining the status quo, that's -- their assertion is
16   that you wouldn't have -- you would not have suspended
17   payments unless your goal was to economically shut them
18   down.
19          Now, again, I'm not prejudging that.  I'm just
20   telling you that's what I understand their argument to be.
21          So help me understand from the Government's point
22   of view a couple of things.
23          One is, why the suspension of benefits -- and I'm
24   not suggesting I'm sold on the temporal proximity argument.
25   But if the temporal proximity argument -- what in the
```

1    Government's arsenal would rebut the temporal proximity

2    argument?  What alternative administrative remedies are

3    there that could have been employed?

4         And I understand your argument that neither I nor

5    anyone else has any authority to review what CMS does with

6    respect to the exercise of its discretion.

7         But if I were to respectfully disagree with that

8    for just a moment, tell me why it is that the Government is

9    harmed if the other administrative tools that are in its

10   arsenal were employed short of suspension of benefits.

11        What additional protection against -- of fraud

12   does the Government obtain by suspending benefits versus

13   100 percent review?

14        That's a compound question.  I apologize for it.

15   But if you can get to the idea of what I'm concerned about,

16   maybe you can address those in any order you think would be

17   helpful to me.

18        MR. FLYNN:  Sure.  As I understood the question,

19   there were two parts to it.

20        The first is the temporal proximity issue.  And,

21   Your Honor, I would suggest to the Court there is no

22   temporal proximity here, that the actual decision to take

23   steps to suspend occurred long before the alleged breakdown

24   of negotiations, as we put in the declaration before the

25   Court.

 1          But even beyond the temporal proximity issue, I do

 2     believe Your Honor's question is, what other remedies could

 3     CMS have enacted?  And why did they choose to do the

 4     suspension?

 5          And there was a prepayment review.  But unlike

 6     defendants have characterized it, it was not 100 percent

 7     prepayment review.  It was actually a prepayment review of

 8     certain procedural codes.

 9          And what they found through the prepayment process

10     over the years is that they're denying a huge rate of

11     claims.  58 percent is what's in before the Court.

12          Now, of that, defendants have appealed some of

13     those and been successful.  But as we pointed out, they

14     haven't appealed approximately 72 percent of those claims.

15          So what's happening is there's evidence of fraud

16     that has been happening.  But yet the United States

17     continues to pay out and pay for this fraud.

18          And so by suspending Dr. Qamar and ICE, we've

19     turned off the spigot temporarily, mind you, but turned off

20     the spigot in order for CMS to conduct further

21     investigation, not just the False Claims Act issued before

22     the Court, but also the other credible allegations of fraud

23     that were listed in the suspension, and determine whether

24     overpayment has occurred and make sure that they recoup

25     that money instead of continuing to pay out money to

1    Dr. Qamar for, you know, fraudulent claims.

2           And in addition to that, there are other

3    administrative remedies or administrative procedures,

4    measures that CMS can enact.

5           One of them is revocation, which I don't think is

6    really before the Court, Your Honor.  They mention it in

7    their reply.  Revocation has been enacted.  And revocation

8    did go into effect yesterday.  It's a three-year

9    revocation.

10          And so what we're talking about now is the

11   suspension, which is before the Court, is a limited period

12   of time that there was claims that were submitted.  And

13   those claims were reviewed and either denied or approved

14   and then sent into an escrow account to determine whether

15   they can be offset by overpayments that occurred through

16   other claims.

17          THE COURT:  Do you agree with what Mr. Kehoe told

18   me, that the process, at least as he understands it, is

19   that once the revocation occurs, that there is no -- there

20   is no review of the CMS decision by the Court or any

21   administrative agency, or there's no APA relief?

22          There's nothing that the defendant could do to

23   seek further review other than await some further action by

24   Medicare?

25          MR. FLYNN:  No, Your Honor.

1          And I didn't understand Mr. Kehoe, in fairness, to

2    have said that.  I think Mr. Kehoe did acknowledge that the

3    revocation -- there is appeal rights, administrative appeal

4    rights.  And they can appeal that.

5          And there is the appeal process which culminates

6    in 405(h), which ultimately allows the district court to

7    review that decision.  So there are appeal rights with the

8    revocation.

9          With the suspension, because it's a temporary

10   measure, as the two circuit court cases that we put in our

11   brief point out, it's a temporary measure and is only to

12   allow CMS time to conduct an investigation to determine

13   whether overpayments have occurred and whether those

14   overpayments should be offset by appropriate claims that

15   have been paid.

16         That's different from the revocation, which

17   completely revokes their Medicare privileges and does not

18   allow them to actually submit those claims.

19         THE COURT:  That's the reason I asked the

20   question, because you didn't mention this with respect to

21   your citation of the V.N.A. versus Heckler case.

22         But as I read V.N.A. versus Heckler, if ultimately

23   the Court would have jurisdiction at the exhaustion of the

24   administrative process, then by my review of V.N.A. versus

25   Heckler would suggest that at least there may be some

1    authority for the exercise of jurisdiction over a request

2    for a preliminary injunction in some circumstances.

3            And I know Mr. Kehoe has not made his claim under

4    the All Writs Act.  So he's not proceeding that direction.

5    But I was -- and that's probably why you didn't address it

6    in your brief.

7            But that's why I wanted to ask the question, to

8    make sure I fully understood what the -- I don't mean in a

9    pejorative sense, but the administrative gauntlet, what

10   that looks like.  So now I think I have a better

11   understanding of it.

12           MR. FLYNN:  Right.  And I point out that, you

13   know, subsequent to that decision that you reference,

14   there's Supreme Court cases that sync the position that

15   virtually all claims arising under the Medicare Act have to

16   be administratively exhausted.

17           Even if they are constitutional claims, they are

18   inextricably intertwined with a claim for Medicare

19   payments, which that's exactly what they're asking the

20   Court to do.  They're asking for it to lift the suspension

21   so that claims would be paid to them.

22           So this is clearly the relief that they're asking

23   for, has to do with payment of Medicare claims.

24           THE COURT:  Well, I've read all those cases.  And

25   I -- at least I discerned from Mr. Kehoe's argument in the

