## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

UNITED STATES OF AMERICA, ex rel.
ROBERT A. GREEN and HOLLY A.
TAYLOR,

      Plaintiff,

v.                                 Case No. 5:11-CV-00406-10TBS

DR. ASAD U. QAMAR and the
INSTITUTE OF CARDIOVASCULAR
EXCELLENCE, PLLC,

      Defendants.

_____/

### DEFENDANTS' CONSOLIDATED MOTION TO DISMISS
### THE CONSOLIDATED COMPLAINT IN INTERVENTION
### AND INCORPORATED MEMORANDUM OF LAW

Defendants Asad U. Qamar, M.D. and Institute of Cardiovascular Excellence, PLLC ("ICE" or "the Practice") move to dismiss Plaintiff United States' Consolidated Complaint in Intervention ("the Complaint") (Doc. 10) pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

### MEMORANDUM OF LAW

### INTRODUCTION

Plaintiff has sued Defendants for alleged violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A) & (B), and related claims under the common law. The Complaint contends that Dr. Qamar and the Practice improperly submitted claims for payment to the government for providing cardiovascular treatments to Medicare beneficiaries with peripheral artery disease ("PAD"). However, despite four years of investigating Defendants' work, the Complaint contains no allegations identifying which particular procedures

performed by Defendants were "medically unnecessary," or articulating why any given procedure was "medically unnecessary."   This fatal ambiguity is compounded by the Government's refusal to identify any non-party individual who allegedly participated in the fraudulent scheme.   The Complaint's shortcomings place Dr. Qamar and the Practice's employees in the untenable position of having to defend this lawsuit based on conjecture and innuendo.

There is no allegation that Defendants ever submitted factually false claims to Medicare, either by billing for treatments not performed or for treatments not correctly coded.   Rather, Plaintiff asserts that Defendants' factually accurate Medicare claims were legally "false" under one of three theories.   First, Plaintiff contends that Defendants submitted some false claims (or presented false certifications of claims) for unspecified cardiovascular services that were not "medically necessary."[1]   (*See* Compl. ¶ 199 (Count I), 204 (Count II), 224 (Count V), 230 (Count VII).)   Second, Defendants supposedly submitted some false claims for treatments whose medical necessity was inadequately documented. (*See id.*)   Third, Plaintiff alleges that Defendants submitted claims tainted as "false" because they waived Medicare co-payments for indigent patients without sufficient justification, thereby supposedly violating the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b. (Compl. ¶ 212 (Count III), 219 (Count IV), 227 (Count VI).)   Notably, though, the Complaint

---

[1] Tellingly, although Plaintiff frequently accuses Defendants of performing "excessive" services (*e.g.*, Compl. ¶ 6), it does not actually include any such accusation in its formal causes of action.   In fact, these allegations of "excessive" treatment have no independent relevance (or factual merit), except to confirm the Government's efforts to ration healthcare for older and poorer patients.

- Does not allege *which* particular medical procedures were medically unnecessary or improperly documented;

- Does not allege *why* particular medical patient procedures were medically unnecessary or *how* their documentation was deficient;

- Does not allege *who* at the Practice actually submitted false claims to Medicare;

- Does not allege a required element of the AKS, that Defendants waived co-payments with the *purpose* of inducing Medicare beneficiaries to seek treatment at the Practice;

- Does not allege *who* at the Practice decided to waive co-payments, nor the particular times *when* those decisions were made; and,

- Does not allege that the Defendants knowingly submitted any false claims or knowingly made any false statements with the intent that the government rely upon them in making Medicare payment determinations.

By failing to "specifically plead the minimum elements of [their] allegation[s]," Plaintiff is "needlessly harm[ing] . . . [D]efendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1314 n.24 (11th Cir. 2002).  For all of these reasons, the Court should dismiss the Complaint with prejudice[2].

## **BACKGROUND**

### I.    **DEFENDANTS' MEDICAL PRACTICE**

Dr. Qamar is a cardiologist and the founder, owner, and managing member of the Practice, a Florida S-Corporation that operates as a multi-specialty independent physician

---

[2] The government cannot provide the needed specificity despite four years of investigation. Allowing Plaintiff to amend the Complaint would simply encourage further speculation and conjecture, given that the government conducted a full investigation, yet failed to identify any articulable wrongdoing.

group with almost 200 employees.   (Compl. ¶¶ 15-16.)   The Practice is a freestanding healthcare center with 15 providers (including 10 physicians), serving over 24,000 patients throughout North Central Florida, one of the most heavily concentrated Medicare populations in the United States.  Its patients have predominantly been Medicare beneficiaries, including significant numbers of low-income Medicaid patients (known as "dual eligible" patients).

The Practice provides care under several business names, all of which use the same Medicare billing information.  One is the Institute of Cardiovascular Excellence ("ICE"), used when the Practice provides about half of its patients (around 12,000) with a wide range of cardiovascular diagnostic and therapeutic treatments, including both medical and interventional treatments.  (*See also* Compl. ¶ 17.)   Another name is Institute of Medical Excellence, used when providing preventive services to the Practice's other patients.

