**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

UNITED STATES OF AMERICA *ex rel.*
ROBERT A. GREEN; HOLLY A.
TAYLOR; and STATE OF FLORIDA,

    Plaintiffs,

v.                                                 Case No. 5:11-cv-406-Oc-37TBS

INSTITUTE OF CARDIOVASCULAR
EXCELLENCE, PLLC; ICE HOLDINGS,
PLLC; ASAD ULLAH QAMAR; and
HUMERA A. QAMAR,

    Defendants.
_____

**ORDER**

This matter is before the Court on jurisdictional review and to advise the parties of the reasons for the Court's Order dated June 15, 2015. (Doc. 50 ("June Order").)

**BACKGROUND**

The Defendants in this False Claims Act ("FCA") action—Institute of Cardiovascular Excellence, PLLC ("ICE") and Asad Ullah Qamar, M.D. ("Dr. Qamar")—are providers of "cardiovascular services to Medicare beneficiaries" in "at least three North Central Florida cities: Ocala, The Villages, and Williston."[1] (*See* Doc. 2; *see also* Doc. 10, ¶¶ 13–17.) Seeking to recover "tens of millions of dollars" (trebled) "on behalf of the United States Department of Health and Human Services ('HHS'), and its operating division, the Centers for Medicare and Medicaid Services ('CMS')," the United States of America ("Government") asserts four FCA claims and three federal common law claims

---

[1] The proper name for "Medicare" is the "Health Insurance for the Aged and Disabled Program." (*See* Doc. 10, ¶ 20.)

against Defendants.[2] (*See* Doc. 10, ¶¶ 1–6, 10, 20.)[3] All seven claims are based on Defendants' alleged "pattern and practice" (from January 1, 2009, through December 31, 2013 (the "Relevant Period")) of knowingly departing from "the rules governing Medicare coverage, claim submission, and reimbursement" by billing Medicare for "excessive, medically unnecessary, and/or inadequately documented cardiovascular procedures" ("Procedures"). (*See id.* ¶¶ 1–6, 161; *see also id.* ¶¶ 76–109.)

Providing context for the Government's allegations, the detailed Consolidated Complaint summarizes:

(1) the complex statutory and regulatory framework by which the Secretary of the HHS and CMS administers Medicare Part B (*see id.* ¶¶ 18–30 (citing Title XVIII of the Social Security Act ("SSA"), 42 U.S.C. §§ 1395–1395kkk-1, 1320c-5, and 42 C.F.R. §§ 410.10, 421.300, 421.400));

(2) the process by which Medicare B providers like Defendants submit claims for "reimbursements" (which are retrospective payments "of federal funds for health services, including physician, laboratory, outpatient, diagnostic, and radiology services") and the certifications that such providers make when they submit CMS Form 1500 Health

---

[2] This action results from the Government's intervention, pursuant to 31 U.S.C.§§ 3730(b)(2) and (b)(4)(A), in two actions that had been initiated under the FCA's *qui tam* provisions by relators Robert A. Green, M.D. ("Relator Green") (who filed his *qui tam* Complaint in July 15, 2011) and Holly A. Taylor ("Relator Taylor") (who filed her *qui tam* Complaint on June 17, 2014, *United States ex rel. Taylor v. Dr. Asad Qamar*, Case No. 8:14-cv-1454-T-35EAJ ("*Taylor* Action")). (*See* Doc. 10, ¶¶ 11–12.) At the Government's request, the Court consolidated the *Taylor* Action with this action after transferring the *Taylor* Action from the Tampa Division and assigning it a new case number—5:15-cv-179-WTH-TBS. (*See* Doc. 9; *see also* Doc. 10, ¶ 13.) Until the Government intervened, this action and the *Taylor* Action were maintained under seal in accordance with § 3730(b)(2). (Doc. 2 (unsealing Relator *Green*'s *qui tam* Complaint, lifting seal, and directing the Government to file and serve its Consolidated Complaint by April 21, 2015).)

[3] (*See also* Doc. 10, ¶¶ 4, 198–222 (alleging violations of §§ 3729(a)(1) based on Defendants' alleged presentment of false or fraudulent claims (Count I), including claims "tainted by kickbacks" in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (Count III), and related false statements (Counts II and IV)); *id.* ¶¶ 223–31 (alleging Unjust Enrichment (Count VII) and Payments under Mistake of Fact (Counts V and VI)).