```
 1    manner in which it's brought that they recognize that

 2    there's a small eye in this needle.

 3           MR. FLYNN:  Right.  And even if there was the

 4    ability to do this, you know, constitutional retaliation

 5    claim, Your Honor, I want to stress that there's absolutely

 6    no evidence in the record of any retaliation in this case.

 7           You asked Mr. Kehoe a very pointed question:  What

 8    else do you have other than this alleged temporal

 9    proximity?

10           And I didn't hear anything in that response.  He

11    went back and said a history which predated the alleged

12    breakdown of settlement negotiations.  I don't know how

13    that can be evidence of retaliation, of a retaliation for a

14    constitutionally protected right when that alleged right

15    was the refusal to settle the case when this all occurred

16    before that date.

17           So to me there is no way that that can be evidence

18    of retaliation, just like the decision to suspend the

19    defendants, which was put in place and the process was

20    started long before this alleged breakdown in settlement

21    negotiations.  It's not temporally proximate to the

22    suspension -- I mean to the breakdown in negotiations.

23           So I've heard no evidence.  I've seen no evidence

24    in the record.  I've heard no evidence here today of any

25    constitutional retaliation.  All we have here is
```

1    speculation on their part.

2           And even -- and I think the case, which I thank

3    Mr. Kehoe for giving to me this morning, but the case he

4    handed up to you, Your Honor, if you just looked to the

5    next paragraph down, it says that Perez, which I believe

6    was the prosecutor, indicated that he would not drop the

7    criminal prosecution until the civil matter in which the

8    plaintiff was involved was terminated.

9           There's been no allegation that there's been any

10   threat made by the United States.  In no part during the

11   settlement negotiations is there an allegation that the

12   United States said, if you don't settle this case, we're

13   going to take administrative action.  We're going to

14   suspend your Medicare payments.

15          There's no allegation there.  That didn't happen,

16   and they're not even suggesting it here today.  There's

17   absolutely no evidence at all of retaliation because there

18   was no retaliation.

19          CMS is responsible for ensuring to protect the

20   Medicare program.  And by suspending the Medicare payments,

21   that's exactly what they're doing, making sure that their

22   funds are not being paid out for fraudulent claims while

23   they can investigate the credible allegations of fraud,

24   which include but are not limited to the False Claims Act

25   before Your Honor.

1            In addition, Your Honor, as mentioned in our

2   brief, you know, it's not even a constitutional right for

3   them to make a settlement offer to us that we viewed as

4   unreasonable and we reject, and that all a sudden is a

5   constitutional-protected right that prevents us from taking

6   any parallel action.

7            If you follow their logic --

8            THE COURT:  Let's make sure we're both on -- make

9   sure I'm not on the wrong page.  Let's do it that way.  I

10  don't think anybody is suggesting that there's a

11  constitutional right to not walk away from the negotiating

12  table.  At least that's not how I discern the defendants'

13  position.

14           I discern their position -- we've glossed over it,

15  truthfully, whether or not they were engaged in protected

16  activity.  I mean, what is the protected activity?

17           Mr. Kehoe would assert that the protected activity

18  is the right to maintain the economic wherewithal to come

19  into court and fight the Government on these charges.

20           You know, I don't know whether that's protected

21  activity or not.  At least that's what I discern to be

22  their position.

23           I don't understand them to be saying that the

24  Government is obliged to continue to sit down at the

25  negotiating table or to suspend administrative action while

1  negotiations are ongoing.  That's not what I discern.  But