The Practice does not discriminate against patients on the basis of their insurance coverage; accordingly, it treats all Medicaid and uninsured patients, even at a loss.  In 2012 alone, the Practice provided over $3 million worth of services to uninsured patients, and spent over $2 million on equipment for those patients' benefit.

The Complaint focuses on the treatment of peripheral arterial disease ("PAD"), also known as peripheral vascular disease.  PAD involves the build-up of plaque in the arteries that carry blood to the arms and legs, causing increased risk of infection, amputation, coronary heart disease, heart attack, and stroke.  *See* HHS, Nat'l Heart, Lung, & Blood Inst. ("NHLBI"), *What Is Peripheral Arterial Disease?*, *available at* http://www.nhlbi.nih.gov/health/health-topics/topics/pad.  Various treatments can alleviate PAD, including interventions known as revascularizations, which involve the use of a

catheter to remove plaque (atherectomy) and/or widen blood vessels with a small balloon (angioplasty).  *Id.*  (*See also* Compl. ¶¶ 40-45.)

## II.    THE MEDICARE COVERAGE FRAMEWORK

At issue here is the Medicare Part B program.  (*See* Compl. ¶ 23.)  "Medicare Part B is a public health insurance program that provides the disabled and elderly with outpatient items and services . . . ."  *Hays v. Sebelius*, 589 F.3d 1279, 1280 (D.C. Cir. 2009).  Medicare Part B benefits include coverage for "medical and other health services" that are "reasonable and necessary" for a particular patient.  See 42 U.S.C. §§ 1395k(a)(1), 1395y(a)(1)(A).

The Secretary of Health and Human Services ("HHS") administers Medicare Part B through the Centers for Medicare and Medicaid Services ("CMS").  CMS contracts with private entities known as regional "Medicare Administrative Contractors" ("MACs") to review and process claims.  *See id.*; 42 U.S.C. § 1395kk-1(a)(4).  HHS can issue a "national coverage determination" ("NCD") to establish "whether or not a particular item or service is covered nationally" by Medicare Part B.  42 U.S.C. § 1395y(l)(6)(A).  Absent an applicable NCD, a MAC may develop a "local coverage determination" ("LCD") to explain whether a particular service is covered within that MAC's geographic area.  *See id.* § 1395kk-1(a)(4); *id.* § 1395y(l)(5) & (6)(B); *Hays*, 589 F.3d at 1280.[3]

Here, First Coast Service Options, Inc. ("FCSO"), the MAC for Florida, has published the applicable LCD cited in the Complaint: LCD L32102, *Vascular Stenting of Lower Extremity Arteries* (effective Oct. 6, 2011) (hereinafter "the LCD"), *available at* http://www.cms.gov/medicare-coverage-database.  (*See* Compl. ¶ 51.)  The LCD is attached

---

[3] Separate from the MAC, CMS also contracts with Zone Program Integrity Contractor ("ZPICs") who are charged with ensuring the accuracy of claims.

hereto as **Exhibit A** for the Court's convenience.[4]   The LCD states that "stenting of lower extremity arteries" will be deemed medically necessary when performed for "clinically significant" vascular disease." (Ex. A at 1; *see also* Compl. ¶ 51.) The LCD also imposes various requirements for documenting the clinical justification for such stenting. (Ex. A at 3; *see also* Compl. ¶ 53.)

## LEGAL STANDARD

A complaint's factual allegations must rise above speculation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The liberal Rule 8(a)(2) pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (interpreting Rule 8(a)(2)). Rather,

> [a] plaintiff must state sufficient facts, assumed true, to state a claim to relief that is plausible on its face, *i.e.*, a claim that creates a reasonable inference of the defendant's liability and fairly notifies the defendant of both the claim and the grounds upon which it rests. A complaint alleging facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief and a formulaic recitation of the elements of a cause of action will not do.

*Dulduao v. La Creperia Café, Inc.*, No. 8:11-CV-1413, 2011 WL 6840585, at *2 (M.D. Fla. Dec. 29, 2011) (citations and quotation marks omitted). "In considering a motion to dismiss, courts can generally only consider well-pleaded factual allegations, documents central to or referenced in the complaint, and matters judicially noticed. However, a court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, 'undisputed' means that the authenticity of the document is

---

[4] The Complaint's reliance on these LCDs incorporates them by reference. *See Parker*, 2015 WL 1456122, at *7 n.13.

not challenged." *U.S. ex rel. Parker v. Space Coast Med. Assocs., L.L.P.*, --- F. Supp. 3d ---, No. 6:13-CV-1068, 2015 WL 1456122, at *7 n.13 (M.D. Fla. Feb. 6, 2015) (Conway, C.J.) (dismissing FCA complaint) (quotation marks and citations omitted).

An FCA complaint must also comply with Rule 9(b)'s heightened specificity standard, which requires a complaint to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). "The purpose of this requirement is to alert defendants 'to the precise misconduct with which they are charged and to protect defendants against spurious charges of immoral and fraudulent behavior.'" *Parker*, 2015 WL 1456122, at *3 (quoting *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006)) (brackets omitted). "'Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Id.* (quoting *Clausen*, 290 F.3d at 1310).