>   Insurance Claim Form, CMS Form 855b (Medicare Enrollment Application for clinics/group practices and certain other suppliers), and CMS Form 855i (Medicare Enrollment Application for physicians and certain non-physician practitioners) (*see id.* ¶¶ 28–30, 56–59);
>
> (3) the guidelines, standards, and general principles that are applied to determine whether the charges claimed by a Medicare Part B provider for the diagnosis and treatment of vascular diseases (including peripheral artery disease ("PAD")) are "reasonable" and medically "necessary" (*see id.* ¶¶ 33–55, 60–61); and
>
> (4) the exceptional procedures (including pre- and post-payment claim review) that Medicare Administrative Contractors ("MACs") and Zone Program Integrity Contractors ("ZPICs") may employ to "address suspect billing practices" (*see id.* ¶¶ 24–26, 62).

(*See also id.* ¶¶ 63–75 (summarizing statutory and regulatory provisions concerning Medicare copayments and the Anti-Kickback Statute ("AKS")). Further, the Government alleges that the MAC and ZPIC who were responsible for Defendants' reimbursement claims during the Relevant Period conducted "audits and reviews" of Defendants' billing practices and instituted code-specific and comprehensive pre-payment claim reviews.[4] (*See id.* ¶¶ 179–88.) The Government alleges that a significant portion of the Defendants' claims were not approved for payment due to the pre-payment reviews.[5] (*See id.*)

Sixteen days after Defendants received copies of the Government's Consolidated Complaint (*see* Docs. 11, 12), and without filing an answer or counterclaim,[6] Defendants filed an Amended Motion for Preliminary Injunction or, Alternatively, an Injunction

---

[4] During the Relevant Period, CMS contracted with First Coast Service Options, Inc. ("First Coast") to serve as the MAC for Florida (Doc. 10, ¶¶ 24–25), and SafeGuard Services, LLC ("SafeGuard") was the ZPIC for CMS in Florida (*id.* ¶ 26).

[5] First Coast subjected Defendants to a code-specific pre-payment claim review process in 2010 and 2011, and SafeGuard subjected Defendants to a comprehensive pre-payment review in 2012, which it "reduced" to a code-specific pre-payment review in early 2013. (*See* Doc. 10, ¶¶ 179–88.)

[6] Since the June Order, Defendants filed a Motion to Dismiss the Consolidated Complaint. (Doc. 54.) That Motion is not yet ripe.

3

Pursuant to Inherent Authority, to Preserve the Status Quo and Enjoin Ongoing Retaliation (Doc. 18 ("PI Motion")). Specifically, Defendants asked the Court to enjoin the Government ("including HHS," CMS, First Coast, and SafeGuard) "from taking any action to implement or otherwise give effect to" a March 13, 2015 decision to temporarily suspend Medicare payments to Defendants ("Suspension Decision"). (*See id.*; *see also* Doc. 18-4 ("Proposed Injunction").)

Arguing that the Suspension Decision was an "unconstitutionally retaliatory litigation tactic designed to ensure that Defendants have no ability to contest" the Government's claims in this action, Defendants argued that the Court could enter the Proposed Injunction pursuant to Federal Rule of Civil Procedure 65(a) and the Court's inherent authority to sanction bad faith litigation practices. (*See* Doc. 18.) Defendants further argued that they are likely to prevail on a Fifth Amendment Due Process retaliation claim against the Government because: (1) the Government's claims in this action are meritless; (2) the pre-payment reviews already in place made the Suspension Decision unnecessary; and (3) the Suspension Decision came only seven days after Defendants informed the Government that their "discussions regarding potential resolution" were at an impasse ("Impasse Statement"), while an investigation of Defendants' Medicaid billing practices that the Department of Justice ("DOJ") commenced in September 2014 had not prompted such a decision. (*See* Doc. 43, p. 15; *see also* Doc. 18-3, p. 2.)

The Court established a briefing schedule and scheduled a hearing on the PI Motion. (Doc. 20.) The Government then filed its timely Response arguing that "the facts" readily disprove "Defendants' unfounded speculation" that the Impasse Statement caused the Government to retaliate with the Suspension Decision. (*See* Doc. 29.) The

Government supported its Response with declarations from CMS's Director of Provider Enrollment & Oversight (Doc. 29-1 ("Chong Declaration")) and from one of the Government's attorneys in this action (Doc. 29-2 ("Tarosky Declaration")). Defendants filed a Reply (Doc. 30), but they were not permitted to rebut the Government's Declarations (*see* Doc. 31).