2  they can straighten me out if I'm wrong about that.

3          So I don't want us to be talking -- I don't want

4  us to be proverbial ships in the night.  So if you're

5  arguing that the party has a constitutional -- that the

6  walking away from the negotiation table is not a protected

7  right, you would get no quarrel from me on that issue.

8          MR. FLYNN:  Even, Your Honor, if you understand

9  their position to be that by walking away from the

10 negotiating table that somehow precludes them from having

11 financial wherewithal to defend themselves, I don't think

12 that's a protected activity anyway either.

13          There's no indication that there was any intent,

14 that the intent of CMS to suspend Medicare payments was

15 because they wanted to preclude them from having the

16 financial ability to defend themselves.

17          Even if a company files bankruptcy, they still

18 have counsel that represents them.  You know, Dr. Qamar is

19 a very wealthy man.  There's no suggestion or evidence

20 before Your Honor that he would be financially unable to

21 defend himself in this case.

22          There's -- the record is completely void of any

23 facts that would permit it, even if that was a

24 constitutionally protected right.

25          If that's the case, if the defense were allowed to

```
 1    make a settlement offer that's rejected by the United

 2    States and because of that rejection they don't have the

 3    financial ability to defend themselves, the United States

 4    would be prohibited from taking any parallel administrative

 5    action or, if you take it the next step, would be prevented

 6    from taking any criminal action against the defendant just

 7    because they made a settlement demand that was rejected by

 8    the United States and they now claim they don't have the

 9    ability to defend themselves.

10              THE COURT:  Again, that's not their claim.  Their

11    claim is that the administrative action of suspending

12    payments is in retaliation for their refusal to resolve the

13    case during the settlement negotiations and that the

14    Government is acting in bad faith and they're seeking to

15    invoke the Court's inherent authority under the bad faith

16    -- which is the only basis that I know of, frankly, to

17    invoke the Court's inherent authority with respect to

18    issuing a status quo injunction.

19              So I don't see that as emanating from the decision

20    to walk away from the negotiating table.  I see it as

21    emanating from their assertion yet to be proven, their

22    assertion that the suspension of benefits by Medicare, the

23    turning off the tap, the spigot, to use your terminology,

24    is in direct retaliation for their refusal to accept

25    whatever the terms were that were on the table when you all
```

```
 1   were negotiating.

 2           So, again, the question I put to Mr. Kehoe, which

 3   I'll have to go back and look at Mr. Mabry's affidavit as

 4   to what, other than temporal proximity, is there to suggest

 5   that this was a retaliatory act is what I'm, frankly,

 6   focused on, not that there are not any other issues saying

 7   that you just --

 8           I mean, the point that you just made with respect

 9   to whether or not a bankrupted state is a -- I mean, is

10   that sufficient?  Obviously the case law would suggest that

11   it is, but that's not on the jurisdictional question.

12           But that's a case that arose -- if memory serves

13   me correctly, that's a case that arose out of the All Writs

14   Act jurisdictionally.  And that's not the posture of this

15   case, even though we spent a lot of time talking about it

16   and a lot of the briefing time spent on it.

17           MR. FLYNN:  Right, Your Honor.

18           And, again, I would reiterate there is no evidence

19   of retaliation here.  All they have is the alleged temporal

20   proximity, which, again, I think we pointed out there is no

21   temporal proximity here, that it started before that

22   process.

23           There is no temporal proximity here in this case,

24   Your Honor, and there's no evidence at all of retaliatory

25   intent.
```

```
1              THE COURT:  Okay.