## ARGUMENT

A claim for government payment can be "false" under the FCA "if it is either factually or legally false." *Parker*, 2015 WL 1456122, at *6. A claim can be "factually false" if it misrepresents the goods or services that were provided to the government. *See id.* Alternately, a claim can be "legally false" if the claimant "knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *Id.* (quotation marks and citations omitted).

The Complaint does not allege that Defendants submitted factually false claims, *i.e.*, that the Practice billed for services not provided.  Instead, the Complaint alleges that three conditions of payment may have been violated: (1) the statutory requirement that services provided to Medicare Part B beneficiaries be medically "necessary," 42 U.S.C. § 1395y(a)(1)(A); (2) the regulatory LCD requirement that providers' must adequately document the clinical justification for the PAD treatments for which they seek Medicare payment (*see* Ex. A at 3); and (3) the Anti-Kickback Statute's prohibition on inducing the ordering of federally reimbursed healthcare services, 42 U.S.C. § 1320-7b(b)(2).

"Proceeding under the false certification theory, however, does not alleviate [Plaintiff's] obligation to plead [its] case with particularity."  *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687, 2013 WL 1651811, at *3 (M.D. Fla. Apr. 16, 2013) (dismissing FCA complaint for failing, *inter alia*, to allege false certifications with particularity).  To plead a false claim via false certification here, the Complaint must plausibly and particularly allege violations of conditions of payment for cardiovascular services, and specific false certifications of compliance with such conditions.  The Complaint does none of these things.

## I.    THE COMPLAINT FAILS TO PLAUSIBLY OR PARTICULARLY PLEAD THAT DEFENDANTS FALSELY CERTIFIED THEIR COMPLIANCE WITH CONDITIONS OF MEDICARE PAYMENT.

"The submission of a false claim is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citation, quotation marks, brackets, and ellipsis omitted).  "Without the presentment of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper,

there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311.  Under Rule 9(b), "the actual submission" of a false claim "must be pled with particularity and not simply implied from the circumstances."  *Parker*, 2015 WL 1456122, at *3 (citing *Corsello*, 428 F.3d at 1013).  Thus, "[i]n order to plead the submission of a false claim with particularity, a [complaint] must identify the particular document *and statement* alleged to *be false, who made or used it,* when the statement was made, *how the statement was false*, and what the defendants obtained as a result."  *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012) (emphases added) (holding that FCA complaint satisfied Rule 9(b) where it alleged those specific details); *see, e.g.*, *Schubert*, 2013 WL 1651811, at *4 (dismissing complaint under Rule 9(b) and contrasting insufficiently particular FCA allegations with *Matheny* allegations' level of detail).  Even though the Complaint identifies numerous specific claims supposedly submitted to Medicare, its allegations concerning the *falsity* of any claims are fatally deficient both under Rule 9(b) and Rule 8(a)'s plausibility standard.

### A.     The Complaint Does Not Identify Any Particular Procedure That Was Not Medically Necessary or Inadequately Documented.

The Complaint must assert *specific facts* showing how and why each cited Medicare claim was medically unnecessary or inadequately documented.  It has not done so.

The Complaint purports to set forth a "statistically-valid random sample" (Compl. ¶ 109) of four patients who supposedly received "excessive, medically unnecessary, and/or inadequately documented cardiovascular interventions" (*id.* ¶¶ 119, 129, 135, 138).  Each patient narrative incorporates a chart that summarizes five to seven allegedly false Medicare claims relating to that person.  (*See id.* ¶¶ 119 (six claims), 129 (seven claims), 135 (five

claims), 138 (six claims).)  Each chart purports to list the Medicare claim number, date of service for that claim, date that Medicare paid that claim, and the payment amount for that claim.  (*Id.*)

Even assuming that each of the 24 Medicare claims concerns a single "cardiovascular intervention[]" (Compl. ¶¶ 119, 129, 135, 138), each intervention and each claim actually sought payment for multiple separate services.  The Complaint fails to identify which specific procedures within each disputed claim were supposedly unnecessary or unsupported.

For example, Plaintiff alleges that Medicare Claim Number 591011259033520 ("Claim 520") was submitted to Medicare on September 30, 2011 for treating Patient CF on September 13, 2011.  (Compl. ¶ 119.)  It further alleges that Claim 520 was "false" because it sought payment for "excessive, medically unnecessary and/or inadequately documented cardiovascular interventions."  (*Id.*)   Claim 520 is attached hereto at **Exhibit B**, with redactions for patient privacy.  The Court may consider it on this Motion because Claim 520's text is "undisputed," and is also "central to and referenced in" the Complaint.  *Parker*, 2015 WL 1456122, at *7 n.13.

Claim 520 seeks payment for seven different types of services: (1) two "lt renals"; (2) one "SMA"; (3) one "cath CA(s) cor angio, sup/interp; L hrt cath"; (4) one "translum ballon angioplasty, renal art"; (5) one "translum balloon angioplasty, add viscer"; (6) one "transcatheter introduction intravascular stents"; and (7) one "low osmolar contrast material, 300-399 mg/ml iodone."  (Ex. B at 2.)  The Complaint never specifies which of these seven types of procedures were supposedly excessive, medically unnecessary, or inadequately documented.  This is hardly an allegation of "exactly which sentence and its substance" is

claimed to be false.  *Matheny*, 671 F.3d at 1225.  As a result, Defendants must speculate about whether Plaintiff is alleging that one, some, or all of these services for which payment was claimed were improper.