After a Motion Hearing on May 29, 2015 (Docs. 39, 43), the Court entered an Order reserving ruling on the PI Motion pending expedited discovery on the "limited issue of the causal connection necessary for retaliation" (Doc. 41 ("Discovery Order")). The Government promptly sought reconsideration or clarification of the Discovery Order (Doc. 46 ("Reconsideration Motion")), and Defendants filed a timely Response (Doc. 48 ("Reconsideration Response"); *see also* Doc. 47). In its June Order, the Court granted the Government's Motion for Reconsideration (Doc. 46), vacated its Discovery Order (Doc. 41), and denied the PI Motion (Doc. 18).[7] (Doc. 50.) The following memorializes the Court's reasoning behind its June Order.

## LEGAL STANDARDS

The Court has an ongoing obligation to inquire into its jurisdiction "whenever the possibility that jurisdiction does not exist arises."[8] *See Fitzgerald v. Seaboard Sys. R.R.,*

---

[7] On May 28, 2015, CMS enacted a three-year revocation of Defendants' Medicaid payments, which is subject to review by appeal ("Revocation"). (Doc. 43, pp. 31–32, 46.) Because the Revocation would prevent Defendants from receiving Medicare reimbursement payments, it appears that the Proposed Order would not restore the status quo or prevent any irreparable harm to Defendants. This provides an additional reason to grant the Government's Motion and deny the PI Motion.

[8] Defendants argue that the Government has not met its heavy burden to establish that reconsideration of the June Order is warranted based on: (1) newly discovered evidence; (2) demonstrated clear error or manifest injustice; or (3) an intervening change in the controlling law. (*See* Doc. 48.) The Court finds that the reconsideration standard is inapplicable because the Court's decision was based entirely on the threshold issue of

*Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985). Jurisdiction cannot exist over a claim asserted against the federal government absent a finding that the government unequivocally consented to be sued on the claim (*i.e.* waived *sovereign immunity*). *See Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text."); *United States v. Dalm*, 494 U.S. 596, 605 (1990); *Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1249 (11th Cir. 1996) ("The United States must expressly and unambiguously waive its sovereign immunity before it can be sued."); *see also United States v. United States Fid. & Guaranty Co.*, 309 U.S. 506, 514 (1940) ("Consent alone gives jurisdiction to adjudge against a sovereign.").

The party asserting a claim against the government has the burden to establish a waiver of sovereign immunity. *See Thompson v. McHugh*, 388 F. App'x 870, 872 (11th Cir. 2010). A waiver "cannot be implied" and any ambiguity concerning the existence or scope of the government's waiver must be construed in favor of the government. *See Ramos v. U.S. Dep't of Health & Human Serv.*, 429 F. App'x 947, 950 (11th Cir. 2011) (narrowly construing waiver under the Federal Tort Claims Act); *see also F.A.A. v. Cooper*, 132 S. Ct. 1441, 1456 (2012) (narrowly construing waiver of sovereign immunity in Privacy Act).

### DISCUSSION

Absent a pleading setting forth Defendants' claim against the Government and the grounds for jurisdiction, the Court has carefully considered each of the arguments for jurisdiction raised in Defendants' briefing. (*See* Docs. 18, 30, 48.) Defendants' primary

---

jurisdiction.

argument is that the Court's jurisdiction is founded in its "inherent equitable authority" to address "abuses of the litigation process," to preserve the "status quo," and to protect the Court's ability to render judgment in this action. (*See* Doc. 18, pp. 2–4, 12–17; Doc. 30, pp. 2–3; *see also* Doc. 48, pp. 4–9.) In their Reconsideration Response, Defendants also point to the All Writs Act, 28 U.S.C. § 1361, as "'a codification of the federal courts' traditional, inherent power to protect the jurisdiction they already have, derived from some other source.'" (Doc. 48, p. 5 n.2 (quoting *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1099 (11th Cir. 2004)).) Finally, Defendants argue that discovery is permissible based on their *prima facie* case of retaliation because the discovery goes to the "contested issue" of jurisdiction. (*See id.* at 6–7.)

Upon consideration, the Court finds that Defendants failed to satisfy their burden to establish that the Government has unequivocally waived its sovereign immunity for a Fifth Amendment retaliation claim, for an injunctive relief claim, or for a claim seeking judicial review of the Suspension Decision. First, to the extent the Defendants' claim would seek review of the Suspension Decision, the Court lacks jurisdiction because the Defendants have not yet exhausted their administrative remedies. *See* 42 U.S.C. § 405(g); *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 15, 23–24 (1999) (explaining that, under § 405, an individual must present a claim to the agency for review before seeking federal judicial review); *Heckler v. Ringer*, 466 U.S. 602, 627 (1984) (stating that "administrative remedies [must] be exhausted before judicial review" and explaining that "Congress must have felt that cases of individual hardship resulting from delays in the administrative process had to be balanced against the potential for overly casual or premature judicial interference in an administrative system").