2              MR. FLYNN:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              Mr. Ogrosky?  Did I pronounce that correctly?

5              MR. OGROSKY:  Yes, Your Honor.

6              THE COURT:  You don't have to say that if I

7    didn't.

8              MR. OGROSKY:  No.  You hit it right on the head,

9    Your Honor.

10             I'm going to, first, go right to the temporal

11   issue and walk through it for the Court.  But this is an

12   issue of first impression.

13             The question of whether the Affordable Care Act

14   and the provision that talks about credible allegations of

15   fraud can be used in this manner by the Department of

16   Justice to basically end False Claims Act litigation is --

17   this is the first time a court is hearing this argument

18   about how they're using a provision of this law.

19             So --

20             THE COURT:  I apologize for the interruption, but

21   I've done it to everybody.

22             Can I ask you to tell me what -- other than

23   temporal proximity, don't you have to have more than that?

24   In order to demonstrate you've got a substantial likelihood

25   of success on the merits of your retaliation claim, surely
```

1    you have to have more than just the two things may have

2    occurred at or about the same time.

3            It seems to me that this case is somewhat

4    analogous to, I don't know, maybe a Title VII retaliation

5    claim or a claim -- so what troubles me is the causation

6    element.

7            What is there in the record that would suggest

8    that the action taken by Medicare or the administrator who

9    made the decision to terminate the benefits -- other than

10   your assertion that there is a temporal connection, what is

11   there to suggest that it is the cause of, that the

12   breakdown in negotiations is the cause of that order being

13   entered?

14           MR. OGROSKY:  Well, there are two things.

15           THE COURT:  Let me just finish my thought just so

16   you know.

17           Because the reason I asked that question is, if

18   you look, for instance, at the Title VII retaliation cases,

19   there's a whole -- there are a slew of cases where there is

20   an adverse employment action taken.

21           But there's a lot of evidence in the record that

22   this employee had problems before then and that there was

23   contemplation that the employee was going to be fired.

24   Maybe there had been a number of progressive disciplinary

25   reviews.

1          Then the employee engages in protected activity.

2     And then the employee gets fired.  And the employee says,

3     hey, I got fired because I engaged in protected activity.

4          And the employer says, no, no, no.  This has been

5     -- we've been looking at you.  You've been an

6     under-performing player for a long time.  So, yes, there's

7     a temporal relationship between the firing and your

8     protected activity.  But this process was in place long

9     before then.

10          It seems to me that that's a somewhat similar

11     circumstance.  You may not agree with that.

12          But help me with that.

13          MR. OGROSKY:  It is, Your Honor, somewhat similar.

14          So we make a prima facie showing that there's a

15     temporal connection.  And then there are other features

16     that I want to talk about.

17          Then they respond and say, no.  Here are the

18     alternative reasons.

19          What they responded with in this case is, it's not

20     true.  They haven't put forth anything in the record to

21     rebut other than an affidavit that says, I was unaware of

22     the settlement negotiation.  But then it goes on to say,

23     but it wasn't my job.  It was someone else's job to make

24     this decision.

25          And there's nothing else.

1          So, yeah, Bechtel, Higdon, Johnson (phonetic), all

2    cases that are on point here that say that temporal

3    connection is critically important for that prima facie

4    showing.

5          But then we get something else here that's

6    critical.  This law, this first impression that I was

7    talking about, this question before the Court that is

8    really can DOJ use this allegation, these credible

9    allegations of fraud provision?

10         What is before here that's interesting is in the

11   red, CFR 405.372(a)(4)(i).  What that says is CMS must

12   consult with DOJ.  Right?

13         So if they must consult with DOJ about issuing a

14   suspension, something happened between the affidavit that

15   they've submitted that says, it's not my job to rule on

16   this.

17         We don't have any information to rebut the

18   presumption that we've established by the temporal link

19   here.

20         But what this says, we'll give you an affidavit

21   that says this particular person didn't know, but the law

22   says we must consult.  And the person who actually made the

23   decision we don't hear from.

24         There's nothing in the record to rebut our

25   temporal showing.  So let's look at that temporal showing