The same inherent vagueness afflicts each and every allegedly improper Medicare claim indexed in the Complaint.  (*See id.* at ¶¶ 119, 129, 135, 138.)  This alone renders the Complaint insufficiently particular under Rule 9(b).

> **B.    The Complaint Does Not Plausibly or Particularly Allege Why Any Specific Medical Procedure Was Not Medically Necessary or Inadequately Documented.**

Just as the Complaint does not specify *which* exact procedures were unnecessary or unsupported, it fails to specify *why* any of the 24 cited claims were false.  At most, Plaintiff alleges *in the disjunctive* that the claims concerned "excessive, medically unnecessary, ***and/or*** inadequately documented cardiovascular interventions."  (Compl. ¶¶ 119, 129, 135, 138 (emphasis added).)  This fails to plead falsity, either plausibly or particularly.

First, taking the allegations as true, it is merely *possible*, rather than *plausible*, that these 24 claims were "medically unnecessary" (in violation of the statutory condition of payment) or "inadequately documented" (in violation of the alleged LCD condition of payment).  Those are the only theories of falsity (along with kickbacks) that support the Complaint's causes of action.  (*See generally* Compl. ¶¶ 198-231.)  But Plaintiff's descriptions of all 24 claims include the term "excessive" and the ambiguous phrase "and/or."  Thus, as alleged, it is equally possible that all 24 claims were merely "excessive" but *not* "medically unnecessary" nor "inadequately documented."  The Complaint does not allege that an "excessive" service is, by itself, a violation of some condition of payment.  *Cf.*

42 U.S.C. § 1395y(a)(1)(A) (excluding services from Medicare Part B coverage only if not "reasonable and necessary" for treatment). Nor does the Complaint ever use the word "excessive" in *any* of the Complaint's causes of action. (*See* Compl. ¶¶ 198-231.) *See also supra* note 1. Because each of the 24 alleged claims might merely be "excessive," the Complaint has not necessarily pleaded *any* specific false claims to support Counts I and II, V, all of which turn on medical necessity and inadequate documentation.

Second, even ignoring the term "excessive," the Complaint's use of "and/or" is still fatal. Based on the pleadings alone, Defendants cannot know which of the 24 claims are alleged to be false for lack of medical necessity, insufficient documentation, or both. Perhaps Plaintiff believes every procedure set forth in those 24 claims was medically necessary but *not* adequately documented. Perhaps the reverse is true. But the Complaint sheds no light on the subject. As a result, it fails to alert Defendants "to the precise misconduct with which they are charged." *Atkins*, 470 F.3d at 1359. Without notice of "how the statement was false," *Matheny*, 671 F.3d at 1225, they cannot adequately defend against Plaintiff's theory of the case.

Third, even assuming *arguendo* that each of the 24 claims were specifically identified as allegedly unnecessary, unsupported, or both, this would still be inadequate. The Complaint does not explain *how* or *why* any specific procedure performed in any of the 24 claims was supposedly "excessive, medically unnecessary, and/or inadequately documented." (*E.g.*, Compl. ¶ 119.)

Plaintiff identifies eight different reasons why PAD treatments *might* generally be unnecessary: (1) the PAD is asymptomatic; (2) there is no claudication: (3) there is no critical

limb ischemia; (4) non-invasive measures have not been exhausted; (5) there is insufficient stenosis; (6) there is a risk of restenosis; (7) the PAD is not "clinically significant"; or (8) other factors are present.  (Compl. ¶¶ 49-55.)  But these are little more than a partial recitation of generic textbook guidelines that may or may not apply to any PAD intervention. Plaintiff makes no effort whatsoever to link any of those eight abstract deficiencies to any particular treatment performed for a particular patient.

The bare allegation that a claim is "medically unnecessary" (in violation of the Medicare statute) or "inadequately documented" (in violation of the LCD) is just a "legal conclusion[]" devoid of "further factual enhancement," and therefore not a "well-pleaded *factual* allegation[]" whose truth must be assumed.  *See Iqbal*, 556 U.S. at 677-78 (emphasis added; quotation marks omitted).  Further, such bare-bones pleading leaves unclear whether, for example, any alleged lack of medical necessity is attributable to one of the eight generic reasons noted above, some combination of those reasons, or some unspecified other reason. Thus, unlike a case where the complaint might adequately *how* a specific patient's claim violates a specific LCD's condition of payment, *see Parker*, 2015 WL 1456122, at *4-*6 (finding Rule 9(b) satisfied but dismissing for failure to plead falsity), the instant Complaint's nebulous pleading fails to satisfy Rule 9(b).