Second, Defendants' have pointed to no statute whereby the Government unequivocally waived sovereign immunity for a retaliation claim under the Fifth Amendment. *See Ivey v. Paulson*, 222 F. App'x 815, 820 (11th Cir. 2007) (affirming dismissal of Fifth Amendment claim "because the Constitution does not waive sovereign immunity" and the claim was not brought "under a specific statute").

The Court rejects Defendants' argument that the Court may exercise jurisdiction pursuant to its inherent authority to preserve the status quo when a party acts in bad faith.[9] (*See* Doc. 48, pp. 4–5.) Although the Court is vested with such inherent authority, *see Peer v. Lewis*, 606 F.3d 1306, 1315 (11th Cir. 2010), the Court is persuaded by the decision of the U.S. Court of Appeals for the First Circuit that "sovereign immunity ordinarily will trump supervisory power [also known as 'inherent power'] in a head-to-head confrontation." *See United States v. Horn*, 29 F.3d 754, 763 (1st Cir. 1994) (noting that "supervisory powers are discretionary and circumscribed; sovereign immunity is mandatory and absolute. . . . [U]nlike the doctrine of supervisory power, the doctrine of sovereign immunity proceeds by fiat: if Congress has not waived the sovereign's immunity in a given context, the courts are obliged to honor that immunity").

---

[9] The temporal proximity between the Defendants' refusal to settle and HHS's (via CMS) decision to suspend Defendants' Medicare payments raises an index of suspicion of retaliation and bad faith. Assuming, arguendo, that the Court adopted the Government's proposed alternative method of developing the record—permitting depositions by written question consisting "solely" of the following question: "Was the suspension decision made because of Defendants' exercise of a Fifth Amendment right to defend against the Government's claim of fraud?" (Doc. 46, p. 14)—and that one of its witnesses answered "yes" (an unlikely outcome), leading to the conclusion that the Government acted in a bad faith manner, the Court would still be without jurisdiction over the claim.

Moreover, Defendants' reliance on the All Writs Act as a codification of the Court's "inherent power to protect the jurisdiction they already have, derived *from some other source*" (Doc. 48, p. 5 n.2 (emphasis added)) is unpersuasive. The "other source" of jurisdiction identified by Defendants—28 U.S.C. § 1345—confers jurisdiction for the Government's claims, not for a counterclaim asserted by Defendants.[10] *See* Fed. R. Civ. P. 13(d) ("[The rules regarding counterclaims and crossclaims] do not expand the right to assert a counterclaim—or to claim a credit—against the United States or a United States officer or agency.")

Assuming, arguendo, that the Government waived its sovereign immunity, a preliminary injunction would not be an appropriate sanction for the Court to impose pursuant to its inherent authority. *See Timmons*, 672 F.2d at 1379 (explaining that when the Government waives it sovereign immunity by bringing an action, it does so only "to the extent of defeating [its] claim but not to the extent of a judgment against [it] which is affirmative in the sense of involving relief different in kind or nature to that sought by [it] or in the sense of exceeding the amount of [its] claims" (citation omitted)); *Patterson*, 206 F.2d at 348 ("[I]t is beyond dispute that unless expressly permitted by an Act of Congress, no injunction can be granted against the United States."); *United States v. Associated Air Transp., Inc.*, 256 F.2d 857, 862 (5th Cir. 1958) ("It is well settled by the cases that the United States does not waive its immunity from the imposition upon it of

---

[10] The United States may waive sovereign immunity when it institutes an action, but only as to counterclaims which assert matters in recoupment that arise out of the same transaction or occurrence which is the subject matter of the Government's suit. *United States v. Timmons*, 672 F.2d 1373, 1379–80 (11th Cir. 1982) (citing *Frederick v. United States*, 386 F.2d 481, 488 (5th Cir. 1967). A retaliation claim is not a matter of recoupment.

an injunction or other unauthorized remedy by coming into court with a claim or counter-claim.").

In this case, the Government asserts that it has not waived its sovereign immunity as to Defendants' counterclaim, and Defendants failed to counter that assertion by identifying any statutory text that sets forth the requisite waiver. The Court therefore does not have discretion to entertain any proposed counterclaim or to enter an injunction. *See, e.g.*, *Alexander v. FBI*, 541 F. Supp. 2d 274, 300–01 (D. D.C. 2008) (explaining that courts cannot exercise their inherent power to sanction misconduct over the United States and impose monetary sanctions against the government absent a waiver of sovereign immunity).

**DONE AND ORDERED** in Chambers in Orlando, Florida, on July 6, 2015.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record