```
 1   and look at the case law.
 2            THE COURT:  Is that in your briefing?
 3            MR. OGROSKY:  Yes, it is.
 4            THE COURT:  Okay.  I'll find it, then.  Thanks.
 5            MR. OGROSKY:  So what is a credible allegation of
 6   fraud?  And what tool did they use here to do this?
 7            This complaint was filed in 2011.  It contained
 8   allegations.  I guess those weren't credible because the
 9   HHS was investigating it.
10            They issued a subpoena in 2012 in October.  I
11   guess that wasn't credible.  But they had some basis to
12   issue a subpoena.
13            In 2013, they issued another subpoena, but I guess
14   it wasn't credible then.
15            March of 2013, July of 2013, September of 2014,
16   they're all communicating from DOJ saying, we're
17   investigating you.  We think that there's allegations that
18   deserve more attention.  But apparently not credible
19   allegations.
20            So we have a five-year period up to December 22nd
21   of 2014 when apparently none of these were credible
22   allegations of fraud.  Yet the Government was making
23   demands around that time on the defendant and giving
24   PowerPoint presentations.
25            When the defendant comes in and says, we disagree.
```

1    We have experts.  We want to talk to you about the merits

2    in this case.

3          The response is -- and this is in our brief -- how

4    much are you going to pay?

5          This is inherent in the False Claims Act.  And

6    this is why this is a critical question of first

7    impression.

8          Can the Government say, we've got a claim against

9    you.  Travel damages and penalties up to $11,000 per claim.

10   If we add all of this up, it's not millions.  Tens of

11   millions.  Hundreds of millions.  If you don't settle with

12   us, we're going to -- you know, we're going to take this

13   thing and you're facing travel damages and penalties and

14   all of these things.

15         So the reason these cases don't get litigated and

16   tried very often is nobody does it.  The penalties are too

17   severe.  It's inherent in the False Claims Act.

18         So what PPACA does in this new legislation, it

19   says if you have credible allegations of fraud, you're

20   allowed to cut off their payments while you litigate.  It

21   ends the ability to litigate.  There is no ability to

22   litigate.  And there's no appeal that can go on within the

23   administrative agency to deal with this.

24         And what's more important here in the temporal

25   relationship is after the -- and trust me, the defendants

```
 1    have continued to try to resolve this matter.
 2           But after the April 24 meeting, everyone gets
 3    back.  You know, they said, oh, we're going to have to
 4    litigate.
 5           And they revoke the number.  There is no
 6    suspension anymore.  They've revoked it for three years.
 7    So they took one step in retaliation, and then they took
 8    another step in retaliation.
 9           So it is in the record before the Court.  If you
10    take the affidavits and review the timeline, there is no
11    question that after four years, when at any point in that
12    time, CMS, through its contractors, First Coast or
13    SafeGuard, could have said, we believe that there are
14    credible allegations of fraud here, and we're going to
15    issue a suspension.
16           During that whole period of time, the Government
17    was protected anyway because they had prepayment review.
18    And that's what we're here in court for.
19           We're just saying, take us back, Judge, to March 5
20    of 2015; restore the status quo; and let us litigate this
21    case.
22           THE COURT:  Tell me the prepayment review that --
23    Mr. Flynn addressed that in terms of what the Government's
24    continued harm was, why it was necessary to, again, using
25    his terminology, turn off the spigot.
```

47

1          Tell me what -- do you see any circumstance under

2    which the Government is better off from the standpoint of

3    protection of fraud?

4          Obviously if they are not processing claims at

5    all, the chance of fraud is diminished.  But is there

6    continued danger of fraud?

7          Let's just assume for purposes of our conversation

8    that the fraud is well established.  Obviously, I know it's

9    not.  I know it's in dispute.  But just for purposes of my

10   question.

11         So the Government's contention is, we can't

12   continue this prepayment review because claims are going to

13   get paid that are potentially not legitimate claims, and we

14   have no ability to recoup that money.

15         Take that head-on for me.

16         MR. OGROSKY:  So the Government is far and away

17   more protected by putting this company under a prepayment

18   review and being in the status quo situation than it is

19   under any other circumstance.  And here's why.

20         If we leave court and there's no injunction and

21   these people lose their jobs and these patients go to

22   hospitals, the hospitals are going to be submitting claims,

23   which they don't get now, by the way.

24         It's much cheaper to provide an outpatient

25   service.  These are not reviewed claims.  These patients

1    are going to be treated at hospitals.  The doctors in the

2    practice are all going to go to work at other places.  They

3    are going to be submitting claims, no prepayment review.

4         What we're saying is -- and we've offered to the

5    Government, by the way -- we're happy with prepayment

6    review.  We're asking to restore the status quo so that we

7    have prepayment review.

8         The Government, the very same contractors that

9    issued the letters in this case, they can review each

10   claim.  And if they don't like it, they can ask for

11   documents.  They don't have to pay it.

12        And if they don't like the documents, they can

13   say, no.  We'll deny that claim.

14        And if we disagree, we can appeal it.

15        That's what was going on up until settlement

16   negotiations broke down.

17        So the Government is not only better off in the

18   status quo situation -- because they'll get to see all the

19   claims for these patients.  They'll get to go through and

20   decide whether they want to pay or not pay.

21        But as we sit here today, in a typical situation

22   where they cite all of these cases about appeals of

23   overpayment determinations, there's no overpayment

24   determination here.

25        The letter that they sent suspending, you know,