The case of *U.S. ex rel. Frazier v. IASIS Healthcare Corporation*, 554 F. Supp. 2d 966 (D. Ariz. 2008), *dismissal aff'd in relevant part*, 392 F. App'x 535 (9th Cir. 2010), is instructive.  There, the complaint alleged that several healthcare providers violated the FCA by performing a large number of medically unnecessary interventional cardiology procedures.  *See id.* at 972.  On the defendants' motion to dismiss, the district court analyzed

13

whether the pleadings complied with Rule 9(b) by establishing the "who, what, when, where, and how" of the alleged misconduct. *Id.* Ultimately, the court held that the complaint was fatally flawed, because the relator "has not alleged the 'how' of the fraud. *He has not stated why the procedures were medically unnecessary. . . .* His bare allegations that certain doctors performed 'medically unnecessary procedures' without any additional detail cannot survive the motion to dismiss." *Id.* (emphasis added).

On appeal, the dismissal was affirmed, but the relator was granted leave to amend. *See* 392 F. App'x at 538, *subsequently dismissed*, 812 F. Supp. 2d 1008 (D. Ariz. 2011). Upon remand and repleading, the relator's amended complaint tried to identify medically unnecessary procedures through allegations concerning four specific Medicare patients. *See* 812 F. Supp. 2d at 1017. Although the new pleading "conclusively state[d] that the procedures were unnecessary," its only factual support for that legal conclusion were allegations that (1) patients did not understanding the reasons for the procedures, (2) some patients have adverse post-operative outcomes, and (3) the medical practice's volume of procedures exceeded expectations. *See id.* at 1017-18. The district court once again dismissed the medical necessity claims, holding that the complaint failed to "plead facts showing *why* the procedures were unnecessary" or that the physician knew the procedures were superfluous at the time they were performed. *See id.* (emphasis added).

The instant case is analogous to *IASIS*. Like the complaint in *IASIS*, the Complaint here makes conclusory allegations that each sample patient was subjected to medically unnecessary "and/or" inadequately documented treatments. (Compl. ¶¶119, 129, 135, 138.) Like the *IASIS* relator, Plaintiff attempts to bolster this bare legal conclusion by pleading the

patients' subjective perceptions of their care, adverse outcomes, and the volume of procedures performed by Dr. Qamar and ICE.[5] (*See generally id.* ¶¶ 110-138.) Similarly, the Complaint casts various aspersions on the size of Defendants' medical practice and the number of procedures performed, suggesting that the mere size alone of its patient population is suspect. But as the *IASIS* court concluded, such allegations are insufficient to satisfy Rule 9(b).

As in *IASIS*, courts routinely dismiss FCA complaints that do not allege how and why the disputed treatments were medically unnecessary. *See, e.g., U.S. ex rel. Boros v. Health Mgmt. Assocs., Inc.*, 2012 WL 5304172 *2-*3 (S.D. Fla. Oct. 25, 2012) (dismissing FCA action and stating that "[e]ven assuming that this claim was submitted to and paid by the government, the Complaint fails to allege any particularities demonstrating why the presentation of a Medicare claim on this patient would have been improper or why the

---

[5] The Complaint relies on weak innuendo to hedge its accusations. For example, the fact that two elderly patients (who are not physicians) could not "*recall* having a *clear* understanding of the medical necessity" of cardiovascular procedures performed sometime in the last five years is hardly dispositive of anything – and the conspicuously artful use of the adjective "clear" suggests these patients recalled having *some* understanding, just not one that the government deems adequate. (*Id.* ¶¶ 115, 125 (emphases added).) Similarly, Plaintiff repeatedly indulges in the logical fallacy of *post hoc ergo propter hoc* by alleging that patients' health improved after leaving Defendants' care (*see id.* ¶¶ 118, 128, 134) – insinuating that Defendants' cardiovascular treatments were fraudulent because they were not successful immediately and could not possibly have any cumulative effect on a patient's health once he or she starts seeing another physician.

Additionally, the allegations ignore that Dr. Qamar lost patients by *choosing to send them to his competition if he himself could not perform a procedure that he still believed necessary.* This is what happened in the situation misleadingly depicted in Paragraph 117. Plaintiff alleges that Patient CF left Dr. Qamar's care after Dr. Qamar "recommended" an "invasive procedure," which "[t]he physician providing the second opinion advised . . . was unnecessary." (Compl. ¶ 117.) The government omits that it was Dr. Qamar who referred CF to the "physician providing the second opinion," so that *this other physician* could perform the "invasive procedure."

procedure for Patient X was medically unnecessary"); *U.S. ex rel. Serrano v. Oaks Diagnostics, Inc.*, 568 F. Supp. 2d 1136, 1143 (C.D. Cal. 2008) (dismissing FCA claims in part because "it is unclear from the Complaint why the tests were medically unnecessary"); *U.S. ex rel. Bantosolas v. Superior Air & Ground Ambulance Transp., Inc.*, No. 01-CV-6168, 2004 WL 609793, at *3 (N.D. Ill. Mar. 22, 2004) (dismissing FCA complaint in part because it failed to alleged "why or how certain claims were false (*e.g., . . .* why [the provided services] in [a given patient's] case was not medically necessary, *etc.*)"). For all of these reasons, the instant Complaint should also be dismissed.