```
 1   those were claims that were already paid.  Those were

 2   things that were already done.  There's no way to -- this

 3   is the end of the road for this company.

 4           Either we have a chance to be in court -- and

 5   that's what it's really about.  When you asked about -- and

 6   your question characterized our position perfectly.

 7           It's we're asking under the Fifth Amendment for

 8   the due process of law to avail ourselves of this Court's

 9   jurisdiction and not let PPACA, in the way the Government

10   is applying it, both through the regulation that I cited

11   and the statute, that there is no opportunity to come to

12   court.

13           We just want the opportunity to come to court.

14           THE COURT:  All right.  Thank you all.  I

15   appreciate your arguments.

16           Mr. Flynn, do you have something else you want me

17   to hear?

18           MR. FLYNN:  Yes, Your Honor.  May I just speak

19   briefly to correct two points that he made that I think are

20   factually inaccurate?

21           THE COURT:  Sure.

22           MR. FLYNN:  The first, Your Honor, and I think

23   most important, is the declaration from Zabeen Chong.

24           And in that declaration, it doesn't say that CPI,

25   the Center for Program Integrity, sought approval from
```

50

```
 1   somebody else in order to issue the suspension.

 2           It said that it notified the office of

 3   administrator that it intended to suspend.  It was giving

 4   them a heads-up, if you will, that they were going to

 5   suspend Dr. Qamar and ICE, not seeking any approval.

 6           That's what the declaration says.  That's what's

 7   before the Court.  There's no indication -- there's no

 8   evidence at all that DOJ had anything to do, anything to do

 9   with this suspension.  There's nothing in the record before

10   the Court.

11           The other thing is -- and I understand Mr. Ogrosky

12   was not part of the settlement discussions, so he may not

13   be clear on what happened.

14           But when there was a presentation, the United

15   States did give a presentation, did summarize its

16   allegations and the facts it uncovered.  They provided a

17   presentation in response to that.

18           We told them we would take that back for our

19   consultant and let you know if we changed our position.

20   And we took it back to our consultant, and our position did

21   not change.  We told them that.

22           It was not a response where we said, oh, well, you

23   made a presentation.  You made some points.  How much are

24   you going to pay?