<div style="padding-left:2em;">

**C.    The Complaint Does Not Specifically Identify Who Allegedly Participated in the Supposed Scheme to Bill for Medically Unnecessary or Inadequately Documented Procedures.**

</div>

Rule 9(b) requires FCA plaintiffs to name the *specific* individuals who submitted false claims and participated in other key facets of the alleged fraudulent scheme, and thus supposedly acted with the necessary improper intent. *See Corsello* 428 F.3d at 1012 (requiring the "who," "what," "where," "when," and "how" of improper practices and fraudulent submissions to the government). The Complaint is devoid of these fundamental facts. This lack of specificity is particularly problematic for ICE, a legal entity that can only act through its agents. If ICE does not know which of its employees and agents allegedly participated in the fraud, it is exceptionally burdensome to investigate or contest the underlying claims.

Although Plaintiff alleges that "Defendants" submitted false claims, it never alleges "who precisely" at the Practice, other than Dr. Qamar, was allegedly "involved in the fraudulent activity" of submitting false claims. *United States v. Martin-Baker Aircraft Co.,*

*Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (affirming partial Rule 9(b) dismissal of FCA complaint).  In particular, Plaintiff does not identify anyone who submitted, or caused to be submitted, specific Medicare claims while knowing they were "false at the time they were made." *U.S. ex rel. Parato v. Unadilla Health Care Ctr., Inc.*, 787 F. Supp. 2d 1329, 1340 (M.D. Ga. 2011) (granting summary judgment for failure to show defendant's "certifications were known to be false at the time they were made").

"When pleading fraud, the plaintiff should generally identify the individuals who made the alleged misrepresentation." *U.S. ex rel. Butler v. Magellan Health Servs., Inc.*, 101 F. Supp. 2d 1365, 1368 (M.D. Fla. 2000).  Thus, in the FCA context, "Rule 9(b) requires [a complaint] to identify with specificity the individuals involved in the alleged fraud. Regarding corporate defendants, the complaint should specify who their representatives were who took part in the alleged unlawful enterprise." *U.S. ex rel. Carroll v. JFK Med. Ctr.*, No. 01-CV-8158, 2002 WL 31941007, at *5 (S.D. Fla. Nov. 15, 2002) (quotation marks and citations omitted); *accord Martin-Baker Aircraft*, 389 F.3d at 1256-57 (FCA claim alleging fraud by corporate defendant must "identify individuals allegedly involved in the fraud" and "the role these individuals played").  Failing to do so compels dismissal of the claim.  *See, e.g.*, *Brown v. Fed. Nat'l Mortg. Ass'n*, No. 1:10-CV-03289, 2011 WL 1134716, at *5 (N.D. Ga. Feb. 28, 2011) (recommending fraud complaint's dismissal with prejudice where plaintiff failed to specify the individual "who, on behalf of [the corporate defendant], allegedly made false representations"), *report and recommendation adopted*, 2011 WL 1136275 (N.D. Ga. Mar. 25, 2011).

The Complaint summarily alleges that "Defendants" submitted false claims, but does not identify the specific ICE employees or other individuals who actually completed and filed the Medicare submissions.   Nor does the Complaint even describe the Defendant's billing process.  *See*, *e.g.*, *Butler*, 74 F. Supp. 2d at 1216 ("[T]he complaint fails to refer to specific employees who may have been involved in submitting false claims. . . . [It] refers only to 'staff' generally, without identifying any actor, individual or claim involved in the alleged fraud to any extent."); *Cade v. Progressive Community Healthcare, Inc.*, 2011 WL 2837648 *5-6 (N.D. Ga. July 14, 2011) (dismissing an FCA claim where "the person or persons actually submitting the claim remain a mystery" and "the Complaint does not allege who was responsible for actually submitting claims to any federal or state entity."). Throughout these allegations, Plaintiff

- alleges that Defendants "developed and relied upon a variety of record-keeping shortcuts," but does not indicate who developed those short-cuts, when and how the short-cuts were used (if at all), or even whether the "shortcuts" were inaccurate and impermissible (Compl. ¶ 98);

- alleges that Defendants used procedure templates, diagnosis code, and billing "cheat sheets" and "boiler plate notes," but does not allege who drafted these alleged instruments, who used them, when and how often they were used, or even whether these tools were inaccurate and impermissible (Compl. ¶ 99);

- alleges that Defendants improperly utilized "reports dictated or scribed by nurse practitioners who were not always present for the duration of the procedure," without identifying who these nurse practitioners were, when and how often they allegedly

created the reports, when the reports were allegedly incorporated into Medicare submissions, or even whether such dictation and scribing was inaccurate and impermissible (*id.* ¶ 99);

- alleges that Defendants "regularly" failed to document relevant medical histories and "often" failed to document exhaustion of non-invasive procedures (*id.* ¶¶ 103-104), without identifying who failed to document these facts, explaining precisely when these documentation gaps occurred, or even any specific examples of such supposed misconduct; and

- alleges that Defendants treated an "excessive number" of patients, but does not indicate which employees or individuals supposedly orchestrated and implemented the alleged scheme to maximize patient volume (*id.* at ¶79).