25           We took it under consideration.  And it, quite
```

1    frankly, did not change our position in this case.

2           Finally, I want to stress, Your Honor, that the

3    revocation is in place now.  And the revocation does have

4    appeal rights.  It is covered under 405(h).  There is

5    administrative appeal rights.  And those are the

6    administrative appeal rights that need to be exhausted in

7    this case before it goes any further.

8           Thank you, Your Honor.

9           THE COURT:  Thank you, Mr. Flynn.

10          MR. KEHOE:  Judge, can I just point, based on what

11   Mr. Flynn had to say?

12          THE COURT:  Well, we can't keep going back and

13   forth.  I think I -- I'll give you an opportunity to tell

14   me whatever is on your mind, Mr. Kehoe.

15          MR. KEHOE:  Yes, Judge.

16          If I can point back to Mr. Chong's affidavit.

17   Mr. Chong says -- that's the exhibit, the first exhibit in

18   the Government's response.

19          They said that Mr. Chong notified the

20   administrator that they had intended to temporally suspend.

21   But the next paragraph, paragraph five, says, CMS formally

22   approved the suspension, not Mr. Chong.

23          That's not written by Mr. Chong.  It's written by

24   another individual.

25          And the last thing, Judge, I will tell you that

1   going into the settlement discussions, we had a detailed

2   discussion by my client, Dr. Qamar, concerning the facts

3   and circumstances of the Government's allegations.

4         There was absolutely no response back to the

5   detailed explanation given by Dr. Qamar on the necessity of

6   the medical steps that he took, except we took a ten-minute

7   break and they came back and said, how much are you going

8   to pay us?

9         There was no discussion to litigate or discuss or

10  to come back and say, Dr. Qamar, we disagree with this; we

11  disagree with that.  That discussion never took place.

12        THE COURT:  I understand that.  It's not that I

13  don't think those conversations are important to the

14  parties.  I do think they are.

15        But I don't think, quite honestly, that they

16  really provide me with much help in terms of resolving

17  what's before me today, which is whether or not the

18  defendants have met the very high burden, which I know you

19  acknowledge, of establishing the factors necessary for the

20  Court to, first of all, make the decision as to whether or

21  not I have the legal authority to enter a status quo

22  injunction; and then, if I do have the legal authority to

23  enter a status quo injunction, whether or not the criteria

24  for that injunction to enter has been met.

25        So what I have focused on or tried to focus you

1    all on -- and I will share with you what I'm wrestling

2    with -- is the question of whether or not there has been

3    demonstrated a -- first of all, is there a -- does the

4    Court have the jurisdictional authority to proceed?

5            And, secondly, if I do, has there been established

6    a substantial likelihood of success on the merits, not to

7    diminish the importance of the other three criteria, but

8    has there been demonstrated a substantial likelihood of

9    success on the merits of this claim of retaliation?

10           Assuming that I get to that point, which is, as

11   I've mentioned to Mr. Flynn, as I think you all recognized

12   by the way you drafted your papers, it's a very thin eye in

13   the needle that you're trying to thread.

14           It's not lost on me the importance of this

15   proceeding with respect to the economic viability to your

16   client, nor is it lost on me, Mr. Flynn, the importance of

17   this issue to the Government in light of what the

18   Government contends to be the magnitude of the dollars at

19   issue here.

20           So it's -- and as all of you know, the Medicare

21   Act is a complicated creature.  And so I appreciate that

22   this is important to all of you.  I'm going to get to it.

23           And I have been working hard on it before our

24   hearing today.  I gave you all an accelerated schedule,

25   which I appreciate you responding to.

```
1              And I need some time.  I understand that time is
2    of the essence, but I would like to try to get it right.
3    And I know that the parties on both sides deserve my full
4    attention on it.  And I'm going to give you that.  But
5    don't be looking for an order tomorrow.
6              MR. KEHOE:  Understood, Judge.
7              THE COURT:  All right.
8              MR. KEHOE:  I don't know if Your Honor wants us to
9    supplement the record in any fashion.  We did mention the
10   revocation and the timing of that revocation, which is our
11   second strike.
12             First is the suspension that came on March 6 on
13   the heels of the breakdown of negotiations.  And the second
14   is the revocation that came on the heels of yet another
15   breakdown in negotiations the 24th.  The letter comes
16   out the 28th, and we got it May 1.
17             We'll gladly submit that in a separate filing if
18   Your Honor wants, because it is a compelling temporal
19   sequence that parallels what happened with the suspension.
20             THE COURT:  Let's do this.  I know that you had
21   some other matters that you wanted me to consider that were
22   outside the scope of my order.
23             So why don't I give you ten days to file whatever
24   you want to file.
25             And I'll give you, Mr. Flynn, ten days to respond.
```

1           Obviously, the reason that my order is structured

2    the way it is, because I don't think it's fair, frankly,

3    for the movant to have an opportunity to respond with new

4    affidavits and new information that the opponent doesn't

5    have an opportunity to review and respond to.

6           But it's obviously important to both sides, and

7    there's a lot at stake.  So I'll give you ten days to

8    submit some -- whatever you want to submit in terms of

9    additional briefings not to exceed 20 pages.

10          And, Mr. Flynn, I'll give you a ten-day period to

11   respond to that.

12          MR. FLYNN:  Thank you, Your Honor.

13          MR. KEHOE:  Thank you, Your Honor.

14          THE COURT:  Thank you all.  I appreciate your

15   arguments.

16          (Proceedings adjourned at 10:04 a.m.)

17

18               C E R T I F I C A T E

19

20          I certify that the foregoing is a correct

21   transcript from the record of proceedings in the

22   above-entitled matter.

23

24   s\Amie R. First, RMR, CRR

25