Simply put, the Government has not demonstrated the "who, what, where, when, and how" of either the claim submission process or the underlying fraudulent scheme. *See Corsello* 428 F.3d at 1012. Taken together with the Government's inability to specify which procedures were "medically unnecessary" and why they were unnecessary, these additional deficiencies reduce the Complaint to a series of loosely connected ambiguities: some unnamed employees choreographed and implemented a plan to see "excessive" patients, which led to another set of unidentified employees creating various "record keeping shortcuts" and deploying them at unknown times, which in turn led to the use of those "short-cuts" in unspecified Medicare claims submitted by yet another cadre of unidentified employees, which finally resulted in the provision of some undefined subset of procedures which were "medically unnecessary" for reasons unknown.   This is exactly the type of

overreaching and speculative claim that Rule 9(b) was meant to avert.  Defendants cannot be expected to grope in the dark for the factual parameters of the Government's case.

### D.  The Complaint Does Not Plausibly or Particularly Allege Why Any Specific Waiver of Medicare Co-Payments Was Improper.

The Complaint alleges that Defendants violated the AKS, and thereby the FCA, by illegally waiving Medicare co-payments.  (*See* Compl. ¶¶ 150-159.)   Specifically, the Complaint identifies three patients for whom a litany of related Medicare claims were supposedly "tainted by the knowing and willful provision of a kickback in the form of an unjustified copayment waiver."  (*Id.* ¶¶ 152, 155, 159.)  These allegations also suffer from the same fatal vagueness that dooms the medical necessity and inadequate documentation claims.

Plaintiff generally asserts that waiver of co-payments may be improper where it is (a) routine; (b) advertised; (c) unsupported by a "good faith" assessment of the beneficiary's financial need; or (d) not preceded by a "good faith" collection effort.  (Compl. ¶¶ 66-75.)  Once again, however, Plaintiff fails to explain *why* the co-payment waivers associated with each of the three identified patients were improper.

As an initial matter, these allegations fail because the Complaint never alleges that either Defendant waived co-payments for any of these three *specific* patients with the purpose "to induce" any of them to seek Medicare services.  *See* 42 U.S.C. § 1320a-7b(b)(2) (imposing liability where person gives thing of value "to induce" Medicare utilization).  At most, the Complaint offers a single boilerplate legal conclusion, which fails under even Rule 8(a) and *Iqbal*, that Defendants "routinely" waived co-payments improperly to induce *unspecified* Medicare beneficiaries to undergo treatment (Compl. ¶ 4), without any plausible

or particular allegations that claims were ever submitted for such unspecified beneficiaries. (*See also id.* ¶ 212.)

Moreover, the Complaint does not clarify whether the disputed co-payment waivers for the three identified patients were "unjustified" because they were routine, or advertised, or were unaccompanied by a proper financial assessment, or not preceded by a collection effort, or because of some altogether different reason.   Instead, the Complaint sets forth charts with over a hundred claims and categorically declares – without elaboration - that they are all "false" because of an "unjustified co-payment waiver."   (Compl. ¶¶ 152, 155, 159.) Such boilerplate allegations cannot satisfy Rule 9(b).

As with its deficient medical necessity and inadequate documentation theories, the Complaint fails to identify the key factual contours of the alleged kickback scheme. Essentially, the Government devotes a few paragraphs to some conclusory allegations about routine or improper co-payment waivers, but adduces none of the factual underpinnings of its claim.   Throughout these allegations, Plaintiff

- insists that Defendants "routinely" and "indiscriminately" waived Medicare copayments, but offers no details as to who was responsible for assessing the financial capacity of patients, who oversaw collection efforts, who ultimately made the decision to waive copayments, and when those particular decisions were made (*id.* at ¶139);

- generically pleads that Defendants "routinely" advised patients to ignore bills, but fails to identify who furnished this advice or when they did so (*id.* at ¶143);

- asserts that knowledge of Defendants' waiver policies "spread . . . by word of mouth and other forms of publicity," but does not identify when or how such policies were allegedly disseminated (*id.* at ¶ 144);

- concludes that Defendants' collection efforts were "token," but does not even detail these in-house collection efforts, who was responsible for managing those efforts, or what the outcomes of those efforts were (*id.* at ¶ 146); and,

- implies that Defendants never gave collection instructions to its outside billing vendor, but fails to identify who was responsible for giving those instructions, when that individual failed to give those instructions, when the billing vendor solicited those instructions, or any other relevant details.  (*Id.* at ¶¶146-148).

As noted above, such speculative claims are foreclosed by Rule 9(b).

## II.   THE COMPLAINT DOES NOT PLAUSIBLY ALLEGE THAT ANY PARTICULAR CLAIM OR STATEMENT WAS KNOWINGLY FALSE.

FCA liability depends on the submission of claims that are known to be false.  Claims and statements are only "knowingly" false when a person has "actual knowledge of the information," or "acts in deliberate ignorance" or "in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1).  Although "knowledge" of a false claim "may be alleged generally," Fed. R. Civ. P. 9(b), "[c]ourts have found that even if a defendant submits a false claim, if the defendant's interpretation of a statute or regulation was reasonable, and if there is no authoritative contrary interpretation of the rule, the [complaint] cannot satisfy the knowledge requirement under the False Claims Act."  *Parker*, 2015 WL 1456122, at *8 (quotation marks omitted).

For the four patients whose treatments were allegedly unnecessary or unsupported, and the three patients whose treatments were allegedly tainted by co-payment waiver kickbacks, the Complaint never alleges that Defendants submitted those claims with knowledge that they were false. For example, the allegations concerning the latter three kickback patients merely cite record-keeping discrepancies about financial hardship forms – and concede that one patient's form was on file for a time and a third party acknowledged that another patient's form was also in file (Compl. ¶¶ 151, 157) -- or a patient's inability to recall whether he or she had provided such a form (*id.* ¶ 154). These are hardly allegations of fraudulent *scienter* on Defendants' part.[6]

Moreover, for all possible claims concerning medical necessity and documentation, the Complaint fails to allege any basis for knowing falsity before October 2011. The Complaint alleges that false claims were submitted from January 1, 2009 through December 31, 2013. (Compl. ¶ 2.) However, the applicable LCD only became effective on October 6, 2011. (*Id.* ¶ 51.) Plaintiff does not allege that any LCD (or other government document) published *before* that date authoritatively set forth Medicare's medical necessity or documentation requirements for the cardiovascular interventions at issue in this case. Absent any such LCD before October 2011, Plaintiff's performance of those procedures would have relied on its own interpretation more broadly of what constituted a medically "necessary"

---

[6] For Counts II and IV, which proceed under the FCA's false statements provision, 31 U.S.C. § 3729(a)(1)(B), Plaintiff must also allege that Defendants intended that the government rely on their allegedly false statements when deciding whether to pay a claim. *See U.S. ex rel. Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1330 (11th Cir. 2009). But the Complaint does not expressly allege that Defendants intended this as to any of the patients specifically identified. Accordingly, dismissal is warranted. *See id.*

procedure under the Medicare statute.  *See* 42 U.S.C. § 1395y(a)(1)(A).  Before October 2011, "[e]ven if the claims Defendants submitted were false, [Plaintiff] ha[s] not alleged that Defendants' interpretations of the [Medicare statute] were unreasonable." *Parker*, 2015 WL 1456122, at *9 (dismissing FCA complaint for failure to allege knowledge of falsity). Indeed, absent an operative LCD, the Complaint offers *no* basis at all for contending that Defendants impermissibly interpreted the statutory condition of medical necessity. Accordingly, Counts I and II fail. *Id.*

## III.    PLAINTIFF HAS FILED A "SHOTGUN" PLEADING.

The scattershot nature of the case is exacerbated by the Government's filing of a "shotgun" Complaint which mechanically reincorporates all 197 paragraphs of factual allegations into every single count.  "'Consequently, allegations of fact that may be material to a determination of count one, but not count four, are nonetheless made a part of count four. . . .  [I]t is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief.'" *Paylor v. Hartford Fire Ins. Co.*, No. 13-12696, 2014 WL 1363544, *7 (11th Cir. Apr. 8, 2014) (quoting *Anderson v Dist. Bd. Of Trs. Of Cent. Florida Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996)).  Accordingly, the Court should strike the Complaint and order Plaintiff to properly replead its claims. *See, e.g., Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (ordering repleading of "shotgun" complaint); *Hulse v. Wal-Mart Stores, Inc.*, No. 3:15-cv-233-J-39MCR (M.D. Fla. March 31, 2015) (*sua sponte* order striking complaint) (attached hereto as **Exhibit C**).

**IV.     PLAINTIFF FAILS TO PLEAD CLAIMS UNDER FLORIDA COMMON LAW.**

Counts V through VII of the Complaint assert causes of action under Florida common law.   These Counts all rest on the same faulty allegations underlying the FCA Counts. Accordingly, they should be dismissed for all of the reasons already discussed.

## CONCLUSION

In light of the foregoing, the United States' Complaint should be dismissed with prejudice.

Dated:  June 22, 2015                              Respectfully submitted,


 /s/ Gregory W. Kehoe
Gregory W. Kehoe (FBN 486140)              Kirk Ogrosky (*pro hac vice*)
Danielle S. Kemp (FBN 474355)              Murad Hussain (*pro hac vice*)
GREENBERG TRAURIG, P.A.                    ARNOLD & PORTER LLP
Courthouse Plaza                           555 Twelfth Street, NW
625 East Twiggs Street, Suite 100          Washington, DC  20004-1206
Tampa, FL 33602                            (202) 942-5000
(813) 318-5700                             (202) 942-5999 (facsimile)
(813) 318-5900 (facsimile)                 Kirk.Ogrosky@aporter.com
Kehoeg@gtlaw.com                           Murad.Hussain@aporter.com
Kempd@gtlaw.com

*Counsel for the Defendants*



## CERTIFICATE OF SERVICE


I hereby certify that a true and correct copy of the foregoing was served, this 22nd day of June, 2015, via CM/ECF to all parties participating in CM/ECF Electronic Noticing.


                                    /s/ Gregory W. Kehoe